```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                     TYLER DIVISION

 3

 4   UNITED STATES OF AMERICA      )(
                                   )(    CASE NO. 6:22cr3
 5                                 )(
          VS.                      )(
 6                                 )(
                                   )(
 7   SUSAN L. HERTZBERG (1)        )(
     MATTHEW JOHN THEILER (2)      )(
 8   DAVID WELDON KRAUS (3)        )(    Tyler, Texas
     THOMAS GRAY HARDAWAY (5)      )(    8:37 a.m.
 9   JEFFREY PAUL MADISON (7)      )(    October 16, 2023

10

11

12

13

14

15       TRANSCRIPT OF PRETRIAL AND VOIR DIRE EXAMINATION

16                        VOLUME 1

17       BEFORE THE HONORABLE JEREMY D. KERNODLE,

18            UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25
```

09:39:09  1  the MSOs did, and about why so many people across the state

09:39:12  2  of Texas were referring lab tests through Little River.

09:39:16  3        You will hear about Hertzberg being warned about

09:39:18  4  Boston Heart not having a compliance program and about the

09:39:21  5  MSOs paying doctors for referrals.

09:39:24  6        You will see and hear evidence about Hertzberg and

09:39:27  7  Theiler taking steps to limit the circulation of detailed

09:39:30  8  information regarding Little River, including to Boston

09:39:34  9  Heart's board of directors.  You will hear about them

09:39:37  10  becoming upset when information was actually shared.

09:39:41  11        You'll also hear about Madison being concerned

09:39:46  12  about Little River's name being used to open the healthcare

09:39:48  13  industry in general.

09:39:49  14        And you will hear also about some very late

09:39:52  15  attempts to try to provide more cover for the scheme.

09:39:55  16        You will hear about the parties negotiating a

09:39:58  17  joint venture which would allow Little River to be more

09:40:01  18  involved in the performance of the tests.

09:40:03  19        There were talks about building some parts of the

09:40:05  20  lab in Little River, and there were parts about entering

09:40:09  21  into a joint venture agreement with Boston Heart where

09:40:11  22  Little River would control some of the lab aspects in

09:40:14  23  Boston.

09:40:14  24        But you'll also hear that this did not happen.

09:40:17  25        You will hear -- you will hear and see about

09:40:20  1    attempts by Madison and Ryan Downton to have the marketing

09:40:25  2    companies and doctors sign attestations that the MSOs were

09:40:28  3    not paying doctors.  You'll get a chance to see those

09:40:32  4    attestations.

09:40:33  5          Pay attention to the very first bullet point.  You

09:40:35  6    will see the following language:  Neither I nor any of my

09:40:39  7    immediate family members have a direct or indirect

09:40:43  8    financial relationship with the MSO or any agents or

09:40:46  9    affiliates of the MSO.

09:40:50  10          Pay attention to the language where they ask the

09:40:53  11   doctors to sign that the doctors have never received

09:40:56  12   anything of value from the MSO or affiliates of the MSO in

09:40:59  13   exchange for referrals.

09:41:01  14          The evidence will show that Madison and Downton

09:41:05  15   knew that these attestations were false and were only being

09:41:08  16   used to conceal the scheme.

09:41:10  17          Now, the evidence will also show that the

09:41:13  18   relationship between Little River and Boston Heart began to

09:41:16  19   fray in -- by 2016.  Little River did continue to work with

09:41:21  20   Boston Heart, but Little River was now also working with

09:41:24  21   True Health, Boston Heart's biggest competitor in Texas.

09:41:28  22          You will also hear that the other Texas MSO

09:41:32  23   hospital, Integrity, was having a hard time paying Boston

09:41:36  24   to perform the tests.

09:41:37  25          I anticipate that the evidence will show that

09:41:39  1  Hertzberg and Theiler began evaluating other contingency

09:41:43  2  hospitals to maintain the ability to provide this MSO model

09:41:47  3  to the doctors in Texas.

09:41:48  4       You will hear evidence that they were concerned

09:41:50  5  about maintaining the revenue that was associated with the

09:41:53  6  MSO hospitals in Texas and the pressure to maintain those

09:41:57  7  high levels of revenue.

09:41:58  8       Now, through Robert O'Neal, the MSO owner, the

09:42:05  9  Beaumont chiropractor, who was now partnered with Laura

09:42:06  10  Howard, one of Boston Heart's top sales reps, they found a

09:42:08  11  hospital.  That hospital was Stamford Memorial Hospital in

09:42:13  12  Stamford, Texas.

09:42:15  13       Theiler negotiated the deal.  Hertzberg approved

09:42:18  14  the pricing, and the same CFO that signed the Little River

09:42:21  15  contract signed the contract on behalf of Boston Heart.

09:42:25  16       You will hear that at or near the same time,

09:42:29  17  Hertzberg was fighting with the parent company over money,

09:42:32  18  control, and transparency of Boston Heart.  And in May

09:42:39  19  of 2016, she notified her parent company that she intended

09:42:41  20  to resign and began negotiating those terms.

09:42:44  21       You'll also see that days later, a whistleblower

09:42:48  22  e-mailed Hertzberg directly, copying several executives

09:42:52  23  within the company, telling everybody about the unlawful

09:42:55  24  activity related to the MSO model in Texas.

09:42:56  25       And the evidence will show that Hertzberg and

09:42:58  1  Theiler did not take steps to end the relationship with

09:43:01  2  those MSO hospitals, and that they actually retained

09:43:05  3  financial interest in the success of the scheme.

09:43:07  4      You'll also hear that doctors continued to receive

09:43:11  5  payment from Madison and Little River through Robert

09:43:15  6  O'Neal's MSO until at least 2017.

09:43:19  7      Now, these Defendants stand before you charged

09:43:21  8  with one count of conspiracy.  And Judge Kernodle explained

09:43:24  9  to you what a conspiracy is.  And I expect at the end of

09:43:27  10  the trial, that Judge Kernodle is going to instruct you

09:43:30  11  that a conspiracy is just an agreement between two or more

09:43:33  12  people to do something unlawful.

09:43:35  13      Here it's just that, an agreement, an

09:43:37  14  understanding between the Defendants and others to do

09:43:39  15  something that the law forbids.

09:43:41  16      Now, in this case, it was an agreement to enrich

09:43:44  17  themselves through an arrangement that provided

09:43:46  18  remuneration to doctors and marketers, in violation of the

09:43:50  19  AKS, the Anti-Kickback Statute.

09:43:54  20      Now, I anticipate that you will hear different

09:43:58  21  defenses from different Defendants.

09:44:00  22      I anticipate that Hertzberg will argue that she

09:44:03  23  was the CEO of a national lab company and could not

09:44:06  24  possibly know everything that was going on with one client

09:44:08  25  and one region.  The same goes for Matthew Theiler, the

09:44:13  1  vice president of sales.

09:44:14  2          Now, pay attention to the evidence and the

09:44:17  3  testimony about Hertzberg and Theiler's personal

09:44:19  4  involvement in the deal and their communications.

09:44:22  5          Pay attention to the significance of Little River

09:44:25  6  as a client to Boston Heart and how its financial

09:44:28  7  performance was being monitored closely by both of them.

09:44:32  8          Pay attention to the evidence that shows that the

09:44:35  9  steps they took to understand the model, the client, and

09:44:38  10 how to emulate it to be able to retain the doctors that

09:44:41  11 were supposedly Little River doctors.

09:44:43  12         Now, I anticipate that they will also try to

09:44:48  13 criticize the Government's investigation.  Pay attention to

09:44:51  14 whether they create straw man arguments over immaterial

09:44:54  15 issues.

09:44:55  16         I anticipate that they will argue that Boston

09:44:57  17 Heart's parent company falsely blamed them and got minor

09:45:01  18 details wrong.

09:45:03  19         Pay attention to the corroborating evidence and

09:45:05  20 the testimony from other sources, and closely examine

09:45:05  21 whether they are exaggerating supposed misrepresentations.

09:45:14  22         Now, I anticipate that they will also argue that

09:45:16  23 certain witnesses couldn't remember the exact dates of

09:45:18  24 meetings or the locations from years prior, or that there

09:45:22  25 were even two Stamford hospitals.

09:45:25  1        Again, pay attention to the corroborating evidence
09:45:28  2    and testimony and evaluate whether any of these
09:45:31  3    exaggerations matter.
09:45:33  4        Now, I also expect Hertzberg and Theiler to argue
09:45:36  5    that they hired a vice president to oversee the hospital
09:45:38  6    business, hired a vice president to oversee compliance, and
09:45:41  7    that Boston Heart had a lawyer.  Pay close attention to
09:45:46  8    when these people were hired in the context of the
09:45:48  9    conspiracy.
09:45:49  10        I expect you will hear from two of them that they
09:45:52  11    are not provided all of the facts, that they are walled
09:45:56  12    off, and that they actually did raise concerns to Hertzberg
09:46:00  13    and Theiler.  Pay attention to whether they were merely
09:46:03  14    covered.
09:46:04  15        Now, regarding the lawyer, pay attention to
09:46:07  16    whether the lawyer was actually asked to provide legal
09:46:10  17    advice and whether he was actually competent to provide an
09:46:13  18    opinion.
09:46:16  19        Now, I anticipate David Kraus and Thomas Gray
09:46:22  20    Hardaway will take another route, and they'll argue that
09:46:23  21    they actually did know how the conspiracy operated, but
09:46:25  22    they thought that it was okay because Theiler and Hertzberg
09:46:28  23    knew.
09:46:29  24        Pay attention to the evidence and testimony
09:46:31  25    regarding what Hardaway and Kraus learned about the MSO

| | | |
|---|---|---|
| 09:46:35 | 1 | model, their knowledge and experience about the |
| 09:46:38 | 2 | anti-kickback laws, and whether their arguments make any |
| 09:46:40 | 3 | sense. |
| 09:46:44 | 4 | Regarding Hardaway, pay close attention to other |
| 09:46:44 | 5 | warnings that he may have received. |
| 09:46:46 | 6 | Now, I anticipate Jeff Madison will take yet |
| 09:46:50 | 7 | another route and will argue that he was relying on the |
| 09:46:54 | 8 | advice of Ryan Downton and other lawyers.  Ryan Downton did |
| 09:46:56 | 9 | happen to be a lawyer and at certain points served as the |
| 09:47:00 | 10 | chief legal officer of Little River. |
| 09:47:01 | 11 | But the evidence will also show that Madison knew |
| 09:47:04 | 12 | that Downton was an owner of Little River, who held a |
| 09:47:08 | 13 | substantial financial interest in the success of the |
| 09:47:10 | 14 | conspiracy. |
| 09:47:11 | 15 | The evidence will show that Madison could not in |
| 09:47:15 | 16 | good faith rely on Downton's legal advice, and that that's |
| 09:47:18 | 17 | why they sought the advice of other attorneys. |
| 09:47:20 | 18 | The evidence will show that Madison and Downton |
| 09:47:25 | 19 | knew that they were paying MSOs to pay doctors to send |
| 09:47:28 | 20 | referrals to Little River, and that some were claims for |
| 09:47:29 | 21 | which payment may be made in whole or in part by a federal |
| 09:47:31 | 22 | healthcare program. |
| 09:47:33 | 23 | The evidence will also show that, despite |
| 09:47:37 | 24 | receiving legal advice from a neutral outside party, they |
| 09:47:41 | 25 | did not provide him with all the facts, they did not listen |

| | | |
|---|---|---|
| 09:47:43 | 1 | to his advice, and they used him to draft attestations |
| 09:47:46 | 2 | Madison and Downton knew to be false. |
| 09:47:51 | 3 | I also anticipate that one of the main issues in |
| 09:47:54 | 4 | this case will be the issue of willfulness. |
| 09:47:57 | 5 | Now, the Government must prove that Defendants |
| 09:47:59 | 6 | agree to engage in the illegal conduct, and that they knew |
| 09:48:02 | 7 | that their illegal -- that their conduct was unlawful. |
| 09:48:06 | 8 | Now, I expect the instruction from the Court to |
| 09:48:08 | 9 | read something like this:  Willfulness in the Anti-Kickback |
| 09:48:14 | 10 | Statute means that the act was committed voluntarily, |
| 09:48:15 | 11 | purposely, with the specific intent to do something the law |
| 09:48:17 | 12 | forbids; that is to say, with bad purpose either to disobey |
| 09:48:22 | 13 | or disregard the law. |
| 09:48:24 | 14 | Now, the Government must prove that the Defendant |
| 09:48:27 | 15 | acted with knowledge that his conduct was unlawful. |
| 09:48:29 | 16 | However, the Government does not need to prove that |
| 09:48:32 | 17 | Defendant had actual knowledge of the Anti-Kickback Statute |
| 09:48:35 | 18 | or a specific intent to commit a violation of the |
| 09:48:38 | 19 | Anti-Kickback Statute.  Consider this, pay attention and |
| 09:48:41 | 20 | use your common sense. |
| 09:48:45 | 21 | I don't anticipate the Defense will argue that |
| 09:48:47 | 22 | they didn't know that doctors -- that paying doctors or |
| 09:48:51 | 23 | marketers for referrals was unlawful.  These were all |
| 09:48:55 | 24 | experienced healthcare professionals, and they know the |
| 09:48:57 | 25 | rules. |

1                              I N D E X

2

3    WITNESSES FOR THE GOVERNMENT                      PAGE

4

     JASON DEMATTIA, MD
5    Direct Examination Continued by Mr. A. Garcia    647
     Voir Dire Examination by Mr. Lewis               670
6    Direct Examination Continued by Mr. A. Garcia    672
     Voir Dire Examination by Mr. Ansley              679
7    Direct Examination Continued by Mr. A. Garcia    688
     Cross-Examination by Mr. Lewis                   705
8    Cross-Examination by Mr. Mr. Paldino             724
     Cross-Examination by Mr. Ansley                  727
9    Cross-Examination by Mr. Ariail                  730
     Cross-Examination by Mr. Besen                   732
10   Redirect Examination by Mr. A. Garcia            733
     Recross-Examination by Mr. Lewis                 741
11   Recross-Examination by Mr. Ansley               745
     Further Redirect Examination by Mr. A. Garcia    746

12

13   RUBEN MARIONI
     Direct Examination by Mr. Kummerfeld             749

14

15

16                      *      *      *

17

18

19

20

21

22

23

24

25

04:38:35  1  time the Government would offer 773.

04:38:37  2        THE COURT:  Same objection as before, Mr. Lewis?

04:38:41  3        MR. LEWIS:  Yes, sir.

04:38:42  4        THE COURT:  Overruled.  It's conditionally

04:38:43  5  admitted.

04:38:45  6        MR. KUMMERFELD:  If we could, Ms. McCullars, let's

04:38:49  7  start at the very bottom.

04:38:51  8  BY MR. KUMMERFELD:

04:38:56  9  Q.  All right.  This appears to be an invite of some sort;

04:39:00  10  is that right?

04:39:00  11  A.  Yes, sir.

04:39:02  12  Q.  Okay.  Who is it sent from and who is it sent to?

04:39:08  13  A.  It's sent from Mr. Todd Cook, and it's sent to Jordan

04:39:14  14  Perkins and myself.

04:39:15  15  Q.  Sorry, I'm at the very bottom of the page.  If you'll

04:39:19  16  go to -- you could probably see it on the screen better,

04:39:22  17  but you're also welcome to look in the notebook.  I'm

04:39:25  18  looking here at the bottom of the e-mail and working our

04:39:28  19  way up to the top.  Can we do that?

04:39:30  20  A.  Yes.

04:39:32  21  Q.  So this appears to be an invite sent on February 3,

04:39:35  22  2015.  Who sent this invite?

04:39:37  23  A.  Mr. Todd Cook.

04:39:39  24  Q.  Okay.  Does it say on behalf of Jordan Perkins right

04:39:42  25  there?

04:39:42  1  A.  I'm sorry.  I'm already on the wrong thing.  On behalf
04:39:46  2  Mr. Jordan Perkins.
04:39:47  3  Q.  And who is it sent to?
04:39:48  4  A.  It's sent to himself and Mr. Todd Cook.
04:39:52  5  Q.  Okay.  Is this the meeting invite that kind of stood
04:39:58  6  for the meeting that you guys went to, your first meeting
04:40:01  7  together?
04:40:01  8  A.  Yes, sir.  This would be the first meeting we ever had
04:40:05  9  with Mr. Todd Cook.
04:40:06  10  Q.  Yes.  And it gives the address there.  Is that in
04:40:09  11  Conroe, Texas?
04:40:10  12  A.  Yes.  This is the restaurant.
04:40:11  13  Q.  All right.  So following that meeting, a few days
04:40:15  14  later, there's a communication.  What does Mr. Cook relate
04:40:19  15  to you and Mr. Perkins?
04:40:21  16  A.  Would you like for me to read it?
04:40:24  17  Q.  Yeah.  We'll take it paragraph by paragraph.
04:40:27  18  A.  "Hi, Mr. Jordan Perkins and Ruben Marioni.  Great
04:40:33  19  getting to meet you both.  I have copied Mr. Jeff Madison,
04:40:36  20  CEO; Ryan Downton, attorney; and Heidi Riding, our
04:40:40  21  territory manager, on this e-mail as well."
04:40:44  22  Q.  In your meeting with Mr. Cook, did he identify who the
04:40:47  23  different principals of Little River were?
04:40:50  24  A.  Yes, sir.
04:40:50  25  Q.  By this time you knew that Jeff Madison was the CEO?

| | | |
|--|--|--|
| 04:40:54 | 1 | A.  Yes, sir. |
| 04:40:55 | 2 | Q.  Had you already heard of Ryan Downton, or was this new |
| 04:40:59 | 3 | in this e-mail? |
| 04:41:00 | 4 | A.  No.  Todd Cook told us in a meeting -- when we met in |
| 04:41:05 | 5 | person that he would introducing us to Jeff Madison and |
| 04:41:09 | 6 | Ryan Downton. |
| 04:41:09 | 7 | Q.  Okay.  And if we go on to the next paragraph, what does |
| 04:41:17 | 8 | Mr. Cook indicate that Ryan Downton will send you and |
| 04:41:20 | 9 | Jordan Perkins? |
| 04:41:21 | 10 | A.  Repeat the question, please. |
| 04:41:22 | 11 | Q.  Yes.  In the second paragraph, what does Mr. Cook |
| 04:41:27 | 12 | indicate that Ryan Downton will be sending you and |
| 04:41:30 | 13 | Mr. Perkins? |
| 04:41:30 | 14 | A.  He will be sending a nondisclosure agreement. |
| 04:41:33 | 15 | Q.  Okay.  And also include a marketing agreement? |
| 04:41:36 | 16 | A.  Yes, a generic marketing agreement. |
| 04:41:39 | 17 | Q.  In the third paragraph, is there a proposal for a |
| 04:41:45 | 18 | follow-up meeting? |
| 04:41:45 | 19 | A.  Yes, there is. |
| 04:41:46 | 20 | Q.  And when's that supposed to take place? |
| 04:41:49 | 21 | A.  The Thursday following. |
| 04:41:52 | 22 | Q.  And then what does he ask you in the final paragraph? |
| 04:41:57 | 23 | A.  Where do you want me to start to -- starting -- for |
| 04:42:10 | 24 | Heidi to be speaking to the doctors. |
| 04:42:14 | 25 | Q.  He uses the term "collectors"? |

| | | |
|---|---|---|
| 04:42:17 | 1 | A.  Uh-huh. |
| 04:42:17 | 2 | Q.  What does that mean? |
| 04:42:19 | 3 | A.  Collectors is the person selected to collect specimens. |
| 04:42:25 | 4 | Q.  Okay.  And what kind of specimen were you talking about |
| 04:42:28 | 5 | collecting with Todd Cook? |
| 04:42:30 | 6 | A.  Urine collections. |
| 04:42:33 | 7 | Q.  Okay.  Was the topic of collectors addressed in your |
| 04:42:36 | 8 | first meeting with Todd Cook? |
| 04:42:38 | 9 | A.  Yes. |
| 04:42:38 | 10 | Q.  And what did Mr. Cook tell you about the issue of |
| 04:42:42 | 11 | collectors in your first meeting? |
| 04:42:43 | 12 | A.  He said that the collections would not be a problem. |
| 04:42:47 | 13 | Many times we can -- they would hire on the collector |
| 04:42:50 | 14 | within the office -- from an office employee. |
| 04:42:53 | 15 | Q.  From whose office? |
| 04:42:54 | 16 | A.  From the physician's office employee. |
| 04:42:56 | 17 | Q.  And who would hire them? |
| 04:42:59 | 18 | A.  Little River. |
| 04:42:59 | 19 | Q.  Okay.  Would you have to hire them? |
| 04:43:01 | 20 | A.  No. |
| 04:43:01 | 21 | Q.  Would the lab have to hire them? |
| 04:43:04 | 22 | A.  No. |
| 04:43:05 | 23 | Q.  Would the doctor have to hire them? |
| 04:43:06 | 24 | A.  No. |
| 04:43:07 | 25 | Q.  And so here you indicate he's asking you for some areas |

EXHIBIT A

04:43:17   1   where you want start.  What does that mean?
04:43:20   2   A.  We expressed that we were in various areas.  So he
04:43:25   3   wanted to know where do we want to start, which area do we
04:43:29   4   want to start, since Houston was, according to him, a very
04:43:32   5   big landscape compared to Rockdale.
04:43:36   6   Q.  What areas were you in?
04:43:37   7   A.  We were throughout Houston.
04:43:41   8   Q.  Greater Houston area?
04:43:44   9   A.  Yes, sir.
04:43:47  10   Q.  All right.  I'll ask you to look at the next e-mail
04:43:51  11   that's there in that notebook.  It's marked Government's
04:43:56  12   Exhibit 774.
04:44:01  13   A.  (Witness complies.)
04:44:03  14       Yes, sir.
04:44:03  15   Q.  Are you familiar with that e-mail?
04:44:04  16   A.  Yes, I am.
04:44:06  17   Q.  And this is just the next day, right?
04:44:09  18   A.  Yes, sir.
04:44:11  19   Q.  Or maybe it's the -- I apologize.  It looks like it
04:44:15  20   starts on the same day.
04:44:17  21       Okay.  If we -- and if you'll look at the third
04:44:21  22   page and kind of work your way up, are these e-mails sent
04:44:24  23   from Jordan Perkins to Todd Cook, copying you, Ryan
04:44:30  24   Downton, and Jeff Madison; and just continuing that
04:44:32  25   discussion that was started earlier?

04:44:34  1  A.  Yes.  It's from the same thread.

04:44:38  2       MR. KUMMERFELD:  Your Honor, at this time the

04:44:40  3  Government would offer Government's Exhibit 774.

04:44:41  4       THE COURT:  It's admitted.

04:44:44  5  BY MR. KUMMERFELD:

04:44:44  6  Q.  All right.  If we could start on the third page and

04:44:47  7  work our way to the front.

04:44:49  8       This first e-mail, I didn't ask you earlier, what

04:44:57  9  was the subject line of this e-mail and this e-mail chain?

04:44:59  10  A.  Subject line:  Tox Discussion for Spring MSO.

04:45:06  11  Q.  So that initial conversation with Mr. Cook, did you

04:45:09  12  have the opportunity to discuss MSOs?

04:45:11  13  A.  Yes.

04:45:12  14  Q.  How did you describe your MSOs to Mr. Cook?

04:45:18  15  A.  We just got the MSO simply as a physician investment

04:45:24  16  opportunity in which we can send referrals to any given

04:45:29  17  place in exchange for money.

04:45:31  18  Q.  All right.  So let's look at this e-mail.

04:45:38  19       What does Jordan Perkins say to Todd Cook?

04:45:41  20  A.  "Thank you for your e-mail, Todd.  Your thorough

04:45:47  21  follow-up -- your through follow-through is much

04:45:49  22  appreciated.  The opportunity is very promising, and we

04:45:56  23  look forward to working at the team at Little River

04:45:59  24  Healthcare."

04:45:59  25  Q.  He asked you about areas you wanted to start.  In this

04:46:02  1  next paragraph, does Jordan Perkins kind of respond to that

04:46:06  2  and indicate that y'all all have identified some offices?

04:46:09  3  A.  Yes, sir.

04:46:11  4  Q.  When Mr. Perkins said he would like to start training,

04:46:15  5  you've been making calls and you would like to start

04:46:17  6  training, what does that mean?  What kind of training are

04:46:19  7  you -- what kind of training is going to take place?

04:46:22  8  A.  Logistical training as far as how we would fill out the

04:46:28  9  paperwork, where to collect it, where to send it to.

04:46:35  10  Q.  And then in the next sentence, he indicates you'll

04:46:39  11  confirm it and reach out to Todd Cook for training times.

04:46:47  12        Why did he say that?  Is Todd Cook supposed to be

04:46:50  13  involved in it, based on the discussions you've had?

04:46:52  14  A.  Yes.  Todd wanted to be involved in setting up the

04:46:57  15  first few offices before releasing it to Heidi.

04:47:00  16  Q.  Okay.  And you indicate that you're open for a meeting

04:47:05  17  that following Thursday; is that right?  Or Mr. Perkins is?

04:47:09  18  A.  Yes.

04:47:09  19  Q.  Okay.  Let's go to the e-mail before that.  The bottom

04:47:15  20  of page 1.

04:47:20  21        And here we see -- which individual from Little

04:47:25  22  River is responding back?

04:47:27  23  A.  Mr. Jeff Madison.

04:47:30  24  Q.  Okay.  How does he identify himself?

04:47:32  25  A.  My name is Jeff Madison.  I am the CEO of Little River

04:47:37  1  Healthcare.

04:47:37  2  Q.  Does he indicate whether or not he'll meet with you

04:47:41  3  this week?

04:47:42  4  A.  Yes.

04:47:42  5  Q.  Okay.  And that meeting is scheduled through Todd for

04:47:48  6  Thursday.  He says he should be on the ground by 10:00 a.m.

04:47:55  7       What did he mean by that?

04:47:56  8  A.  That means he would be arriving in his private jet on

04:48:01  9  that Thursday and meeting with Todd.

04:48:05  10  Q.  Okay.  And how is he going to get from the airport to

04:48:08  11  the restaurant where you're going to meet?

04:48:12  12  A.  Todd will be picking him up and taking him to the

04:48:16  13  restaurant.

04:48:16  14  Q.  Does he ask you if you have a recommendation for a

04:48:20  15  place to eat lunch?

04:48:22  16  A.  Yes, sir.

04:48:23  17  Q.  Does he indicate that he'll pay for your lunch?

04:48:26  18  A.  Yes.

04:48:27  19  Q.  And what does he say about discussions about an NDA, or

04:48:34  20  a non-disclosure agreement?

04:48:37  21  A.  He said he asked his attorney to develop a NDA for our

04:48:43  22  review.

04:48:44  23  Q.  And if we go to the second to last paragraph of that

04:48:47  24  e-mail, does he also indicate that some other documents

04:48:50  25  will be forwarded to you?

04:48:52  1   A.  Yes.

04:48:53  2   Q.  And what kind of documents are those?

04:48:55  3   A.  We will be forwarded a draft marketing and management

04:48:59  4   agreement.

04:48:59  5   Q.  All right.  If we go to the top of that e-mail chain,

04:49:04  6   Mr. Perkins responds?

04:49:06  7   A.  "Jeff, thank you very much for making time on Thursday.

04:49:13  8   A lunch meeting would work very well.  Both Ruben and I

04:49:16  9   look forward to meeting with you and getting this project

04:49:19  10  off the ground."

04:49:20  11  Q.  In the third paragraph you mention toxicology as a

04:49:24  12  service line you can work together on.

04:49:26  13       Did you envision other service lines that you

04:49:30  14  could work with Little River on?

04:49:31  15  A.  Yes, sir.

04:49:32  16  Q.  And what kind of service lines were those?

04:49:35  17  A.  At this time, I knew there were many service lines

04:49:40  18  that -- that were operational throughout the Houston area.

04:49:44  19  Toxicology was just -- was one of very many.  So labs was

04:49:51  20  the one that we had in mind.

04:49:53  21  Q.  All right.  And you identify the name of the company as

04:49:59  22  the company that we just saw in the corporation paperwork

04:50:02  23  for; is that right?

04:50:03  24  A.  That's correct, sir.

04:50:04  25  Q.  Where do you recommend meeting for -- where does

| | | |
|---|---|---|
| 04:50:08 | 1 | Mr. Perkins recommend meeting for lunch? |
| 04:50:10 | 2 | A.  A restaurant called Jasper's in the Woodlands. |
| 04:50:15 | 3 | Q.  What kind of restaurant is Jasper's? |
| 04:50:18 | 4 | A.  It's a steakhouse. |
| 04:50:19 | 5 | Q.  Had you ever been there before? |
| 04:50:20 | 6 | A.  No, sir. |
| 04:50:20 | 7 | Q.  Is it expensive? |
| 04:50:22 | 8 | A.  Yes, sir. |
| 04:50:23 | 9 | Q.  All right.  If you'll look at 775. |
| 04:50:49 | 10 | Are you familiar with that e-mail, Mr. Marioni? |
| 04:50:51 | 11 | A.  Yes, sir. |
| 04:50:52 | 12 | Q.  And this appears to be a continuation of the same |
| 04:50:55 | 13 | e-mail chain that you and Mr. Perkins, Mr. Cook, |
| 04:50:59 | 14 | Mr. Madison, Mr. Downton had been on; is that right? |
| 04:51:01 | 15 | A.  Yes, sir. |
| 04:51:05 | 16 | MR. KUMMERFELD:  Your Honor, at this time the |
| 04:51:07 | 17 | Government would offer Government's Exhibit 775. |
| 04:51:09 | 18 | MR. LEWIS:  Same objection. |
| 04:51:10 | 19 | THE COURT:  All right.  It's admitted. |
| 04:51:14 | 20 | BY MR. KUMMERFELD: |
| 04:51:17 | 21 | Q.  Who sent this e-mail to you and Mr. Perkins? |
| 04:51:19 | 22 | A.  Mr. Ryan Downton. |
| 04:51:21 | 23 | Q.  Okay.  I'm going to ask you a question, if we could -- |
| 04:51:32 | 24 | MR. KUMMERFELD:  And, Ms. McCullars, if you'll |
| 04:51:34 | 25 | indulge me.  If we could flip back, let's look at 773 for |

| | | |
|---|---|---|
| 04:51:36 | 1 | just a second. |
| 04:51:37 | 2 | BY MR. KUMMERFELD: |
| 04:51:39 | 3 | Q.  The top of 773, that e-mail address that Mr. Cook is |
| 04:51:42 | 4 | using, what's the domain on that e-mail address? |
| 04:51:44 | 5 | A.  I'm sorry.  I was moving back to 773. |
| 04:51:49 | 6 | Q.  That's okay.  It's also on your screen. |
| 04:51:52 | 7 | What's the domain on Mr. Cook's e-mail address? |
| 04:51:54 | 8 | A.  Lrhhealthcare.com (sic). |
| 04:51:59 | 9 | Q.  Okay.  Same question about 774, the e-mail address that |
| 04:52:02 | 10 | Mr. Madison used at the bottom of page 1, what's the domain |
| 04:52:05 | 11 | name on that address? |
| 04:52:06 | 12 | A.  Domain name is lrhhealthcare.com (sic). |
| 04:52:10 | 13 | Q.  Okay.  And presumably, 775, Mr. Downton is |
| 04:52:14 | 14 | lrhhealthcare.com (sic) as well; is that right? |
| 04:52:16 | 15 | A.  Mr. Downton's domain? |
| 04:52:16 | 16 | Q.  Yeah. |
| 04:52:23 | 17 | A.  Gmail.com. |
| 04:52:26 | 18 | Q.  Oh, it's not a Little River Healthcare e-mail? |
| 04:52:27 | 19 | A.  That's correct. |
| 04:52:28 | 20 | Q.  It's Gmail, okay. |
| 04:52:29 | 21 | All right.  And so from his Gmail he sends you |
| 04:52:31 | 22 | some documents.  What does he send you? |
| 04:52:33 | 23 | A.  Draft marketing agreements. |
| 04:52:38 | 24 | Q.  Okay.  Did you have the opportunity to review that in |
| 04:52:43 | 25 | the -- in the lead-up to your meeting with Mr. Madison and |

04:52:47  1   Mr. Downton?

04:52:47  2   A.   I believe it came after the meeting.

04:52:51  3   Q.   Oh, it did.   You're correct.

04:52:55  4           Well, now, I believe this is a Tuesday, and I

04:52:59  5   believe the meeting is scheduled for a Thursday.   And this

04:53:04  6   e-mail says in the second line:   Please let me know if you

04:53:08  7   have any comments before our meeting.   So --

04:53:09  8   A.   Oh, yes.   I'm sorry.   You're correct.

04:53:11  9   Q.   Okay.   What I'll ask you to do is look over at -- on

04:53:15  10  the document itself -- look over page 8, which on the

04:53:19  11  exhibit is page 12 concerning the terms, the payment terms?

04:53:30  12  A.   Yes, sir.

04:53:30  13  Q.   What was the proposal for the services that your

04:53:36  14  company would be providing on behalf of Little River?

04:53:38  15  A.   To market healthcare services, which include laboratory

04:53:44  16  services, with physicians and patients in accordance with

04:53:47  17  company guidelines.

04:53:49  18  Q.   Okay.   What else?

04:53:51  19  A.   To identify potential sales leads and advise the

04:53:59  20  company on marketing the services of the company.

04:54:02  21  Q.   Okay.   And in exchange for those services, what was the

04:54:04  22  base service compensation?

04:54:05  23  A.   The base service compensation was for marketing

04:54:09  24  services.   As consultants, we would receive 15 percent of

04:54:13  25  collections.

04:54:14  1  Q.  Okay.  And further down, does it indicate that the

04:54:24  2  consultant shall not receive any payments for hospital

04:54:28  3  referral of a Government patient?

04:54:30  4  A.  Yes.

04:54:32  5  Q.  Now I want to turn your attention to the meeting.

04:54:44  6  Let's talk about it.

04:54:47  7      So that Thursday, you have a meeting scheduled.

04:54:50  8  Where was -- where was that meeting to be held?

04:54:53  9  A.  At Jasper's.

04:54:54  10  Q.  In the Woodlands?

04:54:55  11  A.  In the Woodlands.

04:54:57  12  Q.  Who attended that meeting?

04:54:58  13  A.  In the meeting, it was myself, Jordan Perkins, Ryan

04:55:04  14  Downton, Jeff Madison.

04:55:07  15  Q.  And how did -- you indicated earlier in the e-mail that

04:55:13  16  Mr. Madison would be on the ground at a certain time.  Did

04:55:17  17  you learn at that meeting how Mr. Madison and Mr. Downton

04:55:21  18  got from Round Rock, Texas, or Georgetown, Texas, to

04:55:27  19  Houston?

04:55:28  20  A.  Yes.

04:55:28  21  Q.  How did they get there?

04:55:29  22  A.  Through a private jet.

04:55:31  23  Q.  How did you get there?

04:55:33  24  A.  I drove.

04:55:34  25  Q.  How do you know that they took a private jet?

| | | |
|---|---|---|
| 04:55:39 | 1 | A. They mentioned it on the e-mail. |
| 04:55:41 | 2 | Q. Did they mention it when they were at the restaurant? |
| 04:55:44 | 3 | A. They did. |
| 04:55:45 | 4 | Q. Was it the first time that you ever met Mr. Madison in |
| 04:55:51 | 5 | person? |
| 04:55:52 | 6 | A. Yes, sir. |
| 04:55:53 | 7 | Q. Never seen him before in your life? |
| 04:55:56 | 8 | A. Correct. |
| 04:55:57 | 9 | Q. Had you ever talked to him on the phone before this? |
| 04:56:00 | 10 | A. No, sir. |
| 04:56:00 | 11 | Q. Just that e-mail that we saw? |
| 04:56:02 | 12 | A. That's correct. |
| 04:56:04 | 13 | Q. In that first meeting with a person you've never met |
| 04:56:09 | 14 | before in your life, did he comment on your clothes? |
| 04:56:11 | 15 | A. Yes. |
| 04:56:13 | 16 | Q. What did he say about your clothes? |
| 04:56:16 | 17 | A. He said I looked sharp. |
| 04:56:18 | 18 | Q. Okay. |
| 04:56:18 | 19 | A. And that -- well -- that I could do better, were the |
| 04:56:26 | 20 | words he had. |
| 04:56:26 | 21 | Q. Okay. How could you do better? You look pretty sharp |
| 04:56:30 | 22 | today. |
| 04:56:30 | 23 | A. Thank you. |
| 04:56:31 | 24 | The -- by "sharp" he meant that, you know, custom |
| 04:56:38 | 25 | clothing, embroidered his name on the collar of his -- he |

04:56:43  1    showed me his collar of his -- on his shirt, and it has --

04:56:48  2    it has his name written there as well.

04:56:51  3    Q.  On his shirt?

04:56:52  4    A.  Sorry.  Yes.  On his shirt.  On his collar.  He has his

04:56:58  5    initials on there.

04:56:58  6    Q.  Uh-huh.

04:56:59  7    A.  And I believe on -- maybe on his collar, too.

04:57:01  8    Q.  Okay.

04:57:01  9    A.  Custom collar.  Sorry.

04:57:03  10   Q.  Okay.  And suggested that you should do the same?

04:57:05  11   A.  Yes.

04:57:06  12   Q.  Did he make comments about boots?

04:57:10  13   A.  That's correct.  Yes.

04:57:11  14   Q.  What did he tell you about his boots?

04:57:13  15   A.  Well, they were very expensive boots.  One day maybe I

04:57:19  16   could have the same.

04:57:20  17   Q.  And how would you be able to achieve all that?

04:57:24  18   A.  Well, us working together, he said that we were a

04:57:27  19   match.

04:57:27  20   Q.  Tell me about the meeting.  What was it like at the

04:57:33  21   restaurant?

04:57:33  22   A.  The meeting was pleasant.  We got to know each other,

04:57:38  23   much like today.  Background, who do we know, how many

04:57:43  24   physicians we had.

04:57:44  25            It was basically an assessment of how much

EXHIBIT A

| | |
|---|---|
| 04:57:49 | 1 | influence or bandwidth that we had to contact these |
| 04:57:53 | 2 | physicians and work together. |
| 04:57:55 | 3 | And he also expressed to me why it would be a good |
| 04:58:01 | 4 | fit because it was a rural hospital -- rural critical |
| 04:58:04 | 5 | access hospitals with the contracts. |
| 04:58:06 | 6 | Q. Do you remember what you ordered? |
| 04:58:11 | 7 | A. Yes, sir. |
| 04:58:11 | 8 | Q. What did you order? |
| 04:58:12 | 9 | A. I ordered steak. |
| 04:58:14 | 10 | Q. Was there wine served or other drinks? |
| 04:58:18 | 11 | A. Yes. There was an expensive wine ordered. |
| 04:58:23 | 12 | Q. Did Mr. Madison describe the problem that he had at |
| 04:58:29 | 13 | Little River? |
| 04:58:29 | 14 | A. Yes. |
| 04:58:32 | 15 | Q. What was his problem? |
| 04:58:33 | 16 | A. Because he was directly tied with -- and not having |
| 04:58:41 | 17 | patients in Rockdale, he explained how small that town is, |
| 04:58:45 | 18 | and he needed to expand to keep the hospital going, and |
| 04:58:52 | 19 | with great contracts, it would be a shame to not utilize |
| 04:58:56 | 20 | patients. |
| 04:58:56 | 21 | Q. What did -- what did he mention to you about the |
| 04:58:59 | 22 | contracts? |
| 04:59:00 | 23 | A. That he had the best contracts in Texas. |
| 04:59:03 | 24 | Q. What did that mean to you from a person with your |
| 04:59:07 | 25 | healthcare background? What did it mean to have good |

EXHIBIT A

```
04:59:10   1   contracts?
04:59:10   2   A.  To have good contracts is a contract between a facility
04:59:15   3   and insurance.  And every contract is independently made
04:59:20   4   between company and -- and insurance -- insurance agency,
04:59:26   5   including Medicare, et cetera.  So he had the best there
04:59:31   6   was.
04:59:31   7   Q.  Did he indicate whether his reimbursement rates were
04:59:36   8   good or bad?
04:59:36   9   A.  He claimed that his reimbursement rates were the best.
04:59:42  10   Q.  Did he explain to you at that meeting how he was able
04:59:44  11   to get such great reimbursement rates from insurance
04:59:47  12   companies?
04:59:47  13   A.  Yes.  I asked him, because the numbers he had put out
04:59:54  14   at the time were astonishing to me.  I had never seen those
04:59:57  15   kind of numbers before.  In Houston they do not exist, not
05:00:00  16   even close.
05:00:01  17           And so me being the quizzing person that I am, I
05:00:06  18   wanted to know how he got there, and he mentioned to me he
05:00:09  19   got it through Life Flights that he was able to have
05:00:14  20   redirected and come to Little River.
05:00:16  21   Q.  What does that mean?  What do you mean, redirected Life
05:00:20  22   Flights?
05:00:20  23   A.  So Life Flights are flights from patients who are in
05:00:25  24   critical care need, and they're coding, they need to be --
05:00:30  25   they need to go the hospital as soon as possible; and the
```

```
05:00:33   1   fastest way to do that is flying through a helicopter.
05:00:37   2   That's a catastrophic emergency, fire, et cetera.
05:00:43   3          As he explained to me, he was initially out of
05:00:46   4   network, and through Life Flights, he was able to -- to
05:00:53   5   run -- write up a really high -- really high claims to
05:01:00   6   insurance on -- from this emergency Life Flights, and
05:01:04   7   therefore, giving him leveraging power so that he could
05:01:08   8   come to the table negotiating a better contract in network.
05:01:13   9   Q.  Mr. Marioni, did you have the opportunity to work in
05:01:18  10   and around emergency rooms in your years in healthcare?
05:01:20  11   A.  Yes, sir.
05:01:20  12   Q.  When patients are in critical care situations when
05:01:25  13   they're coding, where do they need go?
05:01:27  14   A.  Directly to the ER.
05:01:28  15   Q.  To the closest one they can get to?
05:01:30  16   A.  Closest ER they can get to.
05:01:31  17   Q.  For the care they need?
05:01:32  18   A.  Exactly.
05:01:32  19   Q.  And when he said, diverting Life Flights, what did he
05:01:35  20   explain that to mean?  Actually diverting them from the
05:01:39  21   closest at the appropriate care level to his ER?
05:01:42  22   A.  That's my understanding.  He was able to one way or
05:01:46  23   another redirect from going wherever they needed to go
05:01:50  24   to -- for him to be priority -- or Little River.
05:02:01  25   Q.  Does that put the care of patients above the dollars
```

| | | |
|---|---|---|
| 05:02:05 | 1 | you can make, or the dollars you can make over the care of |
| 05:02:05 | 2 | patients? |
| 05:02:05 | 3 | A.  That would put the dollar over the care of patients. |
| 05:02:10 | 4 | Q.  So now that he's in network and has good rates, did you |
| 05:02:22 | 5 | have the opportunity to explain how your MSO worked to him |
| 05:02:28 | 6 | and Mr. Downton? |
| 05:02:28 | 7 | A.  Yes. |
| 05:02:29 | 8 | Q.  And how did you describe it to them? |
| 05:02:39 | 9 | A.  Very simply.  We have an investment model.  Physicians |
| 05:02:47 | 10 | invest in the company.  Our company then sends referrals to |
| 05:02:54 | 11 | the said company in return for money. |
| 05:02:56 | 12 | Q.  Who pays the physicians? |
| 05:02:58 | 13 | A.  We did. |
| 05:03:02 | 14 | Q.  And where did you get the money to pay the physicians? |
| 05:03:04 | 15 | A.  From the hospital. |
| 05:03:05 | 16 | Q.  Did you hold back on the details of how your MSO |
| 05:03:11 | 17 | operated? |
| 05:03:12 | 18 | A.  No, sir. |
| 05:03:12 | 19 | Q.  Did you provide Mr. Downton and Mr. Madison with all of |
| 05:03:17 | 20 | the e-mails? |
| 05:03:18 | 21 | A.  Yes. |
| 05:03:19 | 22 | Q.  Did Mr. Madison express any concerns about the model |
| 05:03:25 | 23 | that you described? |
| 05:03:26 | 24 | A.  No, sir. |
| 05:03:28 | 25 | Q.  Based on the conversations you had that day, did |

| | | |
|---|---|---|
| 05:03:34 | 1 | Mr. Madison and Mr. Downton seem to be familiar with the |
| 05:03:37 | 2 | kind of arrangements you described or unfamiliar with the |
| 05:03:40 | 3 | kind of arrangements you described? |
| 05:03:41 | 4 | A.  They -- excuse me.  I'm sorry.  They made it seem |
| 05:03:52 | 5 | interesting, but not surprising. |
| 05:03:55 | 6 | Q.  How did you leave things at the end of that meeting? |
| 05:04:00 | 7 | A.  We left things with a handshake and an intent to work |
| 05:04:07 | 8 | together. |
| 05:04:07 | 9 | Q.  And did Mr. Madison agree to continue further |
| 05:04:11 | 10 | communications with you about this, following the meeting? |
| 05:04:13 | 11 | A.  Definitely. |
| 05:04:18 | 12 | MR. KUMMERFELD:  Your Honor, may we approach? |
| 05:04:21 | 13 | THE COURT:  You may. |
| 05:04:37 | 14 | (Bench conference.) |
| 05:04:37 | 15 | MR. KUMMERFELD:  I just wanted to gauge.  We're -- |
| 05:04:38 | 16 | THE COURT:  I would like to go to 5:30.  Is that |
| 05:04:40 | 17 | what you were going to ask? |
| 05:04:42 | 18 | MR. KUMMERFELD:  So I could time it up. |
| 05:04:44 | 19 | THE COURT:  Yes. |
| 05:04:46 | 20 | MR. KUMMERFELD:  Yes, sir.  Okay.  Thank you. |
| 05:04:48 | 21 | (Bench conference concluded.) |
| 05:04:48 | 22 | THE COURT:  We're going to go about 25 more |
| 05:04:51 | 23 | minutes, and then we'll break for the day, okay? |
| 05:05:08 | 24 | BY MR. KUMMERFELD: |
| 05:05:20 | 25 | Q.  All right.  Mr. Marioni, following that meeting, did |

05:05:23   1   you have further conversations with Mr. Madison and

05:05:26   2   Mr. Downton?

05:05:26   3   A.  Yes, sir.

05:05:27   4   Q.  All right.  I'm going to turn your attention to what's

05:05:31   5   been marked for identification purposes as Government's

05:05:38   6   777.

05:06:05   7   A.  Yes, sir.

05:06:05   8   Q.  Are you familiar with that e-mail?

05:06:07   9   A.  Yes, I am.

05:06:08  10   Q.  Okay.  Is this an e-mail that you received -- you and

05:06:11  11   Mr. Perkins received shortly after the meeting in The

05:06:19  12   Woodlands?

05:06:19  13   A.  Yes, sir, correct.

05:06:21  14           MR. KUMMERFELD:  Your Honor, at this time, the

05:06:23  15   Government would offer Government's 777.

05:06:25  16           THE COURT:  It's admitted.

05:06:30  17   BY MR. KUMMERFELD:

05:06:31  18   Q.  Mr. Marioni, who sent this e-mail to you?

05:06:33  19   A.  Mr. Ryan Downton.

05:06:35  20   Q.  Okay.  From his Gmail address?

05:06:38  21   A.  From the Gmail address, correct.

05:06:40  22   Q.  Okay.  And what does he indicate here in the body of

05:06:43  23   this e-mail, the first two sentences?

05:06:45  24   A.  He's attaching a revised proposal.  All of the changes

05:06:52  25   are on page 8.

| | | |
|---|---|---|
| 05:06:53 | 1 | "We really want to be fair in our current |
| 05:06:56 | 2 | marketing partners and stay within the same range of our |
| 05:06:59 | 3 | agreements with them.  That said, we are very impressed |
| 05:07:02 | 4 | with you guys and are willing to pay you at the top of the |
| 05:07:08 | 5 | range." |
| 05:07:08 | 6 | Q.  Okay.  Is there a new proposal that's different from |
| 05:07:11 | 7 | the draft agreement that you received prior to the new one? |
| 05:07:13 | 8 | A.  Yes, sir. |
| 05:07:13 | 9 | Q.  What is the new proposal, as Mr. Downton describes it, |
| 05:07:17 | 10 | here in the e-mail? |
| 05:07:18 | 11 | A.  The new proposal gives you a base of 15,000 per month |
| 05:07:23 | 12 | without any collections, and then 15 percent of all |
| 05:07:26 | 13 | collections, plus a bonus of an additional 5 percent for |
| 05:07:29 | 14 | monthly collections over 1 million. |
| 05:07:31 | 15 | Q.  Okay.  And the original marketing agreement was simply |
| 05:07:37 | 16 | 15 percent of the collections agreement? |
| 05:07:38 | 17 | A.  Yes, sir. |
| 05:07:38 | 18 | Q.  It did not have a $15,000-per-month flat feet? |
| 05:07:42 | 19 | A.  That's correct. |
| 05:07:42 | 20 | Q.  It did not have any bonus compensation structure? |
| 05:07:46 | 21 | A.  That's correct. |
| 05:07:46 | 22 | Q.  And if we look over -- does he also indicate that these |
| 05:07:56 | 23 | are the highest percentages and, in fact, a larger flat fee |
| 05:08:01 | 24 | than any other marketers? |
| 05:08:03 | 25 | A.  Yes, sir.  That's what he said. |

05:08:05  1    Q.  All right.  If we could look over at page 8.  Let's

05:08:08  2    look at the specific payment terms.

05:08:13  3           And are those -- sorry?

05:08:16  4           MR. KUMMERFELD:  Ms. McCullars, page 8 of the

05:08:18  5    document.  It's actually page 12 of the exhibit.

05:08:24  6    BY MR. KUMMERFELD:

05:08:25  7    Q.  All right.  Do you see those terms there included in

05:08:29  8    the body of the base services compensation section, as well

05:08:34  9    as the bonus compensation section?

05:08:36  10   A.  Yes, sir.

05:08:36  11   Q.  All right.  Is there a representation in both of those

05:08:43  12   sections pertaining to hospital referrals of Government

05:08:47  13   patients?

05:08:48  14   A.  Yes, sir.

05:08:49  15   Q.  And what is the representation?

05:08:51  16   A.  "Notwithstanding the foregoing, in no event shall

05:09:01  17   consultant receive any fee for revenue received due to a

05:09:04  18   hospital referral of a governmental patient by any person.

05:09:08  19   Payment shall be made within 30 days."

05:09:09  20   Q.  During the meeting in The Woodlands, did you and

05:09:14  21   Mr. Perkins have the opportunity to discuss with

05:09:15  22   Mr. Madison and Downton the types of insurance payors that

05:09:21  23   the physicians that were part of your organization

05:09:23  24   referred?

05:09:23  25   A.  Yes, sir.

| | | |
|---|---|---|
| 05:09:23 | 1 | Q. And what did you tell them about the type of payors? |
| 05:09:27 | 2 | A. Well, the subject of what type of insurance payors came |
| 05:09:31 | 3 | up. They were interested to see what we had because, based |
| 05:09:37 | 4 | on contract, each payor pays differently. So we discussed |
| 05:09:43 | 5 | basically the portions that we had, from my understanding, |
| 05:09:45 | 6 | from physicians. |
| 05:09:45 | 7 | Q. What types of different payors do you recall describing |
| 05:09:49 | 8 | to Mr. Madison and Mr. Downton? |
| 05:09:51 | 9 | A. Basically, in two pods. They were private payors and |
| 05:09:55 | 10 | Government payors. |
| 05:09:56 | 11 | Q. Okay. And were Mr. Madison and Mr. Downton interested |
| 05:10:00 | 12 | in referrals of both types? |
| 05:10:02 | 13 | A. Yes. |
| 05:10:03 | 14 | Q. All right. Following this e-mail, did you and |
| 05:10:14 | 15 | Mr. Perkins reach an agreement with Mr. Madison and |
| 05:10:18 | 16 | Mr. Downton and execute a contract in furtherance of that |
| 05:10:22 | 17 | agreement? |
| 05:10:23 | 18 | A. Yes. |
| 05:10:23 | 19 | Q. I'd ask you to take a look at what's marked as |
| 05:10:27 | 20 | Government's Exhibit 5, please. Flip through that |
| 05:10:30 | 21 | document, and I'll have a few questions for you. |
| 05:10:32 | 22 | A. (Witness complies.) |
| 05:10:42 | 23 | Could you repeat the -- |
| 05:10:44 | 24 | Q. Oh, yes. Government's Exhibit 5. |
| 05:11:10 | 25 | A. Yes, sir. |

| | | |
|---|---|---|
| 05:11:11 | 1 | Q.  Are you familiar with this document? |
| 05:11:12 | 2 | A.  Yes, sir, I am. |
| 05:11:14 | 3 | Q.  Is this the contract that you entered into on behalf of |
| 05:11:17 | 4 | your company with Little River Healthcare? |
| 05:11:20 | 5 | A.  Yes. |
| 05:11:23 | 6 | MR. KUMMERFELD:  Your Honor, at this time the |
| 05:11:24 | 7 | Government would offer Government's Exhibit 5. |
| 05:11:26 | 8 | THE COURT:  Any objection? |
| 05:11:27 | 9 | MR. LEWIS:  I have no objection, Your Honor. |
| 05:11:29 | 10 | THE COURT:  It's admitted. |
| 05:11:31 | 11 | BY MR. KUMMERFELD: |
| 05:11:32 | 12 | Q.  All right.  Mr. Perkins, this is a lengthy contract -- |
| 05:11:35 | 13 | or Mr. Marioni, rather, this is a lengthy contract, and we |
| 05:11:38 | 14 | won't go through all of the terms, but I would like to take |
| 05:11:41 | 15 | a couple of the terms here that are identified. |
| 05:11:45 | 16 | The first is -- in terms -- if you could summarize |
| 05:11:51 | 17 | Paragraph 1 that's titled "Marketing Service."  What do you |
| 05:11:55 | 18 | essentially, on behalf of Next Level Healthcare, what are |
| 05:11:59 | 19 | you agreeing to do on behalf of Little River Healthcare? |
| 05:12:02 | 20 | A.  Provide consultant services, marketing services. |
| 05:12:09 | 21 | Q.  Okay.  What's the effective date of that contract there |
| 05:12:12 | 22 | at the top?  Can you see what that is? |
| 05:12:15 | 23 | A.  The 1st of March, 2015. |
| 05:12:20 | 24 | Q.  All right.  And we mentioned payment terms a little |
| 05:12:22 | 25 | bit.  Let's turn over and look at payment terms.  I'm going |

| | |
|---|---|
| 05:12:25 | 1 |
| 05:12:30 | 2 |
| 05:12:38 | 3 |
| 05:12:39 | 4 |
| 05:12:39 | 5 |
| 05:12:42 | 6 |
| 05:12:46 | 7 |
| 05:12:51 | 8 |
| 05:12:54 | 9 |
| 05:12:57 | 10 |
| 05:13:05 | 11 |
| 05:13:07 | 12 |
| 05:13:09 | 13 |
| 05:13:22 | 14 |
| 05:13:28 | 15 |
| 05:13:33 | 16 |
| 05:13:38 | 17 |
| 05:13:43 | 18 |
| 05:13:43 | 19 |
| 05:13:50 | 20 |
| 05:13:53 | 21 |
| 05:13:56 | 22 |
| 05:14:01 | 23 |
| 05:14:04 | 24 |
| 05:14:10 | 25 |

to turn to paragraph 2 on page 4.

Is that paragraph -- tell me if you're there with me.

A.  Yes.

Q.  Does that paragraph set out the compensation terms?

A.  Yes, on Exhibit A.

Q.  Okay.  Why don't we flip over to Exhibit A so that we can close the loop on that.  And that's on page 9 and page 10, actually.  It's two copies of it.

Is this an executed version of the Exhibit A that we just saw a moment ago?

A.  Yes, sir.

Q.  All right.  Now, here you mentioned a flat fee a moment ago of $15,000.  I want you to think about the operation of your business under this contract.  Were you ever paid this $15,000 per month when -- when referrals had not been sent to the hospital and the hospital had not been paid?

A.  Correct.

Q.  So was this contingent on referrals and the payment for those referrals, or was this a flat fee that was paid irrespective of those referrals?

A.  It was supposed to be independent.  However, they always came in together with the percent of collections.

Q.  Okay.  Are there certain compliance terms laid out in the body of that contract?

| | | |
|---|---|---|
| 05:14:18 | 1 | Discussions about healthcare laws and referrals |
| 05:14:20 | 2 | and things of that nature? |
| 05:14:22 | 3 | A.  Yes.  As far as we would not be getting paid for |
| 05:14:27 | 4 | Government programs. |
| 05:14:28 | 5 | Q.  Okay.  Well, let's look at the couple of those |
| 05:14:30 | 6 | different paragraphs. |
| 05:14:30 | 7 | The first one I'll turn your attention to is on |
| 05:14:33 | 8 | page 2, and it's paragraph 1a titled Cooperation with |
| 05:14:39 | 9 | Company's Compliance Efforts. |
| 05:14:43 | 10 | Could you -- could you read that paragraph, |
| 05:14:45 | 11 | please? |
| 05:14:45 | 12 | A.  Question (sic) with company's compliance efforts. |
| 05:14:52 | 13 | Consultant shall cooperate with company to ensure that |
| 05:14:55 | 14 | company's marketing services meet all requirements imposed |
| 05:14:58 | 15 | by laws, rules, regulations, ordinance, or certification or |
| 05:15:02 | 16 | accreditation requirements, including, but not limited to, |
| 05:15:05 | 17 | those pertaining to federal, state, local agencies, |
| 05:15:08 | 18 | departments, commissions, associations or other governing |
| 05:15:12 | 19 | or advisory bodies having authority to set standards |
| 05:15:15 | 20 | governing the operation of company and/or its facilities. |
| 05:15:19 | 21 | Consultant shall not encourage any person or |
| 05:15:23 | 22 | entity to refer a hospital any patients covered by any |
| 05:15:28 | 23 | Governmental insurance or payor, including, but not limited |
| 05:15:32 | 24 | to, Medicare, Medicaid, and TRICARE (each a Governmental |
| 05:15:38 | 25 | patient). |

| | | |
|---|---|---|
| 05:15:39 | 1 | In the event that any account for which consultant |
| 05:15:44 | 2 | has responsibility, as identified on the attached Exhibit |
| 05:15:49 | 3 | E, refers a Governmental patient, consultant shall not |
| 05:15:53 | 4 | receive any fee based on the referral of such Governmental |
| 05:15:57 | 5 | patient or any collections received by hospital for |
| 05:16:00 | 6 | treatment of such Governmental patient. |
| 05:16:05 | 7 | Q.  Okay.   Mr. Marioni, as you sit here today, did the |
| 05:16:08 | 8 | parties of this contract comply with that paragraph? |
| 05:16:11 | 9 | A.  No. |
| 05:16:15 | 10 | Q.  Is this paragraph true or false? |
| 05:16:17 | 11 | A.  False. |
| 05:16:18 | 12 | Q.  Did Mr. Madison know that? |
| 05:16:21 | 13 | A.  Yes. |
| 05:16:22 | 14 | Q.  Did Mr. Downton know that? |
| 05:16:24 | 15 | A.  Yes. |
| 05:16:24 | 16 | Q.  I'm going to turn your attention to page 4, |
| 05:16:32 | 17 | paragraph 1d.   It's titled No Physician Ownership.   Do you |
| 05:16:37 | 18 | see that paragraph? |
| 05:16:38 | 19 | A.  Yes, sir. |
| 05:16:38 | 20 | Q.  Could you read that paragraph, please? |
| 05:16:40 | 21 | A.  "No physician ownership.   Consultant represents and |
| 05:16:45 | 22 | warrants that consultant is not owed by physicians or by |
| 05:16:49 | 23 | any person in a position to make or influence referrals of |
| 05:16:53 | 24 | services to hospital. |
| 05:16:54 | 25 | Further, consultants represent and warrants that |

| | | |
|---|---|---|
| 05:16:58 | 1 | no employees of consultant are in a position to make or |
| 05:17:02 | 2 | influence referrals. |
| 05:17:03 | 3 | Consultant's compensation under this agreement is |
| 05:17:06 | 4 | not meant to induce any referrals from any physician." |
| 05:17:10 | 5 | Q.  Mr. Marioni, did the parties to this contract comply |
| 05:17:14 | 6 | with this paragraph? |
| 05:17:15 | 7 | A.  No, sir. |
| 05:17:17 | 8 | Q.  So was this true or false? |
| 05:17:19 | 9 | A.  This was false. |
| 05:17:21 | 10 | Q.  Did Mr. Madison know that? |
| 05:17:23 | 11 | A.  Yes, sir. |
| 05:17:24 | 12 | Q.  Did Mr. Downton know that? |
| 05:17:26 | 13 | A.  Yes, sir. |
| 05:17:27 | 14 | Q.  Let's go to paragraph 3.  It's titled "Patient |
| 05:17:36 | 15 | Referrals."  Please read that paragraph. |
| 05:17:39 | 16 | A.  "Patient referrals.  Company and consultant agree (a) |
| 05:17:43 | 17 | that the benefits to company hereunder do not require, are |
| 05:17:47 | 18 | not payment for, and are not in any way contingent upon the |
| 05:17:52 | 19 | referral, admission, or any other arrangement for the |
| 05:17:56 | 20 | provision of any item or service offered by consultant to |
| 05:18:00 | 21 | customers of consultant in any facility, laboratory, or |
| 05:18:05 | 22 | healthcare operation controlled, managed, or operated by |
| 05:18:08 | 23 | consultant or its affiliates and (b) that the benefits to |
| 05:18:14 | 24 | consultant hereunder do not require, are not payment for, |
| 05:18:18 | 25 | and are not in any way contingent upon the referral, |

| | | |
|---|---|---|
| 05:18:23 | 1 | admission, or any other arrangement for the provision of |
| 05:18:27 | 2 | any item or service offered by consultant to customers of |
| 05:18:32 | 3 | consultant in any facility, laboratory, or healthcare |
| 05:18:35 | 4 | operation controlled, managed, or operated by company or |
| 05:18:38 | 5 | its affiliates." |
| 05:18:39 | 6 | Q.  Mr. Marioni, did the parties to this contract comply |
| 05:18:43 | 7 | with this paragraph? |
| 05:18:46 | 8 | A.  No, sir. |
| 05:18:46 | 9 | Q.  So this is a false statement? |
| 05:18:48 | 10 | A.  Yes, sir. |
| 05:18:48 | 11 | Q.  Did Mr. Madison know that? |
| 05:18:50 | 12 | A.  Yes, sir. |
| 05:18:50 | 13 | Q.  Did Mr. Downton know that? |
| 05:18:52 | 14 | A.  Yes. |
| 05:18:52 | 15 | Q.  And let's turn to paragraph 5 -- on page 5, rather, |
| 05:19:01 | 16 | paragraph 9. |
| 05:19:02 | 17 | This is entitled, "Compliance with All Laws and |
| 05:19:09 | 18 | Regulations."  And I won't ask you to read the whole thing, |
| 05:19:16 | 19 | but I'll ask you to just read the first sentence and the |
| 05:19:18 | 20 | last sentence. |
| 05:19:20 | 21 | A.  "Compliance with all laws and regulations.  When |
| 05:19:24 | 22 | performing duties under Section 1 of this agreement, |
| 05:19:26 | 23 | consultant shall comply with all federal, state, and local |
| 05:19:30 | 24 | laws, rules, and regulations applicable to employer and to |
| 05:19:35 | 25 | the provision of the services by company, including, but |

05:19:38  1  not limited to, Section 161.091 of the healthcare (sic)

05:19:45  2  safety code."

05:19:49  3  Q.  And it continues and identifies the False Claims Act;

05:19:53  4  is that right?

05:19:53  5  A.  Yes.  "V.A.T.S., 31 U.S.C. (the False Claim Acts) and

05:20:02  6  the amendments, regulations, and administrative rulings

05:20:05  7  thereto, 42 U.S.C. 1320 (the Anti-Kickback Statute) and the

05:20:11  8  amendments, regulations, and administrative rulings

05:20:15  9  thereto, 42" -- which is the Stark Self-Referral Law --

05:20:18  10  "and the amendments, regulations, and administrative

05:20:21  11  rulings thereto."

05:20:22  12  Q.  Okay.  And that last sentence, what does it say?

05:20:25  13  A.  "In the event that the consultant violates any law,

05:20:29  14  rule, or regulation, consultant shall immediately notify

05:20:33  15  company of such violation and shall fully operate with

05:20:36  16  company to take all steps necessary and lawfully to rectify

05:20:44  17  such violation."

05:20:45  18  Q.  Okay.  Did the parties of this contract comply with

05:20:49  19  this provision of this contract?

05:20:49  20  A.  No, sir.

05:20:49  21  Q.  So when the parties say they did not violate these

05:20:53  22  laws, is that a false statement?

05:20:54  23  A.  Yes, sir.

05:20:55  24  Q.  Did Mr. Madison know that?

05:20:56  25  A.  Yes, sir.

EXHIBIT A

05:20:57  1  Q.  Did Mr. Downton know that?

05:20:58  2  A.  Yes, sir.

05:20:58  3  Q.  And, in fact, one of the statutes identified there, the

05:21:02  4  Anti-Kickback Statute, that's the statute that you were

05:21:04  5  charged with and pled guilty to in conspiracy to violate

05:21:07  6  that statute; is that right?

05:21:08  7  A.  Yes, sir.

05:21:09  8  Q.  Did Mr. Madison know that your -- that together you

05:21:12  9  were violating the Anti-Kickback Statute?

05:21:13  10  A.  Yes, sir.

05:21:14  11  Q.  Did Mr. Downton know that?

05:21:15  12  A.  Yes, sir.

05:21:16  13  Q.  I want to turn over to the signature pages of this

05:21:23  14  document.

05:21:26  15        Let's start on page 7 of the exhibit, please.

05:21:37  16        This may be hard to read there, particularly that

05:21:39  17  top one.  Can you tell whose signature is there as

05:21:42  18  consultant for Next Level Healthcare Consultants?

05:21:45  19  A.  Jordan Perkins.

05:21:46  20  Q.  You're familiar with his signature?

05:21:48  21  A.  Yes, sir.

05:21:49  22  Q.  Who signed on page 7 on behalf of Rockdale Blackhawk

05:21:54  23  doing business as Little River Healthcare systems?

05:21:57  24  A.  Jeff Madison.

05:21:59  25  Q.  And is his name listed there and typed out as Jeff

| | | |
|---|---|---|
| 05:22:04 | 1 | Madison, CEO? |
| 05:22:05 | 2 | A.  It's typed out Jeff Madison, CEO. |
| 05:22:14 | 3 | Q.  On page 8 of the contract, we see another set of |
| 05:22:17 | 4 | signatures; is that correct? |
| 05:22:18 | 5 | A.  Yes, sir. |
| 05:22:19 | 6 | Q.  Can you make out that top one? |
| 05:22:21 | 7 | A.  Yes, sir. |
| 05:22:21 | 8 | Q.  And whose signature is that? |
| 05:22:23 | 9 | A.  Mr. Jordan Perkins. |
| 05:22:24 | 10 | Q.  And who signed on the bottom for Little River |
| 05:22:28 | 11 | Healthcare? |
| 05:22:28 | 12 | A.  Mr. Ryan Downton. |
| 05:22:31 | 13 | Q.  How did he describe his position in the company there? |
| 05:22:34 | 14 | A.  Describes him as manager. |
| 05:22:36 | 15 | Q.  Okay.  As we look over at page 9 of this exhibit, more |
| 05:22:43 | 16 | signatures below the Exhibit A terms; is that right? |
| 05:22:48 | 17 | A.  Yes, sir. |
| 05:22:49 | 18 | Q.  Who signed on behalf of Little River Healthcare on this |
| 05:22:55 | 19 | document? |
| 05:22:55 | 20 | A.  Mr. Jeff Madison. |
| 05:22:58 | 21 | Q.  And who signed for the consultant? |
| 05:23:00 | 22 | A.  Mr. Jordan Perkins. |
| 05:23:01 | 23 | Q.  If we turn to page 10, another set of signatures below |
| 05:23:08 | 24 | the Exhibit A; is that correct? |
| 05:23:10 | 25 | A.  Yes, sir. |

05:23:11  1   Q.  And who signed on behalf of Little River Healthcare

05:23:14  2   here?

05:23:14  3   A.  Mr. Ryan Downton.

05:23:16  4   Q.  And who signed on behalf of the consultant?

05:23:20  5   A.  Mr. Jordan Perkins.

05:23:22  6   Q.  And, Mr. Marioni, was this the contract that you and

05:23:30  7   Mr. Perkins on behalf of Next Level Healthcare and --

05:23:36  8   operated under with respect to your business with Little

05:23:39  9   River beginning on March 1st of 2015?

05:23:41  10  A.  Yes.

05:23:42  11  Q.  And did you continue under the terms of this contract

05:23:45  12  for some period of time until it was later amended?

05:23:48  13  A.  Yes, sir.

05:23:52  14        MR. KUMMERFELD:  Your Honor, now may be a good

05:23:55  15  time before we switch to another topic.

05:23:59  16        THE COURT:  Okay.  All right.  We'll break here

05:24:00  17  for the evening.  All my prior instructions still apply.

05:24:02  18  Not to discuss the case with anybody, including each other,

05:24:03  19  not to look anything up.

05:24:04  20        We'll see you bright and early tomorrow morning at

05:24:06  21  8:45.

05:24:50  22        (Jury out.)

05:24:50  23        THE COURT:  Okay.  Is there anything for us to

05:24:52  24  discuss this evening?

05:24:52  25        MR. A. GARCIA:  Not from the Government,

1           I N D E X

2

3    WITNESSES FOR THE GOVERNMENT                      PAGE

4
     TODD COOK
5    Direct Examination by Mr. A. Garcia              1205

6                        *      *      *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A

1213

09:23:15  1    A.  It was already in place.

09:23:19  2    Q.  And who hired you, Mr. Cook?

09:23:21  3    A.  Jeff Madison.

09:23:22  4    Q.  In this -- when you first started at Little River, did

09:23:33  5    you have an office at Little River?

09:23:35  6    A.  I don't believe so.  I worked from my home, and then

09:23:37  7    went to clients via my car.  I worked out of my home.

09:23:41  8    Q.  Can you tell me a little bit about -- try to put

09:23:43  9    yourself in this time period, but can you tell me a little

09:23:46  10   bit about your day-to-day when you were first hired at

09:23:49  11   Little River?

09:23:49  12   A.  So at the beginning, they wanted to build up labs in

09:23:54  13   the toxicology space, and so I would go around to physician

09:23:57  14   offices, pain doctors, principally, where they would be

09:24:03  15   doing toxicology testing, and I'd go around and -- true

09:24:07  16   sales job where you go in and introduce yourself and

09:24:09  17   explain Little River, their capabilities, what I could do

09:24:13  18   as the salesperson and their point of contact, and try to

09:24:16  19   get them to send their toxicology specimens to Little

09:24:22  20   River.  First year I did about 50,000 miles windshield time

09:24:26  21   driving around Texas.

09:24:27  22   Q.  And when you were first hired, who did you report to?

09:24:32  23   A.  When I was first hired, I reported to Jeff Madison.

09:24:34  24   Q.  And at the time, who were the decision-makers at Little

09:24:41  25   River?

09:24:41  1  A.  At the time that I started, I believe there were three.

09:24:44  2  So there was Jeff Madison, the CEO.  There was Ryan

09:24:48  3  Downton, who is legal; he's a lawyer.  And then there was

09:24:53  4  Peggy Borgfeld.  I believe she's a CPA, but she was the

09:24:55  5  financial part of the three owners.

09:24:57  6  Q.  And so all three of those individuals were owners?

09:25:03  7  A.  To my knowledge, yes.

09:25:09  8  Q.  And where -- where did they office?

09:25:10  9  A.  I believe when I first started, Jeff worked remote,

09:25:19  10  similar to myself.  Peggy, I feel like she worked at the

09:25:24  11  Rockdale Hospital.  And I feel like Ryan was remote, as

09:25:28  12  well, when I started.

09:25:29  13  Q.  And just so we kind of put another bound on this, when

09:25:37  14  did you leave Little River?

09:25:38  15  A.  My last day of employment was February 1st of 2018.

09:25:44  16  Q.  Mr. Cook, were you indicted in this case?

09:26:02  17  A.  Yes, sir.

09:26:02  18  Q.  And did you plead guilty?

09:26:03  19  A.  Yes, sir.

09:26:04  20  Q.  Why did you plead guilty?

09:26:05  21  A.  I was a high-level executive at Little River.  During

09:26:09  22  the course of my tenure, I became aware that MSOs were

09:26:16  23  compensating physicians.

09:26:22  24  Q.  And, Mr. Cook, you entered into a Plea Agreement with

09:26:24  25  the Government, correct?

EXHIBIT A

09:26:25 1    A.  Yes, sir.

09:26:27 2    Q.  Now, as part of that Plea Agreement, you understand

09:26:38 3    that certain stipulations affect a certain Sentencing

09:26:43 4    Guideline range, correct?

09:26:44 5    A.  Yes.

09:26:44 6    Q.  Do you understand that the sentence to be imposed is

09:26:48 7    left to the discretion of the sentencing Judge?

09:26:52 8    A.  Yes.

09:26:53 9    Q.  And do you understand that that Judge is Judge

09:26:57 10   Kernodle?

09:26:57 11   A.  Yes.

09:26:58 12   Q.  Do you understand that the Government's part of this

09:27:08 13   agreement is that you will not -- the Government agrees not

09:27:11 14   to prosecute you for any additional non-tax-related

09:27:16 15   criminal charges?

09:27:16 16   A.  Yes.

09:27:17 17   Q.  And you also understand that, as part of the agreement,

09:27:20 18   the Government agreed to dismiss any remaining criminal

09:27:23 19   charges?

09:27:23 20   A.  Yes.

09:27:23 21   Q.  Also, as part of that agreement, do you understand that

09:27:33 22   the Government -- that depending on -- I'm sorry, that the

09:27:36 23   Government determines that the Defendant has --

09:27:38 24        THE COURT:  Mr. Garcia, I think there's an

09:27:41 25   objection.

| | | |
|---|---|---|
| 09:27:41 | 1 | MR. HILL:  Objection, Your Honor, leading. |
| 09:27:44 | 2 | THE COURT:  Sustained. |
| 09:27:45 | 3 | BY MR. A. GARCIA: |
| 09:27:58 | 4 | Q.  Mr. Cook, what do you believe is your responsibility |
| 09:28:00 | 5 | under the Plea Agreement? |
| 09:28:02 | 6 | A.  I guess I don't understand the question.  I'm sorry. |
| 09:28:10 | 7 | Q.  It's okay. |
| 09:28:14 | 8 | Do you understand that it's your responsibility to |
| 09:28:16 | 9 | tell the truth under the Plea Agreement? |
| 09:28:17 | 10 | A.  Yes. |
| 09:28:18 | 11 | Q.  Do you understand that based on your cooperation, the |
| 09:28:30 | 12 | Government could recommend a downward departure? |
| 09:28:33 | 13 | MR. HILL:  Objection, Your Honor, leading. |
| 09:28:36 | 14 | THE COURT:  Sustained. |
| 09:28:37 | 15 | BY MR. A. GARCIA: |
| 09:28:42 | 16 | Q.  Now, Mr. Cook, you understand that some of the |
| 09:28:43 | 17 | Defendants in this case are some of your former associates, |
| 09:28:48 | 18 | correct? |
| 09:28:48 | 19 | A.  Yes, sir. |
| 09:28:48 | 20 | Q.  You don't hold any sort of animus towards Mr. Madison, |
| 09:28:56 | 21 | do you? |
| 09:28:57 | 22 | A.  No, sir. |
| 09:28:57 | 23 | Q.  You're not testifying here because you dislike |
| 09:29:02 | 24 | Mr. Madison, correct? |
| 09:29:04 | 25 | MR. HILL:  Objection, Your Honor.  He continues to |

09:29:06  1   lead.

09:29:06  2          THE COURT:  Sustained.

09:29:07  3   BY MR. A. GARCIA:

09:29:10  4   Q.  All right.  Mr. Cook, let's turn over -- let's turn to

09:29:13  5   your experience with toxicology.

09:29:15  6          Can you tell me a little bit of what it was, this

09:29:18  7   toxicology outpatient billing that you mentioned, what was

09:29:22  8   that?  What was Little River doing?

09:29:24  9   A.  So as I started, Little River had a lab that they had

09:29:31  10  contracted with, Essential Labs.  It was in the St. Louis

09:29:39  11  area, I believe.  And they were going to be used as an

09:29:42  12  initial reference lab.

09:29:44  13         I would go around, as I've already spoken to, that

09:29:48  14  first year in the toxicology space, go visit doctors who

09:29:51  15  were already doing toxicology testing and see if I could

09:29:57  16  get them to give us a look, so to speak.

09:30:00  17         The part at the beginning was is that there was

09:30:03  18  always going to be a lab built on campus, and so part of

09:30:06  19  the initial was to bring in specimens within the -- in the

09:30:10  20  future.  You're looking to have those tests occurring on

09:30:14  21  the Rockdale campus.

09:30:16  22  Q.  And in 2014, was that lab ever built?

09:30:19  23  A.  The lab was not built in 2014.

09:30:22  24  Q.  And you mentioned this -- this Essential Lab.  Are

09:30:30  25  there different components to toxicology testing?

EXHIBIT A

| | | |
|---|---|---|
| 09:30:33 | 1 | A.  There's principally two.  So, the first component, you |
| 09:30:37 | 2 | can do -- it's called a tox screen.  It's a plus or minus |
| 09:30:42 | 3 | on ten or 12 different common chemicals.  It can be done in |
| 09:30:47 | 4 | the office, commonly done with a little cup.  And, again, |
| 09:30:52 | 5 | toxicology testing is urine testing, so it can be done in |
| 09:30:56 | 6 | an office. |
| 09:30:57 | 7 | And an office usually decides they've seen |
| 09:31:01 | 8 | something in that cup that they don't like or needs further |
| 09:31:05 | 9 | scrutiny, and they would send it out for confirmation |
| 09:31:08 | 10 | testing, which is you quantify probably up to a hundred, |
| 09:31:12 | 11 | 125 different chemicals can be quantified, that they might |
| 09:31:15 | 12 | seek whether it's the chemical they're taking or things |
| 09:31:18 | 13 | that they maybe shouldn't be taking that could cause |
| 09:31:22 | 14 | problems if they have them in their body. |
| 09:31:22 | 15 | Q.  And at this time, in 2014, was Little River performing, |
| 09:31:25 | 16 | itself, the confirmation testing? |
| 09:31:27 | 17 | A.  They were not performing the confirmation testing, no, |
| 09:31:31 | 18 | sir. |
| 09:31:31 | 19 | Q.  Who was doing that? |
| 09:31:32 | 20 | A.  That was being done at Essential Labs. |
| 09:31:35 | 21 | Q.  And who was billing for the confirmation testing? |
| 09:31:39 | 22 | A.  The confirmations were being billed by Little River. |
| 09:31:43 | 23 | Q.  I want to ask you some questions about your previous |
| 09:31:53 | 24 | experience with Aegis. |
| 09:31:56 | 25 | A.  Okay. |

| | | |
|---|---|---|
| 09:31:56 | 1 | Q.  Did Aegis have a sales component, like a sales team? |
| 09:32:00 | 2 | A.  I was part of a sales team, yes, sir. |
| 09:32:02 | 3 | Q.  Did Aegis also have a -- kind of a technical team to |
| 09:32:06 | 4 | perform the tests? |
| 09:32:07 | 5 | A.  Yes, sir. |
| 09:32:17 | 6 | Q.  All right.  I'm turning back to Little River. |
| 09:32:20 | 7 | Who were the co-workers that you interacted with |
| 09:32:23 | 8 | the most? |
| 09:32:23 | 9 | A.  I would say the three owners, Jeff Madison, Peggy |
| 09:32:34 | 10 | Borgfeld, and Ryan Downton, a lot of interactions; and then |
| 09:32:38 | 11 | probably next would be my territory managers, which would |
| 09:32:43 | 12 | be weekly or more. |
| 09:32:44 | 13 | There was a backfill along the way of an |
| 09:32:49 | 14 | individual that I put into a previous role I had as I moved |
| 09:32:51 | 15 | up in the company.  His name is Brandon Rader. |
| 09:32:54 | 16 | And then the marketers that were out in the field |
| 09:32:56 | 17 | probably would be the next group of individuals that I had |
| 09:32:58 | 18 | the most interactions with. |
| 09:33:00 | 19 | Q.  Okay.  And how did you interact with those -- with |
| 09:33:03 | 20 | those people and those marketers?  Was it via text |
| 09:33:08 | 21 | messages, emails, phone calls, in person? |
| 09:33:10 | 22 | A.  All of the above. |
| 09:33:19 | 23 | MR. A. GARCIA:  Your Honor, may I approach the |
| 09:33:23 | 24 | witness? |
| 09:33:24 | 25 | THE COURT:  You may. |

1220

09:33:26   1   BY MR. A. GARCIA:
09:33:27   2   Q.  Mr. Cook, I'm going to show you Government's
09:33:30   3   Exhibit 765, and I'm going to approach to give you the
09:33:32   4   binder.
09:33:32   5   A.  Okay.
09:34:13   6          MR. A. GARCIA:  Your Honor, I believe this exhibit
09:34:15   7   is already in evidence, so I think it would be fair to
09:34:19   8   publish it to the witness.
09:34:21   9          THE COURT:  Okay.  You may.
09:34:23  10   BY MR. A. GARCIA:
09:34:24  11   Q.  Mr. Cook, do you see the calendar invite in front of
09:34:26  12   you?
09:34:26  13   A.  Yes, sir.
09:34:27  14   Q.  All right.  Just to kind of wrap our heads around this,
09:34:32  15   when did you start at Little River again?
09:34:36  16   A.  Middle of April of 2014, month four.
09:34:41  17   Q.  All right.  So this is a couple months after your start
09:34:43  18   date, correct?
09:34:44  19   A.  Probably about six weeks or so, sure.
09:34:47  20   Q.  Okay.  I'm going to ask you some questions about some
09:34:49  21   of the people that are listed in this calendar invite.
09:34:53  22          The first one is Nick - Precision Testing.  Can
09:35:00  23   you tell me who that is?
09:35:01  24   A.  Nick Fineman is a salesperson for a company called
09:35:11  25   Precision Testing Solutions.

09:35:12   1   Q.  And what does Precision Testing Solutions do?

09:35:15   2   A.  So the screen that I spoke of a moment ago in the

09:35:19   3   toxicology space in the cup, there's an advanced way to do

09:35:22   4   that testing that is done with a desktop analyzer that you

09:35:27   5   might get -- place that I knew of, Nick partnered was

09:35:33   6   Siemens, and so you would have this desktop analyzer in

09:35:39   7   your -- in the doctor's space.  And then they'd be able to

09:35:39   8   do the screen in-house.

09:35:40   9       The reason that folks did it is there was a higher

09:35:46   10  reimbursement level attached to that analyzer versus using

09:35:52   11  the traditional cup testing.

09:35:52   12  Q.  So that's something that could be done at a doctor's

09:35:56   13  office?

09:35:56   14  A.  Yes, sir.

09:35:56   15  Q.  All right.  And who is Carolyn Bryan?

09:35:59   16  A.  Carolyn Bryan was what I would call an executive

09:36:02   17  secretary for Mr. Madison.

09:36:06   18  Q.  All right.  And what about the next three individuals,

09:36:09   19  Ginny Jacobs, Scott Jacobs, and Jason DeMattia?

09:36:16   20  A.  So Ginny and Scott Jacobs were part of one of the

09:36:23   21  marketing groups that Little River contracted with, S&G

09:36:29   22  Marketing was one of their names, and then Dr. Jason

09:36:31   23  DeMattia was one of the physicians in the Tomball area

09:36:36   24  where Scott and Ginny were located.

09:36:38   25  Q.  And based on your understanding, did Dr. DeMattia work

09:36:44   1   with S&G Staffing?

09:36:46   2   A.  Yes, sir.

09:36:46   3   Q.  Did he play an integral role in it?

09:36:53   4   A.  Yes, sir.

09:36:54   5   Q.  Mr. Cook, did you set up this meeting with Jeff Madison

09:37:03   6   and the Jacobs and Dr. DeMattia?

09:37:06   7   A.  I did, yes, organizer.

09:37:07   8   Q.  And how did you meet Mr. Jacobs and Dr. DeMattia?

09:37:14   9   A.  I was introduced to them by the three owners.  Again,

09:37:23  10   Jeff Madison, Peggy Borgfeld, and Ryan Downton said that

09:37:27  11   there was a new group that they were going to be using for

09:37:31  12   marketing in the Greater North Houston area.  Tomball is in

09:37:38  13   North Houston.

09:37:38  14   Q.  And did Little River ultimately enter into some sort of

09:37:43  15   agreement with -- with those individuals?

09:37:46  16   A.  Yes, with -- S&G had two different -- or Scott and

09:37:51  17   Ginny had two different groups, two different contracts.  I

09:37:57  18   believe there was Jacob marketing and then also S&G

09:38:01  19   Staffing, I think they called it, that were -- one did the

09:38:04  20   blood, ultimately, and then the other was toxicology.

09:38:08  21   Q.  Okay.  Mr. Cook, can you please turn to Government's

09:38:17  22   Exhibit 766 in your binder?

09:38:55  23   A.  Sorry.  Okay.  I think I'm there.

09:38:57  24   Q.  And let's look at that email line.

09:39:01  25           You mentioned before that you interacted with the

| | | |
|--|--|--|
| 09:39:04 | 1 | owners.  Did you interact with them by email? |
| 09:39:06 | 2 | A.  One of the ways, yes. |
| 09:39:08 | 3 | Q.  Did you have a Little River email -- email address? |
| 09:39:11 | 4 | A.  I did. |
| 09:39:12 | 5 | Q.  Is that your email address there? |
| 09:39:14 | 6 | A.  Yes, sir. |
| 09:39:23 | 7 | MR. A. GARCIA:  Your Honor, at this time, the |
| 09:39:24 | 8 | Government offers Government's Exhibit 766 into evidence. |
| 09:39:27 | 9 | MR. PEELE:  Your Honor, I think -- |
| 09:39:31 | 10 | THE COURT:  You need to speak into a microphone. |
| 09:39:33 | 11 | MR. PEELE:  I'm sorry, is he trying to lay the |
| 09:39:36 | 12 | business record exception here to this?  Is that what the |
| 09:39:40 | 13 | admissibility is premised on? |
| 09:39:41 | 14 | MR. A. GARCIA:  Your Honor, it's a statement by |
| 09:39:42 | 15 | Mr. -- |
| 09:39:43 | 16 | THE COURT:  Okay.  You can -- I'll -- is there an |
| 09:39:44 | 17 | objection? |
| 09:39:45 | 18 | MR. PEELE:  Hearsay, Your Honor. |
| 09:39:46 | 19 | THE COURT:  Overruled. |
| 09:39:53 | 20 | MR. A. GARCIA:  Your Honor, at this time the |
| 09:39:55 | 21 | Government offers into evidence Government's 766. |
| 09:39:59 | 22 | THE COURT:  It's admitted. |
| 09:40:03 | 23 | BY MR. A. GARCIA: |
| 09:40:04 | 24 | Q.  All right.  Let's orient ourselves.  What date is this |
| 09:40:07 | 25 | email? |

```
09:40:07   1    A.  July 8th of 2014.
09:40:11   2    Q.  Do you --
09:40:12   3    A.  Tuesday night.
09:40:13   4    Q.  And what is the subject line?
09:40:15   5    A.  The subject line is Joshi and team.
09:40:23   6    Q.  Do you recognize that name, Joshi?
09:40:27   7    A.  I do.
09:40:27   8    Q.  Who is that?
09:40:29   9    A.  Andy Joshi is a pain doctor in the Austin area.
09:40:32   10   Q.  Did you have a previous relationship with Dr. Joshi?
09:40:35   11   A.  I did not.
09:40:36   12   Q.  Were you introduced to Dr. Joshi?
09:40:40   13   A.  I was.
09:40:40   14   Q.  By whom?
09:40:41   15   A.  I believe Ryan Downton is the one that reached out to
09:40:46   16   him, said that I would be coming.
09:40:49   17   Q.  Can you please read the email message?
09:41:01   18   A.  Sure.
09:41:03   19        I need a -- I need the total number of Joshi and
09:41:06   20   team tox referrals since we've been getting his referrals,
09:41:13   21   please.  I'm building a proforma for his practice and need
09:41:17   22   that.  Do you know the payor mix for them?  Thanks.
09:41:23   23   Q.  So let's take that piece-by-piece.
09:41:25   24        Did Mr. Madison frequently ask you for information
09:41:29   25   related to referrals?
```

EXHIBIT A

09:41:30  1   A.  Yes.

09:41:30  2   Q.  And what does he mean by "I'm building a proforma for

09:41:34  3   his practice"?

09:41:35  4   A.  So what Little River was doing and the major part of

09:41:41  5   their business was a build-out of their physician group,

09:41:46  6   and so they would lease practices.  It looks to the outside

09:41:49  7   world like it would be a buying of a practice, but they did

09:41:52  8   it through a lease.

09:41:53  9          And when they would build a proforma, it was

09:41:59  10  having a deeper discussion with that provider and his

09:42:02  11  practice where you get the last two years of patient visits

09:42:05  12  and things like that.

09:42:06  13  Q.  Were there any advantages to leasing versus buying the

09:42:11  14  practice?

09:42:11  15  A.  That would be something that you'd probably need to ask

09:42:13  16  Jeff or Peggy or Ryan.  I just know what they did.

09:42:16  17  Q.  You weren't involved with that -- with that part of the

09:42:20  18  process?

09:42:20  19  A.  Ultimately, I was someone who helped identify folks and

09:42:24  20  then helped build those proformas, but, again, the decision

09:42:29  21  to onboard somebody or not onboard a practice would have

09:42:36  22  been resided with the three owners.

09:42:37  23  Q.  What do you understand "payor mix" to mean at the end

09:42:41  24  of this email?

09:42:42  25  A.  So payor mix to me would be who is their insurances

09:42:46  1  that have been ordered.

09:42:48  2  Q.  Why do you think that that information would be

09:42:51  3  important to Mr. Madison?

09:42:52  4  A.  I'm sure that looking at what they've done in tox will

09:42:58  5  give him a pretty good idea of what the practice looks like

09:43:01  6  in general.  It's a pain office, and so you're guessing

09:43:05  7  that they probably don't grab certain insurances over

09:43:11  8  another.  They would just test the people that they'd want

09:43:14  9  a toxicology result for so it would help Jeff understand

09:43:18 10  what their insurance plans that they take and who those

09:43:21 11  patients are.

09:43:24 12  Q.  Mr. Cook, you mentioned earlier that you communicated

09:43:36 13  with some of the owners via text messages.  Did I hear that

09:43:42 14  correctly?

09:43:43 15  A.  Yes, sir.

09:43:43 16  Q.  Did you ever text Peggy Borgfeld?

09:43:47 17  A.  Yes, sir.

09:43:47 18  Q.  Were you ever part of group text messages between

09:43:50 19  Ms. Borgfeld and some of the owners at Little River?

09:43:52 20  A.  Yes.

09:43:53 21  Q.  Was text message one of the primary forms of

09:44:00 22  communication between y'all at Little River?

09:44:02 23  A.  Depending on the length of the message, yeah.  If it's

09:44:06 24  quick, again, you have 140 characters, but a lot of times

09:44:10 25  that saves a lot of extraneous conversation on a phone

09:44:13    1    call, so...

09:44:25    2         MR. A. GARCIA:  Your Honor, at this time the

09:44:27    3    Government offers Government's Exhibit 139A -- 193A, I'm

09:44:34    4    sorry.

09:44:37    5         MR. PEELE:  Your Honor, just for clarification,

09:44:42    6    193A is a list of 500 lines or more of different texts, and

09:44:48    7    so as the Government is attempting to bring in specific

09:44:52    8    texts, we may have specific objections about relevance, but

09:44:57    9    we -- it's hard to address all at once.

09:45:00    10        THE COURT:  Okay.  Counsel, would you approach?

09:45:02    11        (Bench conference.)

09:45:26    12        THE COURT:  I don't have 193A, so I don't know

09:45:29    13   what we're looking at.  Make sure you turn around so she

09:45:33    14   can see you.

09:45:33    15        MR. A. GARCIA:  193A is a spreadsheet containing

09:45:36    16   text messages from Peggy Borgfeld's phone.  It includes

09:45:40    17   messages.  The actual exhibit itself is a -- is a redacted

09:45:45    18   version that only includes the messages in which Todd Cook

09:45:49    19   is a participant.  There's a recipient or a sender.

09:45:53    20        We seek the conditional admittance at this point.

09:45:56    21   We -- regarding these text messages.  We intend to call

09:46:00    22   Peggy Borgfeld as a witness, and we also intend to be able

09:46:03    23   to authenticate it because it was provided -- it was

09:46:06    24   produced pursuant to a civil investigative demand, and so

09:46:10    25   the agents will also be able to -- the testifying agents

| 09:46:13 | 1 | will also be able to authenticate it. |

09:46:13 1 will also be able to authenticate it.

09:46:16 2      And the way that we plan to use the exhibit,

09:46:18 3 Your Honor, is go down the spreadsheet to show the

09:46:20 4 different text messages.  And so we -- we'll refrain

09:46:24 5 from -- from, you know, showing all of it and publishing it

09:46:29 6 all at one time.  So there'll be an opportunity, we

09:46:31 7 believe, for Mr. Madison to object on relevancy grounds or

09:46:35 8 other grounds as we go forward.

09:46:37 9      THE COURT:  And you consider Ms. Borgfeld as a

09:46:40 10 conspirator?

09:46:42 11      MR. A. GARCIA:  Yes, Your Honor.  And, in fact,

09:46:43 12 the parties conferred regarding some of the different

09:46:44 13 recipients and senders that would not fall under the

09:46:45 14 exception, and with the exception of, I believe, three

09:46:48 15 different -- just three individuals, we've either redacted

09:46:53 16 all the other messages, or we will not be going into them.

09:46:56 17      THE COURT:  Okay.  So what's the objection?

09:46:57 18      MR. PEELE:  Your Honor, well, so we still have our

09:47:00 19 ongoing hearsay objection to the co-conspirator,

09:47:03 20 803(d)(2)(E).  I don't know if this is going to pick up

09:47:07 21 803 -- excuse me, 801(d)(2)(D) --

09:47:09 22      MR. A. GARCIA:  It won't.

09:47:10 23      MR. PEELE:  -- so we have the ongoing of that.

09:47:11 24      And then we just have the issue of, you know,

09:47:14 25 relevance.  We're going to have to sort of take it up

```
09:47:16   1   line-by-line.
09:47:17   2            THE COURT:  Okay.
09:47:18   3            MR. PEELE:  This is -- you know, this is a subset
09:47:20   4   of 7,600 lines of text that we got Friday for the first
09:47:25   5   time.
09:47:25   6            THE COURT:  So are you seeking to introduce the
09:47:27   7   entire spreadsheet at this point, and then you --
09:47:30   8            MR. A. GARCIA:  So, eventually, yes, Your Honor,
09:47:32   9   and I think a conditional admittance is probably the best
09:47:36  10   route here, as opposed to kind of filtering out each text
09:47:40  11   message, which would end up being a row of an Excel
09:47:43  12   spreadsheet.
09:47:44  13            So I think the way that we plan to approach this
09:47:46  14   is talking about certain limited, like, date ranges, and
09:47:51  15   then giving an opportunity -- treating conversations
09:47:53  16   together, as opposed to the individual text messages
09:47:55  17   themselves.
09:47:57  18            THE COURT:  Okay.
09:48:00  19            MR. FERRY:  Could I ask the Government one
09:48:05  20   question, please?
09:48:07  21            (Attorneys confer.)
09:48:07  22            MR. HILL:  Your Honor, I do have one concern about
09:48:09  23   the exhibit that would go into evidence.  We just want to
09:48:12  24   make sure that it's going to consist only of those portions
09:48:15  25   of the text messages that were presented to the Court and
```

| | | |
|---|---|---|
| 09:48:17 | 1 | ruled upon. |

09:48:17  1  ruled upon.

09:48:18  2      To the extent the Government wants to put in the

09:48:21  3  entirety of this conversation, we would object on relevance

09:48:27  4  grounds and hearsay grounds.  It's just problematic to

09:48:27  5  think the jury would have a grab bag of statements that

09:48:29  6  were never introduced.

09:48:29  7      THE COURT:  Understood.

09:48:29  8      My understanding is we're only admitting the

09:48:31  9  portions that you're going to introduce piece-by-piece,

09:48:34  10  correct?

09:48:34  11      MR. A. GARCIA:  Right.  And if there are any sort

09:48:36  12  of sustained objections, Your Honor, we'll redact the

09:48:39  13  actual exhibit that eventually goes to the jury.

09:48:42  14      THE COURT:  Okay.

09:48:43  15      MR. HILL:  Thank you, Your Honor.

09:48:44  16      THE COURT:  All right.

09:48:45  17      (Bench conference concluded.)

09:49:03  18      MR. A. GARCIA:  Your Honor, at this time, the

09:49:04  19  Government moves to admit Government's Exhibit 193A.

09:49:08  20      THE COURT:  Okay.  It's conditionally admitted on

09:49:11  21  the grounds that we just discussed at the bench.

09:49:43  22      MR. HILL:  Objection, Your Honor.  What's

09:49:45  23  published on the screen is more than any one statement

09:49:48  24  that's --

09:49:49  25      THE COURT:  Yeah, I think you need to figure out

09:49:50   1  what exactly you're going to focus on, and then identify

09:49:54   2  that on the record, and then we'll -- you can publish just

09:49:57   3  that portion.

09:49:57   4          MR. A. GARCIA:  Your Honor, the first text

09:50:00   5  messages will span from -- from July 23rd, 2015 (sic), to

09:50:10   6  October 3rd, 2014.  July 23rd -- oh, I'm sorry.  Actually,

09:50:22   7  that's not right.  From July 16th, 2014, to October 3rd,

09:50:26   8  2014.

09:50:50   9          Ms. McCullars, can you please publish it?

09:50:54  10  BY MR. A. GARCIA:

09:50:58  11  Q.  Mr. Cook, on July 16th, 2014, the toxicology business

09:51:03  12  was already being implemented; is that correct?

09:51:06  13  A.  Yes, sir.

09:51:07  14  Q.  Okay.  Let's look at this first text message.

09:51:10  15          MR. A. GARCIA:  Line 223.

09:51:13  16          THE COURT:  I'm not sure you've explained to the

09:51:14  17  jury what this is.

09:51:15  18          MR. A. GARCIA:  Oh.

09:51:16  19  BY MR. A. GARCIA:

09:51:17  20  Q.  Mr. Cook, did you -- did you commune -- did you

09:51:21  21  communicate via text message with certain people at Little

09:51:25  22  River?

09:51:25  23  A.  Yes, sir.

09:51:26  24  Q.  Okay.  And who were those people?

09:51:27  25  A.  The list is probably a couple hundred deep.  Text is

1232

09:51:34  1  real common for people who had phones.  Certainly, the

09:51:36  2  owners, my territory managers, I had lead phlebotomists

09:51:41  3  that, you know, you would have texted with.

09:51:43  4  Q.  And have you -- have you had a chance to review this

09:51:45  5  spreadsheet regarding the text messages?

09:51:47  6  A.  I have seen it, yes.

09:51:49  7  Q.  And is this a fair and accurate representation of your

09:51:52  8  text messages with at least the -- the three owners?

09:51:55  9  A.  Yes.

09:51:55  10  Q.  And there might be some other individuals, correct?

09:51:57  11  But we'll get into those later.

09:51:59  12        But as far as with the owners, let's look at that

09:52:01  13  first message.  Is this a text message between you and, if

09:52:04  14  you look at Column B, Mr. Madison and Mr. Downton?

09:52:09  15  A.  Yes, sir.

09:52:11  16  Q.  And if you look down on No. 228, do you see the name on

09:52:21  17  the "from" line?

09:52:21  18  A.  Peggy Borgfeld.

09:52:23  19  Q.  And what are the last four digits of that number?

09:52:26  20  A.  5548.

09:52:27  21  Q.  And -- all right.  And so let's look at that first text

09:52:39  22  message on line 223.

09:52:41  23        Did you text -- did you commonly text the owners

09:52:48  24  regarding kind of your developments in the field?

09:52:50  25  A.  Yes.

1233

09:52:52    1    Q.  Because you weren't -- you weren't always there at the

09:52:55    2    office; is that right?

09:52:55    3    A.  Rarely was I there.

09:52:57    4    Q.  All right.  So what is Bastrop?

09:53:03    5    A.  It is a town in Texas.

09:53:05    6    Q.  And when you say "it's off and running," what do you

09:53:10    7    mean by that?

09:53:10    8    A.  There was a clinic there.  I want to say it was an

09:53:14    9    internal medicine clinic.

09:53:17   10    Q.  Okay.  And here, you're -- you're -- you're informing

09:53:21   11    Mr. Madison about certain referrals; is that right?

09:53:23   12    A.  Yes, sir.

09:53:24   13    Q.  Is that what "seven insurance patients today" means?

09:53:28   14    A.  Yes, sir.

09:53:29   15    Q.  And Mr. Madison's acknowledging receipt of that

09:53:32   16    information in the next text message?

09:53:34   17    A.  With the word "awesome," yes.

09:53:40   18    Q.  All right.  Can you explain what you mean by the next

09:53:43   19    text message, No. 225?

09:53:44   20    A.  I can probably type that most days during the tenure

09:53:51   21    there.  There was just a lot going on, a lot of change, a

09:53:55   22    lot of growth.  And so I said, have I been here three

09:53:59   23    months or three years?  My golly, we've got stuff going on.

09:54:03   24    It was just a very busy time.  And so more -- more work

09:54:07   25    than what would get during an eight-hour day, so the days

EXHIBIT A

09:54:11   1   were longer than eight hours.

09:54:13   2   Q.  So let's break it down a little bit.  The Nick called

09:54:17   3   yesterday part of this message, who's Nick again?

09:54:17   4   A.  Nick was Nick Fineman from Precision Testing Solutions.

09:54:21   5   Q.  So this text message, is it about the toxicology

09:54:26   6   business?

09:54:26   7   A.  I would have still been focusing on toxicology, yes.

09:54:34   8   Q.  All right.  And what do you mean by five podiatrists in

09:54:40   9   Houston, all individual practices that do 100 to 200 a

09:54:43   10  month?

09:54:43   11  A.  So podiatrists is another group of individuals that

09:54:49   12  give away narcotics, surgical patients, post surgery, and

09:54:51   13  my friend Nick had called -- had a client there where he

09:54:57   14  did the Siemens analyzer, and had introduced me to the

09:55:02   15  podiatrist.  And said, hey, I got a friend who does

09:55:06   16  toxicology in your space.  Would you like to listen?  And

09:55:09   17  so I went in and made a pitch to them, and they started

09:55:15   18  doing referrals to us.

09:55:16   19  Q.  100 to 200 a month, does that mean referrals?

09:55:20   20  A.  That would be 100 to 200 individual toxicology

09:55:26   21  specimens, yes.

09:55:26   22  Q.  Would you consider that to be a significant client?

09:55:29   23  A.  100 to 200 a month, yes, I would consider that to be a

09:55:33   24  good client.

09:55:33   25  Q.  Did Mr. Madison seem excited about that in the

09:55:36  1  follow-up text messages?

09:55:38  2  A.  We got an awesome with four exclamation points, so I'd

09:55:42  3  say yes.

09:55:42  4  Q.  All right.  And it looks like you also sent a message

09:55:45  5  to Ms. Borgfeld regarding your contract.  Can you explain

09:55:52  6  the context of that message?

09:55:54  7  A.  I am not sure.

09:56:02  8  Q.  What was your compensation contract when you --

09:56:04  9  compensation terms in your contract when you first started

09:56:08  10  at Little River?

09:56:08  11  A.  I had -- I was a W-2 employee.  I had a base salary of

09:56:14  12  a hundred to 120, go off the top of my head, and then there

09:56:19  13  was a carve-out of the first thousand toxicology specimens

09:56:25  14  because of the aforementioned Dr. Joshi and Dr. Scott

09:56:30  15  Irvine.

09:56:31  16          They already had a relationship, and so Jeff and I

09:56:34  17  agreed they were already kind of clients of Little River.

09:56:36  18  So above a thousand I started to get a per-cup commission,

09:56:42  19  based upon a cup of urine.

09:56:44  20  Q.  During the time that you were at Little River, did your

09:56:48  21  contract get modified and amended?

09:56:51  22  A.  Yes, it did.

09:56:52  23  Q.  All right.  Let's look at the text message 229.  Can

09:56:59  24  you take a second to read that message to yourself?

09:57:02  25  A.  Okay.

09:57:17  1  Q.  Do you remember what some of these acronyms are?  775,

09:57:21  2  IPA, what is that?

09:57:22  3  A.  That is Scott Irvine's practice.

09:57:26  4  Q.  And what does the 77 -- what is the number preceding

09:57:30  5  it?

09:57:30  6  A.  The number would be the number of toxicology specimens.

09:57:35  7  Q.  And this is information that you would have sent to

09:57:38  8  Mr. Madison?

09:57:38  9  A.  That is correct.  Again, in an executive report or an

09:57:41  10  update of activity.

09:57:42  11  Q.  And that's reflected in this message, correct?

09:57:45  12  A.  Yes.

09:57:46  13       MR. PEELE:  Your Honor, objection.  May we

09:57:48  14  approach?

09:57:48  15       THE COURT:  Okay.

09:57:50  16       (Bench conference.)

09:58:09  17       MR. PEELE:  Your Honor, I believe the Government

09:58:12  18  is starting to move into testimony that violates one of

09:58:15  19  your prior motions in limine.

09:58:17  20       Mr. Madison's Motion in Limine No. 28 was that the

09:58:20  21  Government not elicit testimony or bring forth evidence

09:58:23  22  conflating federal and private referrals.

09:58:26  23       You granted that motion.  And so if the

09:58:29  24  Government's going to elicit information regarding

09:58:31  25  referrals, then we believe that they need to be eliciting

| | | |
|---|---|---|
| 09:58:35 | 1 | whether those are private or federal pay because that's |
| 09:58:38 | 2 | Motion in Limine No. 28. |
| 09:58:40 | 3 | THE COURT:  Mr. Garcia? |
| 09:58:41 | 4 | MR. A. GARCIA:  Your Honor, I'm happy to clarify |
| 09:58:43 | 5 | that it included both.  However, I don't think I'm |
| 09:58:47 | 6 | conflating anything.  We're just talking about referrals. |
| 09:58:50 | 7 | There's no other implication. |
| 09:58:52 | 8 | MR. PEELE:  That's exactly what the motion in |
| 09:58:54 | 9 | limine goes to, Your Honor, is that -- so this is Madison |
| 09:59:07 | 10 | Motion in Limine No. 28.  Your order -- the title of it is |
| 09:59:12 | 11 | Conflating Purely Private Insurance Transactions and Claims |
| 09:59:17 | 12 | Involving Federal Healthcare Funds, and you granted that. |
| 09:59:21 | 13 | So it's -- the point being that when the |
| 09:59:22 | 14 | Government just says, oh, it's both, it puts the -- the |
| 09:59:26 | 15 | jury's in no position -- is 775, all private, 774 private |
| 09:59:31 | 16 | and one federal?  We don't know -- and the Government |
| 09:59:35 | 17 | should be forced to delineate which is private and which is |
| 09:59:40 | 18 | federal, because one could potentially serve as a |
| 09:59:43 | 19 | kickback -- |
| 09:59:44 | 20 | THE COURT:  That's not how I interpreted this |
| 09:59:46 | 21 | motion. |
| 09:59:46 | 22 | MR. PEELE:  Okay. |
| 09:59:47 | 23 | THE COURT:  I interpreted it to being treating |
| 09:59:49 | 24 | private referrals as federal, not that there are -- there |
| 09:59:53 | 25 | may be a mix in certain transactions. |

| | | |
|---|---|---|
| 09:59:53 | 1 | MR. PEELE:  Your Honor, I think the last |
| 09:59:53 | 2 | paragraph -- |
| 09:59:57 | 3 | THE COURT:  And I don't think there's a problem |
| 09:59:58 | 4 | with the Government eliciting testimony that they were both |
| 10:00:02 | 5 | private paying patients and federal paying patients.  In |
| 10:00:06 | 6 | fact, that's already been heard by the jury multiple times. |
| 10:00:11 | 7 | MR. PEELE:  Your Honor, it just says the motion |
| 10:00:11 | 8 | was:  Furthermore, the Government should be precluded from |
| 10:00:12 | 9 | conflating such irrelevant or private insurance claims, and |
| 10:00:15 | 10 | those involving federal healthcare program funds. |
| 10:00:17 | 11 | If the Government is allowed to conflate these two |
| 10:00:17 | 12 | separate and distinct transactions, then any probative |
| 10:00:21 | 13 | value that such evidence has is outweighed by the danger of |
| 10:00:24 | 14 | unfair prejudice, confusion of the issues, misleading the |
| 10:00:27 | 15 | jury, delay, time, and needless presentation. |
| 10:00:29 | 16 | THE COURT:  I don't see a problem in this |
| 10:00:31 | 17 | testimony with that. |
| 10:00:33 | 18 | MR. PEELE:  All right.  So does your motion in |
| 10:00:34 | 19 | limine still stand, Your Honor?  Can I get some |
| 10:00:37 | 20 | clarification on what it does get eliminate or limine out? |
| 10:00:41 | 21 | THE COURT:  What I -- what I meant to limine out |
| 10:00:43 | 22 | would be treating private paying patients as federal |
| 10:00:50 | 23 | patients, not that some number includes both federal and |
| 10:00:55 | 24 | private paying patients.  And I don't see how the |
| 10:00:58 | 25 | Government could present its case if they have to separate |

10:01:01   1   out federal and private in every instance.

10:01:04   2          MR. BESEN:  Doesn't it need to elicit from its

10:01:07   3   witnesses there could have been -- there were federal

10:01:09   4   samples and certain private samples --

10:01:12   5          THE COURT:  Yes, that's what Mr. Garcia has said

10:01:14   6   that he is intending to do here.

10:01:18   7          MR. BESEN:  Okay.  So you're going to ask him

10:01:19   8   whether he knows if it was commercial or federal?

10:01:19   9          MR. A. GARCIA:  Yeah, I'm not -- the evidence --

10:01:20   10  the evidence is what the evidence is.  I'll ask him about,

10:01:22   11  you know, if it includes Medicare.  I'm happy to do that.

10:01:25   12         We're not conflating anything.  I mean, if the

10:01:28   13  referrals are just being talked about as referrals, that's

10:01:31   14  just what it is.  I don't think there's any sort of

10:01:33   15  requirement for us to go out and independently verify that

10:01:36   16  of these 550 referrals, you know, some percentage of it

10:01:41   17  were Medicare.

10:01:43   18         MR. BESEN:  I'm worried that we're going to get a

10:01:46   19  place where the Government is going to ask you did you pay

10:01:49   20  a marketer for these referrals, and when that happens,

10:01:51   21  without being specific about federal or commercial, that is

10:01:56   22  misleading the jury.

10:01:56   23         THE COURT:  Right.  And I would assume that at

10:01:58   24  that point that you would elicit testimony that identified

10:02:01   25  whether or not they were federal -- federal referrals.

1240

10:02:04  1          MR. BESEN:  And what I would point you to,

10:02:06  2   Your Honor, is when Mr. Cook said why he pled guilty, he

10:02:10  3   said:  I knew doctors were paid for referrals.  I heard

10:02:14  4   that.

10:02:15  5          THE COURT:  Right, yeah.

10:02:16  6          MR. BESEN:  That's not going to be good --

10:02:19  7          THE COURT:  Yeah.

10:02:23  8          MR. BESEN:  Thank you, Your Honor.

10:02:23  9          (Bench conference concluded.)

10:02:50  10  BY MR. A. GARCIA:

10:02:50  11  Q.  All right.  Mr. Cook, where we left off, we were

10:02:52  12  looking at some of the numbers here.

10:02:54  13          So 775, what does that mean?

10:02:56  14  A.  That would have been Dr. Irvine's practice, the -- what

10:03:00  15  I was estimating -- and, again, you can see by the date, it

10:03:03  16  wasn't the end of the month yet, but I'm extrapolating the

10:03:07  17  previous three weeks and guessing that he'll do 775

10:03:15  18  toxicology specimens for that month.

10:03:19  19  Q.  And let's go to the next one, Dr. -- is that --

10:03:22  20  A.  There's Dr. Joshi.

10:03:23  21  Q.  And is that the 320 --

10:03:25  22  A.  320 would have been -- I was guessing at that point,

10:03:28  23  projecting out for that month.

10:03:29  24  Q.  All right.  Let's go to the next one.

10:03:31  25          Who's Tomball?

EXHIBIT A

1241

10:03:32  1   A.  Tomball is the area where the Jacobs did their

10:03:38  2   marketing.

10:03:38  3   Q.  Did you frequently refer to them as Tomball?

10:03:43  4   A.  Yes.

10:03:43  5   Q.  And it looks like at the end you tally it up and

10:03:47  6   provide a number.  Is that -- is that what I'm seeing?

10:03:50  7   A.  Yes.

10:03:50  8   Q.  Okay.  And this text message, you sent it to

10:03:54  9   Mr. Madison?

10:03:54  10  A.  Yes, sir.

10:03:55  11  Q.  Consistent with your practice of updating him on the

10:03:58  12  sales figures?

10:03:58  13  A.  Yes.

10:03:59  14  Q.  Do you know if these referral numbers included federal

10:04:03  15  pay referrals?

10:04:08  16  A.  I believe they were all payors.

10:04:14  17  Q.  All right.  And after this text message, did

10:04:16  18  Mr. Madison acknowledge receipt of your message?

10:04:19  19  A.  He did.  Said the word "nice."

10:04:21  20  Q.  And what did you tell him after that?

10:04:23  21  A.  Then I said:  Wait until you see September, four dots.

10:04:28  22  Q.  Were you anticipating that the September results would

10:04:33  23  be good?

10:04:34  24  A.  We were in a growth pattern, and so I anticipated --

10:04:36  25  there were sign-ups that were in process, and it's the end

| | | |
|---|---|---|
| 10:04:40 | 1 | of July.  So over the course of August, you realize |
| 10:04:42 | 2 | September, then you'll have those all come to fruition. |
| 10:04:45 | 3 | Q.  And was Mr. Madison happy with that -- with that |
| 10:04:47 | 4 | notice? |
| 10:04:47 | 5 | A.  Again, an "awesome" with one exclamation point. |
| 10:04:52 | 6 | Q.  Not the four exclamation points? |
| 10:04:58 | 7 | A.  Not four as the other, but still pretty good. |
| 10:04:59 | 8 | Q.  All right.  All right.  And then it looks like there's |
| 10:05:06 | 9 | another conversation a month later.  And if you look at row |
| 10:05:14 | 10 | No. 246, it seems like it involves you, Ms. Borgfeld, and |
| 10:05:19 | 11 | Mr. Madison; is that correct? |
| 10:05:20 | 12 | A.  Yes, sir. |
| 10:05:21 | 13 | Q.  All right.  Let's look at the actual text. |
| 10:05:23 | 14 | What do you mean by "old customer sign-up"? |
| 10:05:26 | 15 | A.  On 246, it looks like it's just a Jeff and I. |
| 10:05:30 | 16 | Q.  Okay.  And what does it -- what does it mean by "old |
| 10:05:32 | 17 | customer sign-up," Mr. Cook? |
| 10:05:32 | 18 | A.  So it would have been from my Aegis days. |
| 10:05:36 | 19 | Q.  So you would have had a connection with another |
| 10:05:39 | 20 | doctor -- |
| 10:05:39 | 21 | A.  I would have been in an office I had previously, and |
| 10:05:42 | 22 | there were a number of accounts in the San Antonio area |
| 10:05:44 | 23 | where they did their own testing, but insurances would |
| 10:05:48 | 24 | not -- not all insurances would pay for it, and so I -- I |
| 10:05:52 | 25 | recall that there was a couple of them where Humana would |

10:05:55  1  not allow them to self-refer toxicology to themselves, and
10:06:00  2  so they needed to still get the tests done and send it out.
10:06:05  3  Q.  And when you say "only Humana," let me break that down
10:06:08  4  for someone that might not be familiar.
10:06:11  5       Is Humana -- Humana is a private insurance
10:06:13  6  company?
10:06:13  7  A.  One of -- I call it the big five, yes.  One of the big
10:06:17  8  five.
10:06:17  9  Q.  Who are those big fives?
10:06:19  10  A.  Cigna, Blue Cross, Humana, Aetna, and United.
10:06:24  11  Q.  And it looks like you asked a question, what does it
10:06:28  12  mean, any idea on a reimbursement average?
10:06:30  13  A.  So that would be a question that I would have into to
10:06:33  14  Jeff where, you know, again, I don't like the idea of
10:06:38  15  cherry-picking specimens, but in this case it's all that's
10:06:38  16  available because they're doing their test anyway.
10:06:42  17       So I wanted to make sure that a customer that I
10:06:44  18  was bringing in, and it wasn't the full scope that we might
10:06:48  19  see that that wasn't, you know, some insurance that's going
10:06:51  20  to get half of a rejected or be poor, so I wanted to ask
10:06:56  21  the question before I fully onboarded them.
10:06:59  22  Q.  So this practice was billing some other insurers, but
10:07:01  23  just not the Humana business?
10:07:03  24  A.  That is correct.  They would have been doing their own
10:07:05  25  testing in-house, and then Humana did not allow them to do

10:07:08  1  that, they wouldn't give them a reimbursement, and so they
10:07:12  2  sent them out.
10:07:13  3  Q.  All right.  And then it looks like you asked
10:07:16  4  Mr. Madison a question, good dollar sign, are you asking
10:07:18  5  him about the reimbursement rate?
10:07:18  6  A.  Yeah, good money.  Is it a good payor for toxicology.
10:07:21  7  Q.  Okay.  And what does Mr. Madison respond?
10:07:24  8  A.  He replies:  Fantastic.  Yes.  Good!
10:07:37  9  Q.  Okay.  And do you get -- what do you respond to that?
10:07:37 10  A.  I guess a little bit tongue in cheek:  So 30 a week is
10:07:39 11  okay, you want them?  Two smiley faces.
10:07:44 12  Q.  Is that significant business?
10:07:45 13  A.  Well, he then says:  Great, probably average a thousand
10:07:51 14  per.
10:07:51 15  Q.  What is "a thousand per" mean?
10:07:52 16  A.  So that would -- a thousand per specimen.
10:07:56 17  Q.  A thousand dollars?
10:07:57 18  A.  Their contract was paying.  And so I -- again, it's
10:08:02 19  quick math, but it's like $1.5 million in sales.
10:08:07 20  Q.  And you actually did that math in the next text
10:08:11 21  message, correct?
10:08:11 22  A.  That is correct.
10:08:14 23  Q.  And what do you ask Mr. Madison after that?
10:08:17 24  A.  And so then I had bought lunch for the practice, so
10:08:20 25  then I -- again, tongue in cheek:  So it was okay to spend

10:08:24  1    $180 at lunch.

10:08:24  2    Q.  And what does Mr. Madison --

10:08:26  3    A.  With a wink.  And he put:  Yes, with an exclamation.

10:08:30  4    Q.  And then he asked you a question.  What is that

10:08:33  5    question?

10:08:33  6    A.  He asked me:  Are we hiring a CT?  A collection tech.

10:08:37  7    Q.  What is a collection tech?

10:08:39  8    A.  A collection tech is a person that is the first point

10:08:42  9    of contact when Little River would be in the process of

10:08:47  10   specimen, they would be the in-office person representing

10:08:51  11   Little River.

10:08:52  12        If it's in toxicology, it's going to have them

10:08:55  13   filling out paperwork and then taking them to the restroom

10:08:58  14   to fill up a cup.  If it's in the blood space, they're

10:09:02  15   going to be putting them in a draw chair, and then a

10:09:05  16   phlebotomist is going to draw their blood.

10:09:07  17        Collection techs were -- again, there were two

10:09:10  18   different types we had.

10:09:11  19   Q.  And what did -- what did you respond to Mr. Madison?

10:09:14  20   A.  As I would have, because I was tasked with this:

10:09:19  21   Absolutely.

10:09:19  22        Because we -- we had to have -- for the first

10:09:22  23   point of contact with any patient had to be a Little River

10:09:25  24   person.  I was told that was the necessary.  So I said:

10:09:29  25   Absolutely.  They were thinking about past employees.  If

10:09:33   1   not, I will round someone up.

10:09:37   2   Q.  And what does Mr. Madison reply to you?

10:09:40   3   A.  He says:  Cool.  What about BCBS?

10:09:45   4   Q.  Is this because previously you had told him only

10:09:48   5   Humana?

10:09:49   6   A.  I had started with only Humana.  And, again, maybe one

10:09:54   7   of the downsides of text message, you're doing it quick,

10:09:56   8   but you haven't given it the full flavor and explanation,

10:09:59   9   like I've done here today for y'all.  He didn't realize

10:10:03  10   maybe that -- you know, why they're only sending us one

10:10:06  11   insurance, and so then he asks about BCS --

10:10:10  12   Q.  And what does he say next?

10:10:12  13   A.  He next says:  We'll take their Medicare, too!

10:10:16  14   Q.  Do you understand that to be that Little River will

10:10:18  15   accept their Medicare referrals, too?

10:10:21  16   A.  Yes.

10:10:22  17   Q.  Is there an exclamation point after that text message?

10:10:26  18   A.  There is.

10:10:27  19   Q.  Does Mr. -- and do you understand that to be that

10:10:31  20   Mr. Madison's excited about this possibility?

10:10:33  21   A.  He would take any specimens that came, but Medicare is

10:10:38  22   included in that group, too.

10:10:40  23   Q.  And then he asked you a question after that.  Do you

10:10:43  24   see that?

10:10:44  25   A.  Sure they don't want their Medicare?

EXHIBIT A

1247

10:10:51  1    Q.  All right.  And then it looks like you respond later to

10:10:53  2    the same text message?

10:10:54  3    A.  Yes.

10:10:54  4    Q.  What do you say?

10:10:55  5    A.  Said they were mine until they built their own lab.

10:11:00  6    Analyzer Nick, which we've already spoken of, they're doing

10:11:06  7    a formal screen in-house.  And then they also have a mass

10:11:11  8    spec, which is the piece of equipment that you run that

10:11:14  9    toxicology confirmation testing on.  Everyone is paying

10:11:17  10   except Humana, but you need to meet them.

10:11:20  11   Q.  I'm going to stop you there.

10:11:22  12   A.  Okay.  I'm sorry.

10:11:23  13   Q.  No, that's okay.  What do you mean by "but you need to

10:11:30  14   meet them"?

10:11:30  15   A.  So the reason why I had said that is I had a

10:11:32  16   conversation with the group, who I knew pretty well, it was

10:11:34  17   one of my first accounts that I got at Aegis.  So at this

10:11:40  18   point, I'd known them for four years or so and explained

10:11:43  19   who Little River was, where I had went.  I was at this new

10:11:46  20   place, and then, again, Jeff's vision for his physician

10:11:51  21   group.

10:11:51  22        And so I had a real surface-level, which I did a

10:11:55  23   number of times, moving into the future, this is one of the

10:11:59  24   first ones, where that'd be something if you guys were ever

10:12:02  25   interested in, a practice lease model.

1                            I N D E X

2

3    WITNESSES FOR THE GOVERNMENT                      PAGE

4

5    ROBERT O'NEAL
     Direct Examination by Mr. A. Garcia           4755
6    Voir Dire Examination by Mr. Lewis            4776
     Direct Examination Continued by Mr. A. Garcia  4779
7

8                         *      *      *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08:57:18  1    Q.  Dr. O'Neal, do you know Jeffrey Madison?

08:57:22  2    A.  Yes, sir, I do.

08:57:23  3    Q.  Okay.  And was Jeffrey Madison involved in that

08:57:26  4    conspiracy?

08:57:27  5    A.  Yes, sir, he was.

08:57:28  6    Q.  Now, there was another -- the second charge that we

08:57:32  7    mentioned, that's the money laundering conspiracy.

08:57:37  8         Did you agree with others to launder money made

08:57:39  9    from the illegal kickback scene?

08:57:42  10        MR. ARIAIL:  Objection.  Leading, Your Honor.

08:57:44  11        THE COURT:  Sustained.

08:57:47  12   BY MR. A. GARCIA:

08:57:48  13   Q.  Dr. O'Neal, I want to turn a little bit to your

08:57:50  14   involvement with hospitals.  When did you first get

08:57:52  15   involved in running a hospital?

08:57:55  16   A.  Probably 2008, '7, somewhere in there -- '6, somewhere

08:58:10  17   in there.  I'm not actually sure.  Somewhere in that area.

08:58:14  18   Q.  Sometime around 2007, 2008?

08:58:16  19   A.  Yes, sir.

08:58:16  20   Q.  Okay.  And where were those hospitals?

08:58:19  21   A.  Those hospitals were in San Antonio, Houston, Dallas, a

08:58:30  22   number of places throughout Texas.

08:58:32  23   Q.  Okay.  What was the name of those hospitals?

08:58:34  24   A.  Victory Hospitals.

08:58:37  25   Q.  Okay.  Were these hospitals located in rural areas or

1                          I N D E X

2

3    WITNESSES FOR THE DEFENDANT                      PAGE

4

5    RYAN DOWNTON
     Direct Examination Continued by Mr. Lewis      5606
6    Cross-Examination by Mr. A. Garcia             5671
     Redirect Examination by Mr. Lewis             5799
7

8                          *     *     *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

04:48:08  1   Q.  Okay.  And we talked about some of those valuations

04:48:11  2   that you received from some of these -- some of these

04:48:15  3   financial partners in -- regarding the recapitalization,

04:48:19  4   right?

04:48:19  5   A.  Yes.

04:48:19  6   Q.  300 -- $500 million?

04:48:21  7   A.  Yes.

04:48:21  8   Q.  And even at the low end, you said -- you showed off

04:48:24  9   some impressive math, and you said 54 million?

04:48:26  10  A.  Yes.

04:48:27  11  Q.  Okay.  You don't think $54 million would have clouded

04:48:32  12  your judgment?

04:48:32  13  A.  No.  The opposite.  I wanted to receive that money.  I

04:48:37  14  needed to make sure we were following the laws.  Because if

04:48:42  15  we weren't, I would never see that money.

04:48:44  16  Q.  What if the reason why the valuation was because Little

04:48:49  17  River was engaging in a criminal practice or something

04:48:52  18  against the law?  Would that have affected the value of

04:48:56  19  Little River?

04:48:56  20  A.  Sure.  It would've taken it -- it would have been a

04:48:59  21  very negative thing for it.

04:49:01  22  Q.  And that would have affected your value -- your

04:49:05  23  financial interest in the company, right?

04:49:06  24  A.  Yes.  If Little River was acting illegally, it would

04:49:10  25  have had a negative impact on my personal financial

| | | |
|---|---|---|
| 02:29:17 | 1 | have said or done. |
| 02:29:18 | 2 | Q.  Do you -- did you bring a lawyer here today to |
| 02:29:20 | 3 | represent you? |
| 02:29:21 | 4 | A.  No. |
| 02:29:21 | 5 | Q.  I want us to look -- and this is the last thing. |
| 02:29:35 | 6 | I want us to look at Government's 193A, line 861. |
| 02:30:03 | 7 | MR. LEWIS:  Do you have it, Keith?  861. |
| 02:30:21 | 8 | BY MR. LEWIS: |
| 02:30:31 | 9 | Q.  Mr. Downton, did you know they -- and this has been |
| 02:30:35 | 10 | offered and admitted into evidence. |
| 02:30:35 | 11 | Did you know that they had some of your text |
| 02:30:38 | 12 | messages? |
| 02:30:38 | 13 | A.  I knew they had text messages from Jeff.  So it doesn't |
| 02:30:44 | 14 | surprise me. |
| 02:30:45 | 15 | Q.  Line 861.  Did you see that there -- this is a text |
| 02:30:48 | 16 | message from you to Jeff Madison and Todd Cook on August |
| 02:30:58 | 17 | the 4th, 2015? |
| 02:30:58 | 18 | A.  Yes. |
| 02:30:58 | 19 | Q.  Can you read the substance of the text you sent to |
| 02:31:04 | 20 | them? |
| 02:31:05 | 21 | A.  We do not pay anyone to market for Government business. |
| 02:31:09 | 22 | However, doctors often prefer to send all of their |
| 02:31:13 | 23 | specimens to a single lab, so we will accept Government |
| 02:31:16 | 24 | specimens.  There just isn't any marketing fee associated |
| 02:31:21 | 25 | with them. |

| | | |
|---|---|---|
| 03:24:01 | 1 | Q.  And then what do you respond? |
| 03:24:02 | 2 | A.  I say:  Some of their locations involve physician |
| 03:24:07 | 3 | ownership in an MSO.  All of those are definitely out.  We |
| 03:24:10 | 4 | are deciding what to do which our non-MSO docs. |
| 03:24:14 | 5 | Q.  So at this time in July of 2015, you were concerned |
| 03:24:16 | 6 | with physician-owned MSOs, right? |
| 03:24:18 | 7 | A.  With respect to Benchmark, yes. |
| 03:24:20 | 8 | Q.  Not with respect to any other marketing group? |
| 03:24:22 | 9 | A.  Not at that time. |
| 03:24:23 | 10 | Q.  Okay.  All right.  Are you aware that Little River |
| 03:24:31 | 11 | continued paying Benchmark for several months after this |
| 03:24:33 | 12 | text message? |
| 03:24:34 | 13 | A.  Yes. |
| 03:24:35 | 14 | Q.  And why did you continue paying them if you had some |
| 03:24:38 | 15 | concerns regarding their physician ownership? |
| 03:24:40 | 16 | A.  Well, their physician ownership wasn't illegal, and |
| 03:24:42 | 17 | they hadn't breached the contract.  But we were exercising |
| 03:24:46 | 18 | our right to stop doing business with them. |
| 03:24:48 | 19 | Q.  Okay. |
| 03:24:48 | 20 | A.  It didn't change our contractual obligations. |
| 03:24:53 | 21 | Q.  And you also mentioned that you had received some |
| 03:24:55 | 22 | reports in the field about them paying kickbacks to |
| 03:24:57 | 23 | doctors.  Right? |
| 03:24:58 | 24 | A.  Yes. |
| 03:24:58 | 25 | Q.  And that didn't stop you from paying them for months |

| | | |
|---|---|---|
| 03:25:02 | 1 | after that? |
| 03:25:02 | 2 | A.  No, it did not. |
| 03:25:03 | 3 | Q.  That wouldn't have been a violation of your contract? |
| 03:25:06 | 4 | A.  Depending on -- if they were structured legally, it |
| 03:25:08 | 5 | would not have been a violation.  It was concerning to me |
| 03:25:11 | 6 | the way it was being discussed. |
| 03:25:13 | 7 | Q.  You also mentioned that they didn't respect doctor |
| 03:25:15 | 8 | clients of other marketing groups.  Do you remember that? |
| 03:25:18 | 9 | A.  I do. |
| 03:25:18 | 10 | Q.  Now, can you explain this to me.  Why isn't more |
| 03:25:23 | 11 | advertising good for Little River? |
| 03:25:25 | 12 | A.  Because if the doctors are already sending to Little |
| 03:25:29 | 13 | River, they're sending to us. |
| 03:25:30 | 14 | Q.  So double advertising doesn't help you? |
| 03:25:32 | 15 | A.  Well, no, more advertising helps us.  Going to doctors |
| 03:25:36 | 16 | already sending to us and saying we want you to join our |
| 03:25:39 | 17 | MSO when Little River will not do business with any doctor |
| 03:25:43 | 18 | in that MSO, that's competing with us.  It's not |
| 03:25:46 | 19 | advertising to help us. |
| 03:25:47 | 20 | Q.  And so there you mentioned going to a doctor and |
| 03:25:50 | 21 | saying, join my MSO.  You're speaking specifically about |
| 03:25:54 | 22 | Benchmark? |
| 03:25:54 | 23 | A.  Correct. |
| 03:25:54 | 24 | Q.  That wasn't the sales pitch of the other marketing |
| 03:25:57 | 25 | groups? |

EXHIBIT A

```
1              IN THE UNITED STATES BANKRUPTCY COURT
                  FOR WESTERN DISTRICT OF TEXAS
2                        WACO DIVISION
3     JAMES STUDENSKY, CHAPTER    )
      7 TRUSTEE,                   )
4                                  )
      Plaintiff,                   )
5     _____    ) 6:21-MC-00028-ADA
      PEGGY S. BORGFELD, RYAN      )
6     H.  DOWNTON, JEFFREY P.      ) ADV. PRO. NO.
      MADISON, and KEVIN J.        ) 20-06062-RBK
7     OWENS,                       )
      Defendants.                  )
8                                  )
      In Re:                       ) CASE NO. 18-60526-RBK
9     LITTLE RIVER HEALTHCARE      ) CHAPTER 7
      HOLDINGS, LLC, et al,        )
10
11
12
13
14    ********************************************************
15              ORAL AND VIDEOTAPED DEPOSITION OF
16                      LOUIS ROBICHAUX
17                      June 23, 2022
18                         Volume 1
19    ********************************************************
20
21
22
23
24
25
                                                    Page  1
```

EXHIBIT B

**Page 2**

1     ORAL AND VIDEOTAPED DEPOSITION OF LOUIS

2   ROBICHAUX, produced as a witness at the instance of the

3   Plaintiff, and duly sworn, was taken in the above-styled

4   and numbered cause on the 23rd day of June, 2022, from

5   9:36 a.m. to 3:03 p.m., via videoconference, before

6   Abigail Guerra, CSR, in and for the State of Texas,

7   reported by machine shorthand, where all

8   Attendees appeared via Zoom in their respective

9   locations, pursuant to the Federal Rules of Civil

10   Procedure and the provisions stated on the record or

11   attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 4**

1         A P P E A R A N C E S (cont'd)

     (Appearing Remotely)

2

3

    ALSO PRESENT:

4     Ms. Megan King, Videographer

     Ms. Rujuta Khanderia

5     Mr. Aidan Henderson

     Mr. Drew Lehman

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 3**

1         A P P E A R A N C E S
     (Appearing Remotely)
2

3

   FOR THE PLAINTIFF:
4
   Mr. Matthew C Powers
5   Ms. Marianne W. Nitsch
    GRAVES, DOUGHERTY, HEARON & MOODY
6   401 Congress Avenue
     Suite 2700
7   Austin, Texas 78701
     Phone:  (512) 480.5725
8   Email:  Mpowers@gdhm.com
          Mnitsch@gdhm.com
9
     - and -
10
   Mr. Joshua A. Romero
11   Mr. Michael C. Roberts
    JACKSON WALKER LLP
12   100 Congress Avenue
     Suite 1100
13   Austin, Texas 78701
     Phone:  (512) 236.2035
14   Email:  Jromero@jw.com
          Mroberts@jw.com
15
   FOR THE DEFENDANT:
16
   Mr. Ryan H. Downton
17   TEXAS TRIAL GROUP, P.C.
    900 S. Capital of Texas Highway
18   Suite 300
     Austin, Texas 78746
19   Phone:  (512) 680-[7947
     Email:  Ryan@TheTexasTrialGroup.com
20
     - and -
21
   Mr. Seth Meisel
22   DUBOIS, BRYANT & CAMPBELL, LLP
    303 Colorado
23   Suite 2300
     Austin, Texas 78701
24   Phone:  (512) 381-8012
     Email:  Smeisel@dbcllp.com
25

**Page 5**

1                 INDEX

2

3   Appearances.......................................     3

4   LOUIS ROBICHAUX

5      Examination by Mr. Powers....................     7

6   Signature and Changes...........................   173

7   Reporter's Certificate..........................   175

8

9

10             EXHIBITS

11   NO.          DESCRIPTION                  PAGE

12   Exhibit 184   Expert Report                      7

13   Exhibit 185   Email                          127

14              Bates Nos. P0000137

15   Exhibit 186   Excel Spreadsheet                157

16              Bates Nos. P0061934

17

18

19

20

21

22

23

24

25

2 (Pages 2 - 5)

EXHIBIT B

Page 166

```
1    A. Okay. What actually occurred after the fact
2 and what BlueCross BlueShield actually paid against
3 charges is accurately set forth in this Exhibit 186
4 after the fact.
5    Q. (BY MR. POWERS) Okay.
6       And you agree that the payment experience
7 reflected here, at least to your understanding, is
8 accurate with respect to these dates of service data?
9       MR. DOWNTON: Objection, form.
10   A. Yeah. I'm going to be -- I'm going to try to
11 be precise. Only with respect to dates of service, not
12 dates of payment.
13   Q. (BY MR. POWERS) And how do you know what
14 management knew at different points of time?
15   A. You have all of the monthly collection reports.
16 You've got cash flow analyses. You've got emails. I
17 mean, the record is -- has quite a bit of information
18 around what management -- what questions they were
19 asking, what information that they had, you know, issues
20 about recoupment. I mean, there's -- honestly, there's
21 a number of things that I cite to in my report that
22 would be responsive to that.
23   Q. I want to ask you a couple of more things about
24 some hindsight issues.
25       Did your analysis take into account the
```

Page 167

```
1 pending criminal charges against some of the defendants?
2    A. No.
3    Q. Are you aware of those?
4    A. I'm aware that they've been filed, yeah.
5    Q. Are you aware that Mr. Madison has been
6 indicted by the United States Government?
7    A. I'm not -- I'm not aware of that.
8    Q. Is that something that would have an impact on
9 a healthcare provider's expected collections on its
10 receivables --
11       MR. DOWNTON: Objection, form.
12   Q. (BY MR. POWERS) -- going forward.
13   A. So I just -- on a broad hypothetical, if the
14 government is taking the position that a provider has
15 been filing false claims, that would have a substantial
16 impact at that time -- at the time that the allegations
17 were known and buyers or lenders, or investors have
18 information around that or should have information, then
19 that would absolutely impact their value.
20   Q. And is that the kind of thing that you think
21 plays -- hindsight plays a proper role in the analysis
22 for?
23       MR. DOWNTON: Objection, form.
24   A. Hindsight? Hindsight?
25       I think once it's fully adjudicated -- once
```

Page 168

```
1 that claim is fully adjudicated and there was no other
2 factors that were developed -- no other actions taken
3 with respect to that claim on either of the other two
4 counterparties, then I think that would be subject to
5 being appropriate hindsight after its adjudicated.
6    Q. (BY MR. POWERS) Your -- your conclusion is if
7 there were an adjudication of criminal activity that you
8 would allow for use of hindsight in that situation, but
9 not otherwise; is that what you're suggesting?
10   A. So --
11       MR. DOWNTON: Objection, form.
12       THE WITNESS: Sorry.
13   A. So at issue here is what is the value of the
14 disputed asset. So it has less to do with criminal
15 activity in my mind. It has more to do with -- it has
16 more to do with whether or not those claims were faulty,
17 and whether or not the company was going to be able to
18 continue to bill and enjoy revenue sources under that
19 scenario. So once it's decided that those claims were
20 false claims, then frankly, the exception to the
21 hindsight would tend to apply and that you would -- you
22 would value. You could pull that backwards in time and
23 take into account as to what you think the value of the
24 assets, the disputed assets are, and what you think the
25 forward revenue stream would be.
```

Page 169

```
1    Q. (BY MR. POWERS) Now, you talked a lot about
2 whether you use hindsight or not depends or implicates
3 what a management know. If the management of the
4 organization, Mr. Madison, for example, were guilty of
5 impropriety, it's -- whether adjudicated or not, it's
6 fair to say that knowledge should be considered in the
7 assessment of the solvency of the entity?
8       MR. DOWNTON: Objection, form.
9    A. Yeah. If the record that I hypothetically was
10 asked to analyze, and it included -- the record included
11 that Mr. Madison knew at this time that -- or if it was
12 later adjudicated that he knew at the time that a
13 business practice was illegal under the False Claims
14 Act, then that -- I would take into account.
15   Q. (BY MR. POWERS) And if -- the other managers
16 of the company knew that even there were red flags
17 suggesting that liability under the False Claims Act
18 could attach to certain practices, those kinds of red
19 flags should play a role in the analysis, correct?
20       MR. DOWNTON: Objection, form.
21   A. I mean, if the record had evidence that
22 management was aware at the time that there was, you
23 know, even -- you know, a moderate amount of reason to
24 believe that a significant part of the revenue stream
25 was being generated by false claims, that would be
```

43 (Pages 166 - 169)

EXHIBIT B

1 relevant.  Even -- even notwithstanding the use of
2 hindsight because that's not hindsight.  That's
3 contemporaneous evidence in the record, right?  So I
4 would --
5     Q.  (BY MR. POWERS)  Right.
6     A.  I wouldn't even deal with that as a hindsight
7 issue.  I deal with it as what was known or reasonably
8 known at the time, yes.
9     Q.  And you agree that --
10     A.  And I apologize it's right at my other meeting
11 start time.  So I apologize, I've got to -- I've got to
12 run.  So is this an okay time to wrap up?
13     Q.  Thank you.  Can I ask one more question?
14     A.  Okay.  Quick, quick.
15     Q.  Do you agree that if, in fact, management was
16 aware of red flags that their practices could
17 potentially be implicated in False Claims Act violations
18 that that would devastate the value of the company and
19 the valuation opinion that assumed a legally operating
20 entity?
21         MR. DOWNTON:  Objection, form.
22     A.  I think your preamble is way too broad for me
23 to say yes to that.  You know, potentially implicated --
24 look, at the end of the day -- I'm sorry -- everyday
25 healthcare providers across the country have false

Page 170

1 claims actions threatened.  You know, every -- you --
2 you can read in the healthcare press there are relaters
3 every day.  The government only joins in on a small
4 portion of initial relater claims.  Most relater claims
5 are not found to be -- are not found to be valid.  So
6 what you're saying is even an implication that something
7 might be challenged, no, I don't agree that that would
8 immediately devastate the value of -- of a company.
9     Q.  (BY MR. POWERS)  Let me ask it a slightly
10 different way.  If there were bona fide reason to think
11 whether advice of counsel or BlueCross submitted
12 something substantial, if there are bona fide reason to
13 think that there were -- there was a False Claims Act
14 liability, that would have a material impact on the
15 value of the company, true?
16         MR. DOWNTON:  Objection, form.
17         Way outside both scope and facts of
18 evidence in this case.
19     A.  I would just say this.  As a general rule
20 litigation liabilities, if they're thought to be valid,
21 impacts the value of the companies just as a general
22 statement.
23         I apologize.  I'm really going to be late
24 for this other meeting.  I'll be happy to -- I'll be
25 happy to continue on on Monday.

Page 171

1         MR. POWERS:  Thanks.  We'll resume on
2 Monday.
3         THE WITNESS:  Thanks.
4         THE VIDEOGRAPHER:  We're off the record at
5 3:01 p.m.
6         (Off-the-record discussion.)
7         THE CERTIFIED STENOGRAPHER:  And just some
8 housekeeping for the attorneys.  Ryan, did you want to
9 purchase a copy of the transcript?
10         MR. DOWNTON:  Yes, please.
11         THE CERTIFIED STENOGRAPHER:  Okay.  And did
12 you also want a copy of the video?
13         MR. DOWNTON:  No.
14         THE CERTIFIED STENOGRAPHER:  Matt, did you
15 want a copy of the video?
16         MR. POWERS:  Yes, please.
17         THE CERTIFIED STENOGRAPHER:  And since this
18 is federal, I have to ask, are there any further
19 stipulations you guys want to put on the record before
20 we officially close it out?
21         MR. POWERS:  I don't think so.
22         MR. DOWNTON:  We'll read and sign.
23         (Proceedings concluded at 3:03 p.m.)
24
25

Page 172

1         CHANGES AND SIGNATURE
2     WITNESS NAME:  LOUIS ROBICHAUX
3     DATE OF DEPOSITION:  June 23, 2022
4
5    PAGE    LINE     CHANGE       REASON
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 Job No. TX5262846

Page 173

44 (Pages 170 - 173)

EXHIBIT B

1     I, LOUIS ROBICHAUX, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5     _____
      LOUIS ROBICHAUX
6
7
8
9  THE STATE OF_____  )
10 COUNTY OF _____  )
11    Before me, _____, on
12 this day personally appeared LOUIS ROBICHAUX, known to
13 me (or proved to me under oath or through
14 _____) (description of identity card or
15 other document) to be the person whose name is
16 subscribed to the foregoing instrument and acknowledged
17 to me that they executed the same for the purposes and
18 consideration therein expressed.
19    Given under my hand and seal of office this
20 _____ day of _____, 2022.
21
22
23
      _____
24    NOTARY PUBLIC IN AND FOR
      THE STATE OF _____
25    Commission Expires: _____

Page 174

---

1     If returned, the attached Changes and
2  Signature Page contains any changes and the reasons
3  therefore:
4     _____ was not requested by the deponent or a
5  party before the completion of the deposition.
6     I certify that I am neither counsel for,
7  related to, nor employed by any of the parties or
8  attorneys in the action in which this proceeding was
9  taken, and further that I am not financially or
10 otherwise interested in the outcome of the action.
11    Certified to by me this 8th day of July,
12 2022.
13
14
15
16
17
      ABIGAIL GUERRA, Texas CSR 9059
18    Expiration Date:  2/28/24
      VERITEXT LEGAL SOLUTIONS
19    Firm Registration No. 571
      300 Throckmorton Street
20    Suite 1600
      Fort Worth, Texas 76102
21    Phone:  (817) 336-3042
22
23
24
25

Page 176

---

1
      IN THE UNITED STATES BANKRUPTCY COURT
2       FOR WESTERN DISTRICT OF TEXAS
              WACO DIVISION
3
   JAMES STUDENSKY, CHAPTER  )
4  7 TRUSTEE,             )
                          )
5  Plaintiff,             )
   _____ ) 6:21-MC-00028-ADA
6  PEGGY S. BORGFELD, RYAN  )
   H. DOWNTON, JEFFREY P.  ) ADV. PRO. NO.
7  MADISON, and KEVIN J.  ) 20-06062-RBK
   OWENS,                 )
8  Defendants.            )
                          )
9  In Re:                 ) CASE NO. 18-60526-RBK
   LITTLE RIVER HEALTHCARE  ) CHAPTER 7
10 HOLDINGS, LLC, et al,  )
11
12
       REPORTER'S CERTIFICATION
13     DEPOSITION OF LOUIS ROBICHAUX
            June 23, 2022
14
15    That the deposition transcript was delivered
16 to Mr. Matthew C Powers Mr. Ryan H. Downton.
17    That a copy of this certificate was served on
18 all parties and/or the witness shown herein on
19 _____.
20    I further certify that pursuant to FRCP Rule
21 30(f)(1) that the signature of the deponent:
22    __X__ was requested by the deponent or a party
23 before the completion of the deposition and that
24 signature is to be before any notary public and returned
25 within 30 days from date of receipt of the transcript.

Page 175

---

1 COUNTY OF _____  )
   STATE OF TEXAS       )
2
3     I hereby certify that the witness was notified
4  on_____, that the witness has 30 days or
5  (_____days per agreement of counsel) after being
6  notified by the officer that the transcript is available
7  for review by the witness and if there are changes in
8  the form or substance to be made, then the witness shall
9  sign a statement reciting such changes and the reasons
10 given by the witness for making them;
11    That the witness' signature was/was not returned as
12 of _____.
13    Subscribed and sworn to on this, the _____
14 day of _____, 2022.
15
16
17
18
19
      ABIGAIL GUERRA, Texas CSR 9059
20    Expiration Date:  2/28/24
      VERITEXT LEGAL SOLUTIONS
21    Firm Registration No. 571
      300 Throckmorton Street
22    Suite 1600
      Fort Worth, Texas 76102
23    Phone:  (817) 336-3042
24
25

Page 177

45 (Pages 174 - 177)

EXHIBIT B

Transcript of the Testimony of

# Jeffrey Madison

## Date:

February 10, 2022

## Case:

JAMES STUDENSKY vs PEGGY S. BORGFELD

EXHIBIT C

Jeffrey Madison                                          February 10, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

JAMES STUDENSKY, CHAPTER 7     )
                               )
TRUSTEE,                       ) 6-21-MC-00028-ADA
                               )
       Plaintiff,              ) ADV. PRO. NO. 20-06062-RBK
                               )
                               )
v.                             )
                               )
PEGGY S. BORGFELD, RYAN H.     )
DOWNTON, JEFFREY P. MADISON,   )
AND KEVIN J. OWENS,            )
                               )
       Defendants.             )
-------------------------------------------------------------
IN RE:                    ) CASE NO. 18-60526-RBK
LITTLE RIVER HEALTHCARE   )
HOLDINGS, LLC, ET AL.,    ) CHAPTER 7
-------------------------------------------------------------

ORAL & VIDEO DEPOSITION OF:  JEFFREY P. MADISON

FEBRUARY 10, 2022

---------------------------------------------------------

   Oral & video deposition of JEFFREY P. MADISON, produced as

a witness at the instance of the plaintiff, and duly sworn,

was taken in the above-styled and numbered cause on the

10th day of February, 2022, before Patrick Stephens,

Certified Court Reporter, at 303 Colorado Street,

Suite 230, Austin, Texas 78701.

Jeffrey Madison

February 10, 2022
Pages 2 to 5

Page 2

A P P E A R A N C E S
ON BEHALF OF THE PLAINTIFF:
    MATT POWERS, ESQ.
    MARIANNE W. NITSCH, ESQ. (Via Zoom)
    BRIAN T. CUMINGS, ESQ. (Via Zoom)
    Graves, Doughtery, Hearon & Moody, P.C.
    401 Congress Avenue
    Suite 2700
    Austin, Texas 78701
    Telephone:  (512) 480-5626
    mpowers@gdhm.com
    mnitsch@gdhm.com
    bcumings@gdhm.com
ON BEHALF OF THE DEFENDANTS:
    RYAN DOWNTON, ESQ.
    The Texas Trial Group
    193 Dorado Beach East
    Dorado, PR 00646
    rdownton1@gmail.com
    AIMEE M. ROBERT, ESQ.
    Robert Law Group, PLLC
    230 Westcott Street
    Suite 100
    Houston, Texas 77007
    Telephone:  (832) 509-2303
ALSO PRESENT:
    David Flores, Videographer
    Alamocitysubpoenas@yahoo.com

Page 3

1             I N D E X

2 APPEARANCES ............................................... 02
3 JEFFREY P. MADISON
4     Cross-Examination by Mr. Powers ................ 05
5
6 Reporter's Certificate .................................. 203
7
8
9        E X H I B I T S
10 NO.  DESCRIPTION               PAGE
11 46    Press Release              49
12 47    E-mails               108
13 48    E-mails               114
14 49    Little River Agreement    118
15 50    Monroe Credit Agreement   132
16 51    E-mail               140
17 52    2016 Tax Return       146
18 53    E-mail               163
19 54    E-mail               166
20 55    E-mail               167
21 56    E-mail               168
22 57    4/11/16 E-mail        169
23 58    6/30/16 E-mail        170
24 59    E-mail               173
25

Page 4

1          P R O C E E D I N G S
2      VIDEOGRAPHER:  Good morning.  Today's date is
3 February 10th, 2022, and the time is 9:45 a.m.  We are on the
4 record.  We are located at the offices of DuBois, Bryant &
5 Campbell at 303 Colorado Street in Austin, Texas, for the
6 oral/video deposition of Jeffrey P. Madison in the matter of
7 James Studensky, Chapter 7 trustee, versus Peggy S. Borgfeld et
8 al., Cause Number 621-MC-00028-ADA.
9      My name is David Flores, the legal videographer,
10 our court reporter is Patrick Stephens, and we are with Kim
11 Tindall & Associates in San Antonio, Texas.  Would counsels
12 please introduce themselves and whom they represent?
13      MR. POWERS:  Matt Powers for the plaintiff.
14      MR. DOWNTON:  Ryan Downton and Aimee Robert for
15 the defendants.
16      COURT REPORTER:  Okay.  Great.  Would you --
17      VIDEOGRAPHER:  The witness may now be sworn in.
18      COURT REPORTER:  Okay.  Would you raise your
19 right hand for me?
20      THE WITNESS:  (Complies with request.)
21      COURT REPORTER:  Do you solemnly swear or affirm
22 the testimony you'll give will be the truth, the whole truth and
23 nothing but the truth, so help you God?
24      THE WITNESS:  I do.
25      COURT REPORTER:  Okay.  Great.  You may take

Page 5

1 over.  Thank you.
2      (Whereupon,
3           JEFFREY P. MADISON
4 was called as a witness herein and, having first been
5 duly sworn, was examined and testifies as follows on:)
6          CROSS-EXAMINATION
7 BY MR. POWERS:
8    Q  Please state your name.
9    A  Jeffrey Paul Madison.
10    Q  Mr. Madison, have you given a deposition before?
11    A  No.
12    Q  I want to talk with you a little bit about the process
13 for today.  I'm sure you've received some information about
14 that, but you understand that you're under oath today.
15    A  I do.
16    Q  You understand that oath means that you need to give
17 full and truthful testimony the same as if we were in a
18 courtroom with the judge and the jury present.
19    A  I do.
20    Q  If at any point I ask a question that's unclear to you
21 or you don't hear me, would you please ask me to clarify or
22 repeat the question?
23    A  Yes.
24    Q  As we go, it's not an endurance contest.  If you need
25 to take a break at some point -- and I'll try to take breaks

EXHIBIT C

Jeffrey Madison

February 10, 2022
Pages 54 to 57

Page 54

1    Q   What's your understanding of -- of whether that's true
2  or false?  Or do you know?
3    A   I don't remember.  I don't know of this Dr. Bhangoo.
4    Q   With respect to the allegations referencing Dr. Megna
5  in the second bullet point, that from February 2016 to December
6  of 2017, he received kickbacks from Ascend in exchange for
7  ordering Boston Heart tests from Little River.  True, false,
8  don't know?
9    A   I don't know what the nature of the relationship
10  between Megna and Ascend was.
11    Q   There's an allegation in this paragraph here, though,
12  about -- there was an exchange for ordering Boston Heart lab
13  tests from Little River specifically; correct?
14         MR. DOWNTON:  Objection, form.
15  BY THE WITNESS (resuming):
16    A   That's mentioned in this paragraph.
17    Q   And do you have any basis to agree or disagree with
18  it?
19         MR. DOWNTON:  He's told you he doesn't know
20  who --
21  BY THE WITNESS (resuming):
22    A   I --
23         MR. DOWNTON:  -- any of these doctors are.
24  BY THE WITNESS (resuming):
25    A   I have no basis --

Page 55

1         MR. POWERS:  Let him answer the questions.
2  BY THE WITNESS (resuming):
3    A   I have no basis for knowing that relationship.
4    Q   Now, you mentioned that you recognize one of the names
5  on this list.  Which one was that?
6    A   Lewis.
7    Q   Kevin Lewis of Houston?
8    A   I don't remember Kevin Lewis, I remember Lewis.
9    Q   And what operation was Dr. Lewis associated with?
10  What -- what facility or --
11    A   I have no idea.
12    Q   And the allegation here is that Dr. Lewis received
13  kickbacks from Health -- Alpha Rise Health.  Was that a company
14  that did marketing work for Little River?
15    A   Not to my knowledge.
16    Q   Did they do marketing work for Boston Heart?
17    A   Not to my knowledge.
18    Q   What about Catalyst Health Partners?
19    A   I don't recognize that either.
20    Q   What about Tomball Medical Management?
21    A   I don't -- I do recognize Tomball Medical Management.
22    Q   What do you -- what does ring a bell about that?
23    A   Tomball is all.
24    Q   Okay.  What about North Houston MSO group?
25    A   No -- no idea.

Page 56

1    Q   Have you been contacted by the -- anyone about these
2  allegations?
3    A   I --
4         MR. DOWNTON:  I mean, you can answer that, have
5  you been contacted by anyone, but don't talk about any
6  communications with attorneys -- your attorneys about these
7  allegations.
8         THE WITNESS:  I'm not -- I'm sorry.  I don't
9  understand.
10         MR. DOWNTON:  Sure.  So he's asking you if you've
11  been contacted by anyone.  Exclude your attorneys.  If you've
12  been contacted by anyone other than your attorneys about these
13  allegations, you can answer that question.
14  BY THE WITNESS (resuming):
15    A   No.
16    Q   Have your -- have your attorneys been contacted by
17  anyone about these allegations, to your knowledge?
18    A   Not to my knowledge.
19    Q   Now, there's a -- there's a discussion on the first
20  page of this document explaining that paying kickbacks to
21  physicians distorts the medical decision-making process,
22  corrupts our healthcare system, increases costs of healthcare
23  funded by the taxpayer, and it goes on to give some explanation
24  about how the Anti-kickback Statute and Stark Law address those
25  matters.  How did the company specifically make sure to arrange

Page 57

1  its relationships with marketers to avoid those kinds of
2  considerations back in 2015 and forward?
3    A   Our legal team would have addressed -- would have
4  addressed that.
5    Q   Am I right -- did you have an understanding that
6  failure to comply with those statutes could have significant
7  penalties associated with it for the company?
8    A   Yes.
9    Q   It could potentially result in forfeiture of the --
10  any revenue that was received that was found to be under an
11  arrangement in violation of that federal law.
12    A   I'm not aware of what the outcome would be.  I know
13  compliance is important.
14    Q   Did you see in this press release that part of the
15  result of the settlement that these physicians entered into
16  ended up with them agreeing that they would not be able to
17  participate in the Medicare and Medicaid program for a period of
18  time after the settlements were entered?
19    A   Would you re-ask that question?
20         MR. DOWNTON:  That's not in here.
21  BY MR. POWERS (resuming):
22    Q   My question is:  Did you -- were you aware that part
23  of the settlements that were struck here described in the press
24  release involved individuals no longer being able to participate
25  in the federal healthcare programs following the settlement?

Jeffrey Madison

February 10, 2022
Pages 58 to 61

Page 58

1          MR. DOWNTON: Objection, form.
2 BY THE WITNESS (resuming):
3    A   Can you point that to me?
4    Q   Sure.
5    A   I don't see that on the doctors.
6    Q   Sure. If you look with me at -- at Page 3 in the
7 bottom of the -- the first full paragraph, DeFoore agreed to pay
8 50,000 to cooperate with the Department's investigation of and
9 litigation against other parties --
10   A   I'm sorry. I need to find where you're at. I
11 apologize.
12   Q   The top --
13   A   Oh, the top.
14   Q   The full paragraph on Page 3, the last line of it.
15         MR. DOWNTON: You're not representing that
16 DeFoore's a physician, are you?
17 BY THE WITNESS (resuming):
18   A   I -- I don't -- I don't know what you're talking --
19 I'm sorry.
20         MR. DOWNTON: (Indicating.) Right there.
21 BY THE WITNESS (resuming):
22   A   Okay. I'm sorry. I did -- I was not on that
23 paragraph.
24   Q   Okay. No problem. So this was referring to
25 Richard DeFoore, CEO of Stamford Memorial Hospital; correct?

Page 59

1    A   (Reviewing.)
2    Q   Do you see that?
3    A   Yes.
4    Q   And --
5    A   Of Jones County -- okay, d/b/a, yes.
6    Q   And that he agreed as part of his penalty here that he
7 would cooperate with the Department's investigations and
8 litigation against other parties and be excluded from
9 participation of federal healthcare programs for three years.
10   A   I see that.
11   Q   And my question is simply: You're aware that that's
12 one of the consequences if there were a failure of compliance
13 with the federal Anti-Kickback State and the Stark Law would be
14 taking away the ability of the provider to continue to
15 participate in the Medicare and Medicaid programs.
16   A   Yes.
17   Q   And would also involve other significant financial
18 penalties; correct?
19   A   I -- I presume.
20   Q   And if those consequences were to follow from the
21 business practices that Little River was engaged in, they'd have
22 a -- a material and devastating impact on the enterprise;
23 correct?
24         MR. DOWNTON: Objection, form.
25 BY THE WITNESS (resuming):

Page 60

1    A   Well, I think any penalty on an organization would be
2 detrimental.
3    Q   The -- and I'm just thinking through. If we were to
4 do a hindsight analysis and kind of look back, if it turned out
5 in retrospect that some of the practices that Little River was
6 engaged in were determined to be inconsistent with the Stark Law
7 and the Anti-Kickback Statute, its entire financial picture
8 would be dramatically different than what you-all thought it was
9 at the time?
10         MR. DOWNTON: Objection, form.
11 BY THE WITNESS (resuming):
12   A   I think that depends on the -- the magnitude of that
13 determination.
14   Q   The -- if the determination were that Little River
15 could no longer participate in the Medicare and Medicaid
16 programs, that would be a --
17   A   That would be a problem.
18   Q   -- an enterprise-killing effect; correct?
19   A   Correct.
20   Q   And if it were required to forfeit the revenue
21 associated with a broad swath of its billings for diagnostic
22 tests, that would also be a huge problem and change the
23 financial picture for the company; correct?
24         MR. DOWNTON: Objection, form.
25 BY THE WITNESS (resuming):

Page 61

1    A   Depending, the magnitude of broad swath.
2    Q   Now, I want to just kind of return to this high-level
3 topic of the -- how you got into this diagnostic testing
4 business. Am I right that there was a -- goal to be able to
5 -- to leverage Little River's opportunity to -- to bill as a
6 rural provider for -- under its more favorable rates that it had
7 with its insurance contracts?
8         MR. DOWNTON: Objection, form.
9 BY THE WITNESS (resuming):
10   A   No. That had nothing to do with it being rural.
11   Q   Okay. Explain to me what your -- your take on that
12 is.
13         MR. DOWNTON: Objection, form.
14 BY THE WITNESS (resuming):
15   A   We, as a hospital, have a fee structure, and the
16 ability to bill under that fee structure provided a revenue
17 source for acquisition of physician practices.
18   Q   And the -- at the hospital, you had a particular fee
19 structure that was available based on contracts that you had in
20 effect with different payors (ph) at a given time; correct?
21   A   Sure.
22   Q   So in 2015 and -- and 2016, am I right that you have
23 kind of some long-standing contracts with several different
24 payors?
25   A   I don't remember how many were long-standing, how many

Jeffrey Madison

February 10, 2022
Pages 202 to 204

Page 202

1    A    You'd have to put that in front of me.  I -- I don't
2  -- I can't speculate.
3    Q    Did you attend a meeting with the community at the
4  time of that decision to close that hospital?
5    A    I don't remember about the community.  It was the
6  employees.
7    Q    And what kind of feedback did you get on the decision
8  to close the hospital?
9    A    Well, I mean, people were sad for sure.  I -- I -- I
10  think, I don't know this for sure, but I think people were
11  impressed that we had tried as hard as we did.
12    Q    Did you get any negative feedback about how the
13  company had run -- how Little River had run Crockett?
14    A    I don't recall that.
15        MR. POWERS:  Pass the witness.
16        MR. DOWNTON:  Reserve questions for time of
17  trial.
18        VIDEOGRAPHER:  The time is 6:23 p.m., and this
19  concludes today's deposition.  We are off the record.
20
21
22
23
24
25        (Whereupon, the proceedings were concluded.)

Page 203

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

JAMES STUDENSKY, CHAPTER 7    )
                              )
TRUSTEE,                      )  6-21-MC-00028-ADA
                              )
        Plaintiff,            )  ADV. PRO. NO. 20-06062-RBK
                              )
                              )
v.                            )
                              )
PEGGY S. BORGFELD, RYAN H.    )
DOWNTON, JEFFREY P. MADISON,  )
AND KEVIN J. OWENS,           )
                              )
        Defendants.           )
-------------------------------------------------------
IN RE:                        )  CASE NO. 18-60526-RBK
LITTLE RIVER HEALTHCARE       )
HOLDINGS, LLC, ET AL.,        )  CHAPTER 7
-------------------------------------------------------

REPORTER'S CERTIFICATE
ORAL & VIDEO DEPOSITION OF JEFFREY P. MADISON
FEBRUARY 10, 2021
    I, Patrick A. Stephens, Certified National Court Reporter,
hereby certify to the following:
    That the witness, JEFFREY P. MADISON, was duly sworn and
that the transcript of the deposition is a true record of the
testimony given by the witness;
    That pursuant to FCRP Rule 30(f)(1), request to review the
transcript was not made by either deponent or party before the
deposition was completed.

Page 204

    That pursuant to information given to the deposition
officer at the time said testimony was taken, the following
includes all parties of record and the amount of time used by
each party at the time of the deposition:
    Mr. Ryan Downton (0 mins)
        Attorney for Defendants.
    Mr. Matt Powers (5 hrs 40 mins)
        Attorney for Plaintiff.
    I further certify that I am neither counsel for, related
to, nor employed by any of the parties in the action in which
this proceeding was taken, and further that I am not financially
or otherwise interested in the outcome of this action.
        Certified to by me on this 2nd day of March, 2022.
                    *
                    *
                    *
                    *
                    *
                    *
                    *

PATRICK A. STEPHENS
NVRA NO. 5462
Expiration: 06/01/2022
Magna Legal Services
Firm Registration No.633
16414 San Pedro Ave.,
Ste. 900
San Antonio, TX  78232

Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                      WACO DIVISION

 3

 4   IN RE:                        )  Chapter 7
                                   )
 5   LITTLE RIVER HEALTHCARE       )  Case No. 18-60526-RBK
     HOLDINGS, LLC, et al.         )
 6                                 )
                      Debtors.     )
 7   ------------------------------)
     JAMES STUDENSKY, Chapter 7    )
 8   Trustee for Little River      )
     Healthcare Holdings, LLC,     )
 9   et al.,                       )
10                                 )
                      Plaintiff,   )
11                                 )
             -vs-                  )
12                                 )
     BLUE CROSS AND BLUE SHIELD OF )
13   TEXAS,                        )
                                   )
14                      Defendant. )
15

16            Remotely held videotaped deposition of JEFFREY
17   MADISON taken before CAROL CONNOLLY, CSR, CRR, and Notary
18   Public, pursuant to the Federal Rules of Civil Procedure
19   for the United States District Courts pertaining to the
20   taking of depositions, commencing at 8:11 a.m. on the
21   25th day of May, A.D., 2022.
22

23

24

25
```

Page 2

```
 1          There were present at the taking of this
 2   deposition the following counsel:
 3          DUANE MORRIS, LLP by
            MR. BRAD THOMPSON (via Zoom) AND
 4          MR. JACOB P. ARECHIGA (via Zoom)
            Las Cisma IV
 5          900 S. Capital of Texas Highway
            Suite 300
 6          Austin, Texas  78746
            (512) 277-2247
 7          bthompson@duanemorris.com
 8                  AND
 9          TEXAS TRIAL GROUP by
            MR. RYAN DOWNTON (via Zoom)
10          193 Dorado Beach East
            Dorado, Puerto Rico  00646
11          (512) 680-7947
            ryan@thetexastrialgroup.com
12
13                  AND
14          ASHCROFT LAW FIRM by
            MR. CHRISTOPHER PEELE (via Zoom)
15          919 Congress Avenue
            Austin, Texas  78701
16          (512) 370-1800
            ashcroftlawfirm.com
17
                    appeared on behalf of the Plaintiff;
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2          SIDLEY AUSTIN, LLP by
            MR. SCOTT D. STEIN (via Zoom) and
 3          MR. JONATHAN DUSSIK (via Zoom)
            One South Dearborn Street
 4          Chicago, Illinois  60603
            (312) 853-7000
 5          sstein@sidley.com
            jdussik@sidley.com
 6
                    appeared on behalf of the Defendant.
 7
 8   ALSO PRESENT:
 9          Mr. Justin Henricksen, Videographer
10          Mr. James Studensky
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1          THE VIDEOGRAPHER:  Good morning.  We are going on

2     the record on May 25th, 2022.  Please note that this

3     deposition is being conducted virtually.  Quality of the

4     recording depends on the quality of camera and the

5     internet connection of all participants.  What is seen

6     from the witness and heard on screen is what will be

7     recorded.  Audio and video recording will take place

8     unless all parties agree to go off the record.

9               This is media unit 1 of the recorded deposition

10    of Jeffrey Madison taken by counsel for the defendant in

11    matter of Little River Healthcare Holding, LLC, et al.

12    versus Blue Cross and Blue Shield of Texas filed in the

13    United States Bankruptcy Court for the Western District

14    of Texas, Waco Division, case number 18-60526-RBK.  This

15    deposition is being conducted remotely using virtual

16    technology.

17              My name is Justin Henricksen, I'm representing

18    Veritext.  I'm the videographer.  The court reporter is

19    Carol Connolly from the firm Veritext.  I'm not related

20    to any party in this action, nor am I financially

21    interested in the outcome.

22              If there are any objections to the proceedings,

23    please state them at the time of your appearance.

24              Counsel and all present, including remotely,

25    will now state their appearance and affiliation for the

Page 7

1    record beginning with the noticing attorney.

2        MR. STEIN:  Scott Stein with Sidley Austin for Blue

3    Cross and Blue Shield of Texas, and with me is Jonathan

4    Dussik.

5        MR. THOMPSON:  Brad Thompson with the firm Duane

6    Morris on behalf of the Chapter 7 Trustee, Mr. Jim

7    Studensky.  Mr. Studensky is currently also with us

8    virtually today, but he may have to be in and out

9    throughout the proceeding.

10       MR. DOWNTON:  Ryan Downton for the witness, and with

11   me is Chris Peele also for the witness.

12       THE VIDEOGRAPHER:  Thank you.

13           Will the court reporter please swear in the

14   witness.

15                   JEFFREY MADISON,

16   called as a witness herein, having been first duly sworn,

17   was examined upon oral interrogatories and testified as

18   follows:

19                   EXAMINATION

20               By Mr. Stein:

21   Q    Good morning, Mr. Madison.

22   A    Good morning.

23   Q    Have you testified in a deposition before?

24   A    Have I -- say that one more sometime.

25   Q    Have you testified in a deposition before,

Page 176

1        A    Well, management services -- management

2    services organizations exist throughout health care.  How

3    that is specifically defined, I'm not sure, but there are

4    companies that, as I said earlier, do billing, staffing,

5    and hospital management.

6        Q    At some point did you become aware of an

7    allegation that a physician had received an improper

8    payment from a marketing group?

9        A    I was never aware that a physician had received

10    a payment.  There was a circumstance where a doctor

11    called accounts payable and asked when a marketer was

12    going to be paid.  The circumstances around that

13    specifically, I'm not aware.  My understanding is that

14    that person in accounts payable -- accounts payable

15    immediately went to Peggy who immediately involved legal

16    who immediately contacted the marketer and was given, as

17    I understood it, clarification of what that -- why that

18    phone call might have existed or happened.

19        Q    Do you know if that marketer was terminated as

20    a result?

21        A    If I recall correctly they were terminated the

22    next day.

23        Q    Do you recall which marketer it was?

24        A    I think it's the LGRB, whatever that entity

25    was.

Page 190

1    STATE OF ILLINOIS  )

                       )  SS:

2    COUNTY OF C O O K  )

3

4            The within and foregoing deposition of the

5    aforementioned witness was taken before CAROL CONNOLLY,

6    CSR, CRR and Notary Public, at the place, date and time

7    aforementioned.

8            There were present during the taking of the

9    deposition the previously named counsel.

10            The said witness was first duly sworn and was

11    then examined upon oral interrogatories; the questions

12    and answers were taken down in shorthand by the

13    undersigned, acting as stenographer and Notary Public;

14    and the within and foregoing is a true, accurate and

15    complete record of all of the questions asked of and

16    answers made by the forementioned witness, at the time

17    and place hereinabove referred to.

18            The signature of the witness was not waived,

19    and the deposition was submitted, pursuant to Rule 30 (e)

20    and 32 (d) 4 of the Rules of Civil Procedure for the

21    United States District Courts, to the deponent per copy

22    of the attached letter.

23

24

25

Page 191

1          The undersigned is not interested in the within
2     case, nor of kin or counsel to any of the parties.
3          Witness my official signature and seal as
4     Notary Public in and for Cook County, Illinois on this
5     10th day of June, A.D. 2022.
6
7
8                    *Carol Connolly*
9                    CAROL CONNOLLY, CSR, CRR
                     CSR No. 084-003113
10                   Notary Public
                     One North Franklin Street
11                   Suite 3000
                     Chicago, Illinois 60606
12                   Phone:  (312) 386-2000
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1            IN THE UNITED STATES BANKRUPTCY COURT
              FOR WESTERN DISTRICT OF TEXAS
 2                    WACO DIVISION
 3   JAMES STUDENSKY,              *
     CHAPTER 7 TRUSTEE,            *
 4   Plaintiff,                    *
                                   *
 5                                 * 6:21-MC-00028-ADA
     PEGGY S. BORGFELD, RYAN H.    *
 6   DOWNTON, JEFFREY P.           *
     MADISON, and KEVIN J.         *
 7   OWENS,                        * ADV. PRO. NO. 20-06062-RBK
     Defendants.                   *
 8                                 *
     In Re:                        * CASE NO. 18-60526-RBK
 9                                 *
     LITTLE RIVER HEALTHCARE       *
10   HOLDINGS, LLC, et al          * CHAPTER 7
11
12
13
14
          *********************************************
15
                 ORAL AND VIDEOTAPED DEPOSITION OF
16
                         RYAN DOWNTON
17
                        APRIL 7, 2022
18
          *********************************************
19
20
21
22
23
24
25
                                           Page 1
```

EXHIBIT E

CONFIDENTIAL

---

**Page 2**

1      ORAL DEPOSITION OF RYAN DOWNTON, produced at

2 the instance of the Plaintiff, and duly sworn, was taken

3 in the above-styled and numbered case on the 7th day of

4 April, 2022 from 9:32 a.m. to 5:56 p.m. before Dana

5 Montgomery, Certified Shorthand Reporter in and for the

6 State of Texas, reported by machine shorthand at the

7 office of DuBois Bryant & Campbell, LLP, 303 Colorado

8 St., Suite 2300, Austin, Texas, pursuant to the Federal

9 Rules of Civil Procedure and the provisions stated on the

10 record or attached hereto.

---

**Page 3**

1      APPEARANCES
2
    FOR THE PLAINTIFF JAMES STUDENSKY, CHAPTER 7 TRUSTEE:
3
     MR. JOSHUA A. ROMERO
4      MR. MICHAEL A. ROBERTS
     MS. JENNIFER WERTZ
5      JACKSON WALKER LLP
     100 Congress Avenue, Suite 1100
6      Austin, Texas 78701
     Jromero@jw.com
7
     MR. MATT POWERS
8      MS. MARIANNE NITSCH
     GRAVES DOUGHERTY, HEARON & MOODY, P.C.
9      401 Congress Avenue, Suite 2700
     Austin, TX 78701 78701
10
11 FOR THE DEFENDANTS RYAN DOWNTON, ET AL:
12      MS. AIMEE ROBERT
     TEXAS TRIAL GROUP, P.C.
13      193 Dorado Beach East
     Dorado, Puerto Rico 00646
14      Ryan@TheTexasTrialGroup.com
15
     ALSO PRESENT:
16
     Jason Lemley, Videographer

---

**Page 4**

INDEX

                 PAGE

Appearances........................................ 3

RYAN DOWNTON

    Examination by MR. ROMERO.................. 8

Changes and Corrections........................... 302

Signature......................................... 303

Reporter's Certificate............................ 304

EXHIBITS

NO.   DESCRIPTION             PAGE/LINE REFERENCE

Exhibit 140...................................... 59/13
    4/16/15 e-mail between Ryan Downton
    And Peggy Borgfeld - Subject:  Daily
    Cash Estimate 2015.xlsx

Exhibit 141...................................... 61/11
    3/3/16 e-mail from Jeff Madison to
    Kevin Owens, et al - Subject:  QMMC
    Daily Cash Report 3-2-16

Exhibit 142...................................... 84/2
    5/26/16 e-mail from Kim Brown to Ryan
    Downton, et al - Subject: LRH Daily
    Cash Report Summary 05/25/2016

Exhibit 143...................................... 89/15
    5/31/16 Letter from Blue Cross/Blue
    Shield to Little River Healthcare

Exhibit 144...................................... 98/9
    6/3/16 e-mail exchange with Kim Brown
    And Ryan Downton - Subject:  BCBS
    Prepayment Review Notice - Eff 6/7/2016

---

**Page 5**

EXHIBITS/con't

NO.   DESCRIPTION             PAGE/LINE REFERENCED

Exhibit 145...................................... 117/16
    10/3/16 e-mail exchange with Peggy
    Borgfeld and Ryan Downton - Subject:
    Important Corporate Card Program
    Information

Exhibit 146...................................... 122/20
    10/18/16 and 10/19/16 e-mail exchange
    With Peggy Borgfeld and Jeff Madison
    Subject: Update

Exhibit 147...................................... 127/24
    10/24/16 e-mail exchange with Peggy
    Borgfeld and Paul Ballard, et al -
    Subject: Request

Exhibit 148...................................... 136/18
    October 2016 e-mail exchange with Peggy
    Borgfeld, Ryan Downton, John Kerins,
    Carsten Beith - Subject:  Additional
    Material

Exhibit 149...................................... 138/18
    Amended and Restated Company Agreement
    Of Little River Healthcare Holdings,
    LLC,

Exhibit 150...................................... 155/14
    Fifth Amended & Restated Company
    Agreement of Rockdale Blackhawk,
    LLC

Exhibit 151...................................... 164/15
    Monroe Capital Management Credit
    Agreement

Exhibit 152...................................... 173/4
    Tax distribution list

Exhibit 153...................................... 136/22
    2015 Tax Return

---

2 (Pages 2 - 5)

EXHIBITS/con't

NO.   DESCRIPTION          PAGE/LINE REFERENCED

Exhibit 154.................................... 194/22
    2016 Tax Return

Exhibit 155.................................... 205/20
    2017 Tax Return

Exhibit 156.................................... 209/19
    2/24/16 e-mail exchange with George
    DeReese, Jeff Matthews, Ryan Downton
    Peggy Borgfeld, Paul Ballard -
    Subject: Tax Distribution

Exhibit 157.................................... 215/9
    4/12/16 e-mail from George DeReese to
    Jeff Madison attaching K-1

Exhibit 158.................................... 217/17
    5/17/17 e-mail from Kevin Owens to
    Ryan Downton, et al -

Exhibit 159.................................... 223/25
    6/6/17 e-mail exchange with Ryan
    Downton and Jeff Cupples - Subject:
    Equity Docs

Exhibit 160.................................... 229/21
    6/23/17 e-mail from Carolyn Bryan to
    Jeff Madison, et al attaching Monroe
    Capital Letter Re: Reservation of
    Right in Respect of the Current
    Default

Exhibit 161.................................... 236/18
    8/3/17 and 8/3/17 e-mail exchange
    Between Ryan Downton and James Callas
    Subject: Doctors

Exhibit 162.................................... 244/7
    12/21/17 and 12/23/17 e-mails with
    Andrea Rigali Cunha and Michael Hayes

Page 6

EXHIBITS/con't

NO.   DESCRIPTION          PAGE/LINE REFERENCED

Exhibit 163.................................... 247/20
    Peggy Borgfeld, Ryan Downton, Jeffrey
    Madison, and Kevin Owens' Second
    Amended Answer, Counterclaim and
    Third-Party Complaint

Exhibit 164. ................................. 258/18
    Qui Tam lawsuit

Exhibit 165.................................... 294/17
    E-mails from Adam Aseron

Page 7

1    THE VIDEOGRAPHER:  Here begins the
2 depositing of Ryan Downton.  Today's date is April 7,
3 2022.  The time is 9:32.
4        Will you court reporter swear in the
5 witness.
6            RYAN DOWNTON,
7 having been first duly sworn, testified as follows:
8            EXAMINATION
9 BY MR. ROMERO:
10    Q.  Good morning.  Can you tell us your full name,
11 please?
12    A.  Ryan Hedley Downton.
13    Q.  Do you prefer Ryan or Mr. Downton?
14    A.  Ryan.
15    Q.  Ryan, you understand I represent the trustee in
16 this case, James Studensky.  Right?
17    A.  Yes.
18    Q.  Where do you currently reside?
19    A.  Puerto Rico.
20    Q.  Puerto Rico.  Do you have any second homes?
21    A.  No.
22    Q.  You're a lawyer.
23    A.  Yes.
24    Q.  What type of lawyer are you?
25    A.  Sorry, let me back that up.  I've got a condo

Page 8

1 here.
2    Q.  In Austin?
3    A.  Yes.
4    Q.  Okay.  Do you rent that out or do you live in
5 it sometimes?
6    A.  No.  When I'm in town, my -- my son lives here.
7 So --
8    Q.  Okay.
9    A.  -- when I see him, I live there.
10    Q.  Gotcha.  Okay.  You're a lawyer.
11    A.  Yes.
12    Q.  What type of lawyer are you?
13    A.  Commercial litigation and health care.
14    Q.  You've taken depositions in your career, I
15 presume?
16    A.  I have.
17    Q.  And is it fair to say you know the deposition
18 rules pretty well?
19    A.  Well, we'll see.  I'm not used to being on this
20 side of the table.
21    Q.  Gotcha.  Okay.  Well, I'll just run over the
22 big ticket items.  Okay?  Let me ask my questions before
23 you answer, and I'll do the same courtesy for you so that
24 we don't cut one another off.
25    A.  Okay.

Page 9

3 (Pages 6 - 9)

EXHIBIT E

1     That accurate -- is that an accurate statement?
2     A.  That is what it says.
3     Q.  And is that why Holdings was formed?
4     A.  Holdings was formed for the recapitalization.
5     Q.  Okay.  And then down below it says that Little
6  River can borrow a maximum of $36,800,000.  Right?
7     A.  Yes.
8     Q.  And why did Little River need to borrow these
9  substantial amounts in March of 2015?
10    A.  I don't know that it needed to.  It chose to.
11    Q.  Okay.  Why did it choose to?
12    A.  There were certain shareholders of Little River
13  who desired to exit from the company, and so there needed
14  to be money to pay for their shares.
15    Q.  Did you consider buying out those -- those
16  other owners?
17    A.  We did buy them out.
18    Q.  Well, Monroe bought them out.
19    A.  Oh.  No, I did not consider personally buying
20  them out.
21    Q.  Okay.  Now, who at Little River did the
22  analysis of whether Little River could afford to take on
23  this type of debt?
24    A.  So that was done in connection with Monroe and
25  then the Little River finance department.

Page 166

1     Q.  And who are those folks in the Little River
2  finance department?
3     A.  So at the time Peggy Borgfeld was CFO.  I
4  couldn't tell you all the people in the finance
5  department.
6     Q.  Did you have a hand in the analysis of whether
7  Little River could take on this debt?
8     A.  I don't think so.
9     Q.  Okay.  In that same Whereas, in Subsection C,
10  it allows resolving loans to Little River not to exceed
11  $4 million.
12        Do you see that?
13    A.  Yes.
14    Q.  And at some point Little River maxed out that
15  credit with Monroe.  Right?
16    A.  Yes.
17    Q.  In fact, at some point Little River maxed out
18  all of its credit with Monroe.  Right?
19    A.  No.
20    Q.  No?  How is my -- why do you say no?
21    A.  Because there's capital expenditure line in
22  here of $5 million --
23    Q.  Okay.
24    A.  -- that Little River never utilized or drew
25  down on.

Page 167

1     Q.  Okay.  So let's go in Subsection 8, Term loans
2  to the borrower in an aggregate amount not to exceed
3  $27,800,000.
4        Little River maxed that line out.  Right?
5     A.  Well, that wasn't a line, that was money Monroe
6  put in at closing.
7     Q.  Okay.  Okay.  And then so capital expenditures,
8  you're saying Little River never tapped capital
9  expenditures loans?
10    A.  Correct.
11    Q.  And then on the revolving loans of $4 million,
12  Little River maxed those out?
13    A.  Sometime in 2017, yes.
14    Q.  Okay.  Let's go to P 1823, please.  The
15  agreement defines default.  And at some point Monroe
16  declared Little River in default under this agreement.
17  Right?
18    A.  Yes.
19    Q.  Do you remember why?
20    A.  I don't.
21    Q.  Do you remember when they were declared in
22  default?
23    A.  I don't.
24    Q.  Okay.  Let go to P 1828.  And you see
25  healthcare laws are define.  Do you see that?

Page 168

1     A.  Yes.
2     Q.  And in Subsection A it says, Healthcare laws
3  includes all federal and state fraud and abuse laws,
4  including the federal antikickback statute, the Stark Law
5  and Civil False Claims Act.  Right?
6     A.  Yes.
7     Q.  And so in this agreement, Little River was
8  required to comply with these healthcare laws?
9     A.  Yes.
10    Q.  Now, did Little River have any -- ever violate
11  any of those healthcare laws?
12    A.  Not to my knowledge.
13    Q.  Ever?
14    A.  There could have been technical violations
15  somewhere.  I'm not aware of them.
16    Q.  Have you ever heard accusations that Little
17  River violated healthcare laws?
18    A.  I feel like there may -- there was a HIPAA data
19  breach at some point.
20    Q.  Okay.  Anything else?
21    A.  Accusations?
22    Q.  Sure.
23    A.  Well, I mean, Blue Cross accused Little River
24  of violating healthcare laws, and the arbitrator found
25  that Little River did not violate any healthcare laws.

Page 169

43 (Pages 166 - 169)

EXHIBIT E

CONFIDENTIAL

1 River with Next Level Healthcare Consultants.  Right?
2     A.  Little River contracted with Next Level
3 Healthcare Consultants.
4     Q.  And you led the charge on those negotiations,
5 didn't you?
6     A.  No, I don't know if I'd characterize it that
7 way.  I did the legal work on it.
8     Q.  Who else was involved in contracting with Next
9 Level Healthcare at Little River?
10     A.  I don't remember.
11     Q.  Okay.  Let's go to Page 27, Paragraph 107.  It
12 says, OIG warned of payment arrangements with physicians
13 that purport to carve out federal healthcare program
14 beneficiaries or businesses.  Do you see that?
15     A.  Yes.
16     Q.  That's what Little River tried to do in its
17 arrangement with labs is carve out federal healthcare
18 programs beneficiaries or businesses.  Right?
19         MS. ROBERT:  Objection; form.
20     A.  No.
21     Q.  They didn't try to do that?
22     A.  No.  Little River took both commercial and
23 federal patients.
24     Q.  As a general matter.  I'm talking about
25 reference labs.

Page 274

1     A.  Yeah.  Little River took commercial and federal
2 patients for lab services.
3     Q.  Yeah.  But when you -- when Little River was
4 engaging those marketing entities, it carved out -- it
5 tried to carve out federal healthcare program
6 beneficiaries and businesses, did it?
7     A.  Well, explicitly said it would not pay for
8 marketing for federal business, because the federal
9 government does not count marketing as a reimbursable
10 cost.
11     Q.  Well, what -- you weren't paying for marketing,
12 either.  You were giving them kickbacks on the
13 reimbursement that Little River received.
14         MS. ROBERT:  Objection; form.
15     A.  No, that's a completely inappropriate way to
16 describe it.  Paying marketers a percent of collections,
17 until the passage of EKRA, was a completely legal and
18 permissible practice.  It's not a kickback.
19     Q.  Okay.  It goes on to say, OIG stated that its
20 concerns with such payment arrangement are not abated
21 when those arrangements apply only to specimens collected
22 from nonfederal healthcare program patients.
23         Do you agree with that?
24     A.  In -- in the abstract, that can be accurate.
25 It doesn't apply to a critical access hospital when

Page 275

1 you're guarantee to lose money on every federal patient.
2 So the idea that Little River would pay marketers for
3 commercial patients to try to induce doctors to send
4 federal patients, it logically makes no sense, because
5 Little River is guaranteed to lose money on every federal
6 patient because of the way it's reimbursed.
7     Q.  At 101 percent of charges on lab tests?
8     A.  At 99 percent of allowable costs on lab tests.
9     Q.  Okay.  And so is it your testimony, then, that
10 there was a carveout for those federal patients because
11 the hospital would lose money?
12     A.  Well, I think there were multiple reasons for
13 the carveout.  And yeah, that was a major one.
14     Q.  Tell me the other reason for a carveout.
15     A.  Regulatory.
16     Q.  You knew that if you had federal healthcare
17 programs involved, there would be antikickback problems.
18     A.  No, not problems.  But there is risk inherent
19 in any business transaction in healthcare that cannot
20 fall within the safe harbor, and marketing agreements at
21 percent of charges cannot fall within a safe harbor.
22     Q.  And so here the OIG is saying that those
23 carveout aren't effective.  Right?
24     A.  Yes.  And we had an opinion letter from counsel
25 saying it was fine.

Page 276

1     Q.  Who was that, the counsel?
2     A.  Adam Aseron.
3     Q.  Have you -- have you reached out to him and
4 told him that the federal government disagrees with his
5 analysis?
6     A.  I'm not sure the federal government disagrees
7 with his analysis.
8     Q.  Okay.  You think in this qui tam they agree
9 with his analysis?
10     A.  So this paragraph or statement's in the
11 abstract about what the OIG has said, not application to
12 the allegations in the complaint.
13     Q.  Are you going to defendant Borgfeld and Madison
14 in this lawsuit?
15     A.  I am not.
16     Q.  Why not?
17     A.  I am conflicted out of representation in the
18 qui tam.
19     Q.  Why?
20     A.  I have client obligations that I cannot
21 discuss.
22     Q.  Okay.  Let's go to Page 38.  Paragraph 153, it
23 says, Rather than focus on providing necessary hospital
24 care to the community, Little River CEO Madison, Little
25 River CEO Borgfeld and their coconspirators agreed to and

Page 277

70 (Pages 274 - 277)

EXHIBIT E

CONFIDENTIAL

| | |
|---|---|

1      CHANGES AND CORRECTIONS

2  WITNESS NAME: RYAN DOWNTON

3  DATE: APRIL 7, 2022

4  Reason codes: (1) to clarify the record; (2) to conform

5  to the facts; (3) to correct a transcription error; (4)

6  other (please explain).

7  PAGE LINE    CHANGE    REASON

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  Job No. TX5154425

Page 302

---

1      IN THE UNITED STATES BANKRUPTCY COURT

      FOR THE WESTERN DISTRICT OF TEXAS

2      WACO DIVISION

3  JAMES STUDENSKY,   *

    CHAPTER 7 TRUSTEE,  *

4  Plaintiff,       *

                *

5          * 6:21-MC-00028-ADA

  PEGGY S. BORGFELD, RYAN H. *

6  DOWNTON, JEFFREY P.    *

  MADISON, and KEVIN J.   *

7  OWENS,      * ADV. PRO. NO. 20-06062-RBK

    Defendants.    *

8               *

  In Re:      * CASE NO. 18-60526-RBK

9           *

  LITTLE RIVER HEALTHCARE  *

10  HOLDINGS, LLC, et al  * CHAPTER 7

11

12

    *******************************************

13      REPORTER'S CERTIFICATE

      RYAN DOWNTON

14      APRIL 7, 2022

    *******************************************

15

     I, Dana Montgomery, Certified Shorthand

16  Reporter in and for the State of Texas, do hereby certify

  to the following:

17

     That the witness, RYAN DOWNTON, was duly sworn

18  by the officer and that the transcript of the oral

  deposition is a true record of the testimony given by the

19  witness;

20     I further certify that pursuant to FRCP Rule

  (30)(f)(1) that the signature of the deponent:

21    __X__was requested by the deponent or a party

  before the completion of the deposition and returned

22  within 30 days from date of receipt of the transcript.

  If returned, the attached changes and signature page

23  contains any changes and the reasons therefor;

    ____was not requested by the deponent or a

24  party before the completion of the deposition.

25

Page 304

---

1      SIGNATURE

2     I, RYAN DOWNTON, have read the foregoing

3  deposition and hereby affix my signature that same is

4  true and correct, except as noted on the previous page.

5

6     _____

7     RYAN DOWNTON

8

9  THE STATE OF TEXAS)

10  COUNTY OF _____)

11

12     Before me, _____, on this day

13  personally appears RYAN DOWNTON known to me (or proved to

14  me under oath of through_____)

15  (description of identity card or other document) to be

16  the person whose name is subscribed to the foregoing

17  instrument and acknowledged to me that they executed the

18  same for the purposes and consideration therein

19  expressed.

20     Given  under my name and seal of office

21  this____ day of_____, 2022.

22

23     _____

24     NOTARY PUBLIC IN AND FOR

25     THE STATE OF TEXAS

Page 303

---

1     The amount of time used by each party at the

    deposition is as follows:

2

     MR. JOSHUA ROMERO - 6 hours, 23 minutes

3     MS. AIMEE ROBERT - 0 hours, 0 minutes

4     I further certify that I am neither counsel

  for, related to, nor employed by any of the parties or

5  attorneys in the action in which this proceeding was

  taken, and that I am not financially or otherwise

6  interested in the outcome of the action.

7     Certified to me this 21st of April, 2022.

8

9

10     *Dana Montgomery*

    Dana Montgomery, Texas CSR 4768

11    Expiration Date: 1/31/2024

    Veritext Legal Solutions

12    Firm Registration No. 571

    300 Throckmorton, Suite 1600

13    Fort Worth, Texas 76102

    800-336-4000

14

15

16

17

18

19

20

21

22

23

24

25

Page 305

77 (Pages 302 - 305)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **JAMES STUDENSKY, CHAPTER 7** | § | |
| **TRUSTEE,** | § | |
|     **Plaintiff,** | § | |
| | § | **6:21-CV-00028-DTG** |
| **v.** | § | |
| | § | **ADV. PRO. NO. 20-06062-RBK** |
| **PEGGY S. BORGFELD, RYAN H.** | § | |
| **DOWNTON, JEFFREY P. MADISON,** | § | |
| **and KEVIN J. OWENS,** | § | |
|     **Defendants.** | § | |

| | | |
|---|---|---|
| **In Re:** | § | |
| | § | **CASE NO. 18-60526-RBK** |
| **LITTLE RIVER HEALTHCARE** | § | |
| **HOLDINGS, LLC,** *et al.*, | § | **CHAPTER 7** |
|     **Debtors.** | § | |

## DECLARATION OF MATTHEW C. POWERS

    I, Matthew C. Powers, under penalty of perjury pursuant to 28 U.S.C. § 1746, hereby declare the following facts stated herein are of my personal knowledge and are true and correct:

    1.    My name is Matthew C. Powers.  I am over the age of 18, have never been convicted of a felony or a crime involving moral turpitude, and am otherwise legally competent to make this Declaration.

    2.    I am counsel of record for Plaintiff in the above-styled cause.

    3.    Attached hereto are true and correct copies of discovery materials exchanged between the parties in this case.

    I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

    EXECUTED on December 22, 2023.

                                  */s/ Matthew C. Powers*

                                  Matthew C. Powers

EXHIBIT F

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| **Little River Healthcare Holdings, LLC,** | § | **Case No. 18-60526-rbk** |
| ***et al.*,** | § | **(Jointly Administered)** |
| Debtors. | § | |
| | § | |
| _____ | § | |
| | § | |
| **James Studensky, Chapter 7 Trustee,** | § | |
| Plaintiff, | § | **Adv. No. 20-06062** |
| | § | |
| **v.** | § | |
| | § | |
| **Peggy S. Borgfeld, Ryan H. Defendant,** | § | |
| **Jeffrey P. Madison, and Kevin J. Owens,** | § | |
| Defendants. | § | |

## DEFENDANT PEGGY S. BORGFELD'S RESPONSE TO
## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

TO:    James Studensky, Chapter 7 Trustee ("Plaintiff"), by and through his counsel of record, Brian T. Cumings, Graves, Dougherty, Hearon & Moody, P.C., 401 Congress Avenue, Suite 2700, Austin, Texas 78701, and Joshua A. Romero, Jackson Walker LLP, 100 Congress Avenue, Suite 1100, Austin, Texas 78701.[1]

COMES NOW Peggy S. Borgfeld ("Borgfeld" or "Defendant"), and pursuant to Federal Rules of Civil Procedure 26 and 34 and Federal Rules of Bankruptcy Procedure 7026 and 7034, submits her objections and responses to Plaintiff's First Request for Production of Documents.

Respectfully submitted,

SPROUSE LAW FIRM

By: /s/ *Marvin E. Sprouse III*
    Marvin E. Sprouse III
    State Bar No. 24008067

---

[1] Ms. Borgfeld received Plaintiff's First Request for Production of Documents to Peggy Borgfeld in Adv. Proc. No. 20-06090 ("Individual Adversary") prior to the consolidation of the Individual Adversary with the current adversary proceeding. Ms. Borgfeld also received Plaintiff's First Request for Production of Documents to All Defendants in the current adversary proceeding. Because the production requests are substantially the same, these responses and objections are intended to apply to the Plaintiff's requests for production initially served in the Individual Adversary, and to the requests for production served in the current adversary proceeding.

1

901 Mopac Expressway South
Building 1, Suite 300
Austin, Texas 78748
(512) 658-1915 – telephone
(512) 692-1934 – facsimile
Email: msprouse@sprousepllc.com

**COUNSEL FOR PEGGY S. BORGFELD**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of January 2021, a true and correct copy of the foregoing has been served via electronic delivery upon the following:

Graves Dougherty Hearon & Moody, PC
401 Congress Ave., Ste. 2700
Austin, Texas 78701
Attn:  Brian T. Cumings
bcumings@gdhm.com

Jackson Walker LLC
Attn: Joshua A. Romero
100 Congress Ave., Ste. 1100
Austin, TX 78701
jromero@jw.com


/s/ *Marvin E. Sprouse III*
Marvin E. Sprouse III

EXHIBIT F

Defendant responds to Plaintiff's First Request for Production as follows:

## **PRELIMINARY STATEMENT**

Defendant has not completed her investigation, has not completed her discovery in this action, and has not completed her preparation for a future hearing.  The Objections and Responses contained herein, therefore, are based only upon Defendant's knowledge as of the date of these Objections and Responses, and are given without prejudice to Defendant's right to produce information or evidence of any subsequently discovered facts or information.  Defendant also reserves the right to supplement these Objections and Responses at a later date in accordance with the Federal Rules of Civil Procedure, any Scheduling Order, any subsequent Order issued in this case, applicable rule or law, and/or any stipulations between the parties.

This Preliminary Statement applies to and is incorporated into each and every objection and response to a Request for Production ("RFP"'"), whether or not expressly incorporated by reference in any individual objection and response to an RFP.

Nothing contained in these Objections and Responses is an admission regarding the relevance, materiality, or admissibility of any statement, position, document, and/or information.  Defendant reserves the right to object to the use of any of the RFP response or documents produced, or any future responses or document and/or information to be produced hereunder, in any subsequent proceeding in, or the trial of, this or any other action.

Defendant's statement that she will produce responses, documents, or information in response to a particular RFP does not constitute an admission that any such response, documents, or information exist.  Defendant will conduct a reasonable search of Defendant's files for purposes of Defendant's response to these RFPs and will produce responsive, non-privileged documents located after such reasonable search that are sufficient to respond to the RFP.

Defendant will produce certain documents which contain confidential or personal information, which should not be filed or shared with any person except as provided in a protective order.

## **GENERAL OBJECTIONS**

The following General Objections are expressly incorporated into each of the specific Objections and

4

Responses set forth below:

1.  Defendant generally objects to each and every RFP to the extent that it may be construed as calling for documents or information that are subject to a claim of the attorney-client privilege, the work product doctrine, or any other lawful privilege or immunity afforded by law. Such documents or information will not be provided in response to the RFPs, and any inadvertent disclosure of such documents or information shall not be deemed a waiver of any privilege or of protection for attorney work product.

2.  Defendant generally objects to each and every RFP, including Plaintiff's Definitions and Instructions, to the extent that it purports to impose upon Defendant any obligation other or greater than those required by the Federal Rules of Civil Procedure, or any Order entered by the Court.

3.  Defendant generally objects to each and every RFP to the extent that it seeks documents and/or information not in Defendant's possession, custody, or control, is not known to Defendant, and/or cannot be located by a reasonable search.

4.  Defendant generally objects to each and every RFP to the extent it is premature in that discovery is ongoing and information and documents that may be relevant have yet to be produced by Plaintiff and/or may be in the possession, custody, or control of a third party, and/or to the extent it calls for documents or information that may be the subject of expert opinion and testimony that is not required to be disclosed or exchanged at this stage in the Lawsuit.

5.  Defendant generally objects to the RFPs to the extent they seek information not relevant to the claims or defenses of any party to this action and/or not proportional to the needs of the action.

6.  Defendant generally objects to the RFPs to the extent they are ambiguous, argumentative, misleading, overly broad, unduly burdensome, and/or vague.

7.  Defendant generally objects to the RFPs to the extent that responding to them would be oppressive, unnecessarily burdensome, unduly expensive, unreasonably cumulative, and/or duplicative.

8.  Defendant generally objects to the RFPs to the extent that they seek information already in the possession, custody, or control of Plaintiff.

5

9.     Defendant generally objects to the RFPs to the extent that they seek information and/or documents in the public domain or available to Plaintiff through alternative or less burdensome avenues, including sources equally available to Plaintiff as to Defendant.

10.    Defendant generally objects to the RFPs to the extent that they contain vague and undefined terms.

11.    Defendant generally objects to the following "Definitions" propounded by Plaintiff on the following grounds:

     a.  Defendant generally objects to Plaintiff's definition of "Document" or "Documents" as vague and ambiguous, overly broad, and unduly burdensome to the extent they purport to impose on Defendant a duty to respond greater than that permitted by the Federal Rules of Civil Procedure or any Order entered in this action.

     b.  Defendant generally objects to Plaintiff's definition of "evidencing," because it is overly broad, unduly burdensome, vague, and ambiguous, and because RFPs that incorporate these terms and phrases are not proportional to the needs of the case and not reasonably calculated to lead to the discovery of admissible evidence to the extent the documents and information sought are unlimited in subject matter and scope or of subject matter and scope that are not related to the Lawsuit and, as such, would encompass documents unrelated and with no connection to the Lawsuit. Defendant further objects to the extent they purport to impose on Defendant a duty to respond greater than that permitted by the Federal Rules of Civil Procedure or any Order entered in this action.

     c.  Defendant objects to Plaintiff's purported requirement "identify the location(s) in Debtor's electronic files where responsive documents are likely to be located" as Defendant has not been an officer of any Debtor in years and has no ability to review Debtors' electronic files or knowledge of how such files are organized.

      d.   Defendant generally objects to Plaintiff's definition of "Defendant," "Defendant," and "you," as Defendant does not have agents, employees, or representatives.

      e.   Defendant objects to the definition of "Distributions" because not all payments made to Defendant were distributions.

12.     Defendant objects to the relevant time period as identified by Plaintiff.  Plaintiff's claims begin with payments made in January 2016, so Defendant will produce documents from January 1, 2016 to the present unless otherwise indicated.

## I.   DOCUMENTS REQUESTED

1.    A copy of all correspondence (including emails, text messages, instant messages, and any other form of communications) between or among you, Peggy Borgfeld, Jeffrey Madison, or Kevin Owens, on the one hand, and any officer of any Debtor, any physician, employee, and/or contractor of Debtors, or any other person (excluding your counsel), on the other hand, between January 1, 2015 to present regarding any of the following subjects:

    a.    the potential bankruptcy, solvency, or Insolvency of any of the Debtors;
    b.    any of the Distributions;
    c.    the payment of income taxes by Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens using any funds or proceeds, whether any constituted Distributions or not, from any of the Debtors;
    d.    the total liabilities (or any material individual liabilities) of any of the Debtors;
    e.    the total assets (or any material individual assets) of any of the Debtors;

f.  Distributions, transfers, or payments to Peggy Borgfeld, Ryan Downton, Jeffrey Madison, Kevin Owens by any of the Debtors for tax purposes;

g.  the hiring or potential hiring of John Madison by any of the Debtors;

h.  the pass through of any taxes by the Debtors to Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens;

i.  any Distributions, payments, or transfers of money or assets from Debtors to Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens;

j.  the prepayment review process imposed on any of the Debtors by Blue Cross and Blue Shield of Texas ("Plaintiff");

k.  the renegotiation of contracts with BCBSTX in 2016;

l.  cash flow issues with any of the Debtors;

m.  the financial performance or financial health of any of the Debtors;

n.  the growth or expansion strategy of any of the Debtors;

o.  missed lease payments, bills, and other obligations of any of the Debtors;

p.  the appropriateness, inappropriateness, legality, or impropriety of any payments, Distributions, or transfers of funds from any of the Debtors to Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens;

q.  any pitch materials or the like related to any potential sale or other form of transaction with any other party and any of the Debtors;

r.  the engagement of any consultants or other individuals or firms to provide restructuring or other like services to any of the Debtors;

s.  demands or other like correspondence from vendors, suppliers, or other creditors for payment of outstanding amounts by any of the Debtors;

t.  any agreement, whether executed or not, between Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens and any of the Debtors, including any agreement related to the employment of any of them in any capacity by any of the Debtors;

u.  the amount of compensation to be paid to John Madison by any of the Debtors;

v.  financial strategy related to the provision of laboratory and pathology services by Debtors;

w.  all travel by Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens, including by private air plane, and hotel or lodging expenses related to the operations of Debtors;

x.  all tax planning work performed or tax advice received in connection with the Debtors; or

y.  all tax refunds sought or received in connection with any of the Distributions.

**RESPONSE:**

Defendant objects to request "1(y)" because her personal tax returns are not at issue in this Lawsuit. Defendant objects that the Plaintiff has possession, custody, and control of all electronic communications utilizing the Debtors' email services in the Debtors' files between Defendant and any person, with respect to all communications prior to December 5, 2018.

Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents after a reasonable search.

2.  All meeting minutes in which any of the Distributions were discussed, analyzed, mentioned, approved, voted on, or disapproved.

EXHIBIT F

**RESPONSE:** Defendant objects that the Plaintiff has possession, custody, and control of all of the Debtors' meeting minutes. As Defendant was not responsible for retaining such minutes, she cannot direct the Plaintiff to their location. The minutes were maintained on the Debtors' servers by Carolyn Bryan and Andrea Rigali-Cunha. Defendant does not have possession, custody, or control over documents responsive to this request.

3.     All meeting minutes in which any payments, transfers, or Distributions from any of the Debtors to you, Jeffrey Madison, Kevin Owens, or Ryan Downton were discussed, analyzed, mentioned, approved, voted on, or disapproved.

**RESPONSE:** Defendant objects that the Plaintiff has possession, custody, and control of all of the Debtors' meeting minutes. As Defendant was not responsible for retaining such minutes, she cannot direct the Plaintiff to their location. The minutes were maintained on the Debtors' servers by Carolyn Bryan and Andrea Rigali-Cunha. Defendant does not have possession, custody, or control over documents responsive to this request.

4.     Documents evidencing any purported or intended purpose of each of the Distributions to you, Jeffrey Madison, Kevin Owens, or Ryan Downton.

**RESPONSE:** Defendant objects that the Plaintiff has possession, custody, and control of all documents regarding any transfers. Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents after a reasonable search.

5.     Documents evidencing how the Distributions were actually used.

**RESPONSE:** Defendant objects that use of the Distributions is neither relevant to any claims at issue in the Lawsuit, nor reasonably calculated to lead to admissible evidence. Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents after a reasonable search.

6.     Documents evidencing what each of the Distributions was intended to be used for at the time it was made.

**RESPONSE:** Defendant objects that the Plaintiff has possession, custody, and control of all documents regarding the intended purpose of any transfers. Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents after a reasonable search.

7.     Documents evidencing your receipt of each of the Distributions.

**RESPONSE:** Defendant will produce responsive documents after a reasonable search.

8.     Documents relating to the Insolvency of any of the Debtors.

**RESPONSE:** Defendant objects that this request is vague and unreasonably broad. Defendant further objects that all documents regarding the Insolvency of Debtors are in the possession, custody, and control of the Plaintiff. Defendant directs the Plaintiff to exhibits in Little River's arbitration with BCBSTX, monthly financial statements, annual financial statements, daily deposit and cash reports, and valuations of any Debtor. Subject to and without waiver of the foregoing and general objections, Defendant will produce

responsive documents after a reasonable search.

9.    Documents evidencing that the intended purpose of the Distributions was to pay taxes incurred by one or more of the Debtors.

**RESPONSE:**  Defendant objects that all documents regarding the purpose of the Distributions are in the possession, custody, and control of the Plaintiff.  Defendant directs the Plaintiff to exhibits in Little River's arbitration with BCBSTX including monthly financial statements and annual financial statements.  Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents after a reasonable search.

10.    Documents evidencing that you used the Distributions to pay taxes incurred by one or more of the Debtors.

**RESPONSE:**  Defendant objects that her personal tax obligations are not at issue in this Lawsuit.  Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents after a reasonable search.

11.    Documents evidencing any missed lease payments, bills, patient refunds, and/or any other obligations of any of the Debtors.

**RESPONSE:**  Defendant objects that responsive documents are in the possession, custody, and control of the Plaintiff.  Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents after a reasonable search.

12.    Documents evidencing any payments or Distributions (or the purposes of any such payments or Distributions) from any of the Debtors to you, Jeffrey Madison, Kevin Owens, or Ryan Downton.

**RESPONSE:**  Defendant objects that all documents regarding the purpose of any payments or the Distributions are in the possession, custody, and control of the Plaintiff.  Defendant directs the Plaintiff to Debtors' bank statements, meeting minutes, transactional documents, and financial statements.  Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents after a reasonable search.

13.    Documents evidencing your, Jeffrey Madison's, Kevin Owens', or Ryan Downton's use of any payments or Distributions from any of the Debtors for tax purposes or for any other purposes.

**RESPONSE:**  Defendant objects that her personal tax obligations are not at issue in this Lawsuit.  Defendant objects that use of the Distributions is neither relevant to any claims at issue in the Lawsuit, nor reasonably calculated to lead to admissible evidence.  Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents after a reasonable search.

14.    Documents evidencing any tax refunds sought or received related to the Distributions.

**RESPONSE:**  Defendant objects that her personal tax obligations are not at issue in this

Lawsuit.  Defendant objects that this request pertains to documents that are not relevant to any claims at issue in the Lawsuit, nor reasonably calculated to lead to admissible evidence.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **IN RE LITTLE RIVER HEALTHCARE HOLDINGS, LLC,** *et al.*, | § <br> § <br> § <br> § | **CASE NO. 18-60526-rbk** |
| **DEBTORS.** | § <br> § | **CHAPTER 7** |
| | § | |
| **JAMES STUDENSKY, CHAPTER 7 TRUSTEEE,** | § <br> § <br> § | |
| **PLAINTIFF,** | § <br> § | |
| **V.** | § <br> § | **ADV. PRO. NO. 20-06062-rbk** |
| | § | |
| **PEGGY S. BORGFELD, RYAN H. DOWNTON, JEFFREY P. MADISON, AND KEVIN J. OWENS,** | § <br> § <br> § <br> § | |
| **DEFENDANTS.** | § | |

### DEFENDANT JEFFREY P. MADISON'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

TO:    James Studensky, Chapter 7 Trustee ("Plaintiff"), by and through his counsel of record, Brian T. Cumings, Graves, Dougherty, Hearon & Moody, P.C., 401 Congress Avenue, Suite 2700, Austin, Texas 78701, and Joshua A. Romero, Jackson Walker LLP, 100 Congress Avenue, Suite 1100, Austin, Texas 78701.

COMES NOW Jeffrey P. Madison ("Madison" or "Defendant"), and pursuant to Federal Rules of Civil Procedure 26 and 34 and Federal Rules of Bankruptcy Procedure 7026 and 7034, submits his objections and responses to Plaintiff's First Request for Production of Documents to All Defendants.[1]

---

[1] These Objections and Responses also respond to Plaintiff's First Request for Production of Documents to Jeffrey P. Madison, propounded in Adv. Pro. No. 20-06089, which has been consolidated into the instant adversary proceeding.

Respectfully submitted,

**DUBOIS BRYANT & CAMPBELL, LLP**

By: */s/ Seth E. Meisel*
    Seth E. Meisel
    Texas Bar No. 24037089
    303 Colorado Street, Suite 2300
    Austin, Texas 78701
    Telephone: (512) 457-8000
    Email: smeisel@dbcllp.com

**ATTORNEYS FOR DEFENDANT
JEFFREY P. MADISON**

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of January 2021, a true and correct copy of the foregoing has been served via electronic delivery upon the following:

Brian T. Cumings
Graves Dougherty Hearon & Moody, PC
401 Congress Ave., Ste. 2700
Austin, TX 78701
bcumings@gdhm.com

Ryan Downton
Ryan Downton, PC
6300 Isla Verde Ave., Ste.907
Catalina, PR
Rdownton1@gmail.com

Joshua A. Romero
Jackson Walker, LLP
100 Congress Ave., Ste. 1100
Austin, TX 78701
jromero@jw.com

Marvin E. Sprouse, III
Sprouse Law Firm
901 Mopac Expwy. South, Bldg. 1, Ste. 300
Austin, TX 78746
msprouse@sprousepllc.com

Kevin J. Owens
209 Watersong Lane
Georgetown, TX 78628
Kocorral_99@yahoo.com

*/s/ Seth E. Meisel*
Seth E. Meisel

*Defendant Madison's Objections and Responses to
Plaintiff's First Request for Production of Documents*    *Page 2*
3319425.1

EXHIBIT F

Defendant responds to Plaintiff's First Request for Production to All Defendants as follows:

## PRELIMINARY STATEMENT

Defendant has not completed his investigation, has not completed his discovery in this action, and has not completed his preparation for a future hearing. The Objections and Responses contained herein, therefore, are based only upon Defendant's knowledge as of the date of these Objections and Responses and are given without prejudice to Defendant's right to produce information or evidence of any subsequently discovered facts or information. Defendant also reserves the right to supplement these Objections and Responses at a later date in accordance with the Federal Rules of Civil Procedure, any Scheduling Order, any subsequent Order issued in this case, applicable rule or law, and/or any stipulations between the parties.

This Preliminary Statement applies to and is incorporated into each and every objection and response to a Request for Production ("RFP"), whether or not expressly incorporated by reference in any individual objection and response to an RFP.

Nothing contained in these Objections and Responses is an admission regarding the relevance, materiality, or admissibility of any statement, position, document, and/or information. Defendant reserves the right to object to the use of any of the RFP response or documents produced, or any future responses or document and/or information to be produced hereunder, in any subsequent proceeding in, or the trial of, this or any other action.

Defendant's statement that he will produce responses, documents, or information in response to a particular RFP does not constitute an admission that any such response, documents, or information exist. Defendant will conduct a reasonable search of Defendant's files for purposes

*Defendant Madison's Objections and Responses to*
*Plaintiff's First Request for Production of Documents*                                      *Page 3*
3319425.1
EXHIBIT F

of Defendant's response to these RFPs and will produce responsive, non-privileged documents located after such reasonable search that are sufficient to respond to the RFP.

## **GENERAL OBJECTIONS**

The following General Objections are expressly incorporated into each of the specific Objections and Responses set forth below:

1.      Defendant generally objects to each and every RFP to the extent that it may be construed as calling for documents or information that are subject to a claim of the attorney-client privilege, the work product doctrine, or any other lawful privilege or immunity afforded by law. Such documents or information will not be provided in response to the RFPs, and any inadvertent disclosure of such documents or information shall not be deemed a waiver of any privilege or of protection for attorney work product.

2.      Defendant generally objects to each and every RFP, including Plaintiff's Definitions and Instructions, to the extent that it purports to impose upon Defendant any obligation other or greater than those required by the Federal Rules of Civil Procedure, or any Order entered by the Court.

3.      Defendant generally objects to each and every RFP to the extent that it seeks documents and/or information not in Defendant's possession, custody, or control, is not known to Defendant, and/or cannot be located by a reasonable search.

4.      Defendant generally objects to each and every RFP to the extent it is premature in that discovery is ongoing and information and documents that may be relevant have yet to be produced by Plaintiff and/or may be in the possession, custody, or control of a third party, and/or to the extent it calls for documents or information that may be the subject of expert opinion and testimony that is not required to be disclosed or exchanged at this stage in the Lawsuit.

*Defendant Madison's Objections and Responses to*
*Plaintiff's First Request for Production of Documents*                                          *Page 4*
3319425.1

EXHIBIT F

5.      Defendant generally objects to the RFPs to the extent they seek information not relevant to the claims or defenses of any party to this action and/or not proportional to the needs of the action.

6.      Defendant generally objects to the RFPs to the extent they are ambiguous, argumentative, misleading, overly broad, unduly burdensome, and/or vague.

7.      Defendant generally objects to the RFPs to the extent that responding to them would be oppressive, unnecessarily burdensome, unduly expensive, unreasonably cumulative, and/or duplicative.

8.      Defendant generally objects to the RFPs to the extent that they seek information already in the possession, custody, or control of Plaintiff.

9.      Defendant generally objects to the RFPs to the extent that they seek information and/or documents in the public domain or available to Plaintiff through alternative or less burdensome avenues, including sources equally available to Plaintiff as to Defendant.

10.     Defendant generally objects to the RFPs to the extent that they contain vague and undefined terms.

11.     Defendant generally objects to the following "Definitions" propounded by Plaintiff on the following grounds:

                a.   Defendant generally objects to Plaintiff's definition of "Document" or "Documents" as vague and ambiguous, overly broad, and unduly burdensome to the extent they purport to impose on Defendant a duty to respond greater than that permitted by the Federal Rules of Civil Procedure or any Order entered in this action.

*Defendant Madison's Objections and Responses to*
*Plaintiff's First Request for Production of Documents*                    *Page 5*
3319425.1

EXHIBIT F

b. Defendant generally objects to Plaintiff's definition of "evidencing," because it is overly broad, unduly burdensome, vague, and ambiguous, and because RFPs that incorporate these terms and phrases are not proportional to the needs of the case and not reasonably calculated to lead to the discovery of admissible evidence to the extent the documents and information sought are unlimited in subject matter and scope or of subject matter and scope that are not related to the Lawsuit and, as such, would encompass documents unrelated and with no connection to the Lawsuit. Defendant further objects to the extent they purport to impose on Defendant a duty to respond greater than that permitted by the Federal Rules of Civil Procedure or any Order entered in this action.

c. Defendant objects to Plaintiff's purported requirement "identify the location(s) in Debtor's electronic files where responsive documents are likely to be located" as Defendant has not been an officer of any Debtor in years and has no ability to review Debtors' electronic files or knowledge of how such files are organized.

d. Defendant objects to the definition of "Distributions" because not all payments made to Defendant were distributions.

12.     Defendant objects to the relevant time period as identified by Plaintiff. Plaintiff's claims begin with payments made in January 2016, so Defendant will produce documents from January 1, 2016 to the present unless otherwise indicated.

13.     Defendant objects to the production of any confidential documents until such time as an appropriate protective order is entered.

*Defendant Madison's Objections and Responses to*
*Plaintiff's First Request for Production of Documents*                                    *Page 6*
3319425.1

EXHIBIT F

## I.   DOCUMENTS REQUESTED

1.    A copy of all correspondence (including emails, text messages, instant messages, and any other form of communications) between or among any of: Peggy Borgfeld, Jeffrey Madison, Ryan Downton, or Kevin Owens, on the one hand, and, on the other hand: any officer of any Debtor, any physician, employee, and/or contractor of Debtors; or any other person (excluding your counsel), between January 1, 2015 to present regarding any of the following subjects:

    a.    the potential bankruptcy, solvency, or Insolvency of any of the Debtors;

    b.    any of the Distributions;

    c.    the payment of income taxes by Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens using any funds or proceeds, whether any constituted Distributions or not, from any of the Debtors;

    d.    the total liabilities (or any material individual liabilities) of any of the Debtors;

    e.    the total assets (or any material individual assets) of any of the Debtors;

    f.    Distributions, transfers, or payments to Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens by any of the Debtors for tax purposes;

    g.    the hiring or potential hiring of John Madison by any of the Debtors;

    h.    the pass through of any taxes by the Debtors to Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens;

    i.    any Distributions, payments, or transfers of money or assets from Debtors to Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens;

    j.    the prepayment review process imposed on any of the Debtors by Blue Cross and Blue Shield of Texas ("BCBSTX");

    k.    the renegotiation of contracts with BCBSTX in 2016;

    l.    cash flow issues with any of the Debtors;

    m.    the financial performance or financial health of any of the Debtors;

    n.    the growth or expansion strategy of any of the Debtors;

    o.    missed lease payments, bills, and other obligations of any of the Debtors;

    p.    the appropriateness, inappropriateness, legality, or impropriety of any payments, Distributions, or transfers of funds from any of the Debtors to Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens;

    q.    any pitch materials or the like related to any potential sale or other form of transaction with any other party and any of the Debtors;

    r.    the engagement of any consultants or other individuals or firms to provide restructuring or other like services to any of the Debtors;

    s.    demands or other like correspondence from vendors, suppliers, or other creditors for payment of outstanding amounts by any of the Debtors;

    t.    any agreement, whether executed or not, between Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens and any of the Debtors, including any agreement related to the employment of any of them in any capacity by any of the Debtors;

    u.    the amount of compensation to be paid to John Madison by any of the Debtors;

    v.    financial strategy related to the provision of laboratory and pathology services by Debtors;

*Defendant Madison's Objections and Responses to*
*Plaintiff's First Request for Production of Documents*                                          *Page 7*
3319425.1

EXHIBIT F

w.   all travel by Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens, including by private airplane, and hotel or lodging expenses related to the operations of Debtors;

x.   all tax planning work performed or tax advice received in connection with the Debtors; or

y.   all tax refunds sought or received in connection with any of the Distributions.

**RESPONSE:** Defendant objects to request "1(y)" because his personal tax returns are neither relevant to any claims at issue in the Lawsuit, nor reasonably calculated to lead to admissible evidence. Defendant further objects that the request is overbroad and unduly burdensome without reasonable limitation as to time. Defendant further objects that the request is unduly burdensome and that the Plaintiff has possession, custody, and control of all electronic communications in the Debtors' files between Defendant and any person with respect to all communications prior to Defendant's separation from Debtors.

Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents, if any, after a reasonable search.

2.   All meeting minutes in which any of the Distributions were discussed, analyzed, mentioned, approved, voted on, or disapproved.

**RESPONSE:**  Defendant objects that the Plaintiff has possession, custody, and control of all of the Debtors' meeting minutes. As Defendant was not responsible for retaining such minutes, he cannot direct the Plaintiff to their location. The minutes were maintained on the Debtors' servers by Carolyn Bryan and Andrea Rigali-Cunha. Defendant does not have possession, custody, or control over documents responsive to this request.

3.   All meeting minutes in which any payments, transfers, or Distributions from any of the Debtors to Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens were discussed, analyzed, mentioned, approved, voted on, or disapproved.

**RESPONSE:**  Defendant objects that the Plaintiff has possession, custody, and control of all of the Debtors' meeting minutes. As Defendant was not responsible for retaining such minutes, he cannot direct the Plaintiff to their location. The minutes were maintained on the Debtors' servers by Carolyn Bryan and Andrea Rigali-Cunha. Defendant does not have possession, custody, or control over documents responsive to this request.

4.   Documents evidencing any purported or intended purpose of each of the Distributions to Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens.

**RESPONSE:**  Defendant objects that the Plaintiff has possession, custody, and control of all documents regarding any transfers.  Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents, if any, after a reasonable search.

*Defendant Madison's Objections and Responses to*
*Plaintiff's First Request for Production of Documents*                                   *Page 8*
3319425.1
EXHIBIT F

5.   Documents evidencing how the Distributions were actually used.

**RESPONSE:**  Defendant objects that use of the Distributions is neither relevant to any claims at issue in the Lawsuit, nor reasonably calculated to lead to admissible evidence. Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents, if any, after a reasonable search.

6.   Documents evidencing what each of the Distributions was intended to be used for at the time it was made.

**RESPONSE:**  Defendant objects that the Plaintiff has possession, custody, and control of all documents regarding the intended purpose of any transfers.  Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents, if any, after a reasonable search.

7.   Documents evidencing the recipient's receipt of each of the Distributions.

**RESPONSE:**  Defendant will produce responsive documents after a reasonable search.

8.   Documents relating to the Insolvency of any of the Debtors.

**RESPONSE:**   Defendant objects that this request is vague and unreasonably broad. Defendant further objects that all documents regarding the Insolvency of Debtors are in the possession, custody, and control of the Plaintiff. Defendant directs the Plaintiff to exhibits in Little River's arbitration with BCBSTX, monthly financial statements, annual financial statements, daily deposit and cash reports, and valuations of any Debtor.

9.   Documents evidencing that the intended purpose of the Distributions was to pay taxes incurred by one or more of the Debtors.

**RESPONSE:**   Defendant objects that documents regarding the purpose of the Distributions are in the possession, custody, and control of the Plaintiff.  Defendant directs the Plaintiff to exhibits in Little River's arbitration with BCBSTX including monthly financial statements and annual financial statements.  Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents, if any, after a reasonable search.

10.   Documents evidencing that the Distributions were actually used to pay taxes incurred by one or more of the Debtors.

**RESPONSE:**  Defendant objects that his personal tax obligations are neither relevant to any claims at issue in the Lawsuit, nor reasonably calculated to lead to admissible evidence. Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents after a reasonable search.

11.   Documents evidencing any missed lease payments, bills, patient refunds, and/or any

*Defendant Madison's Objections and Responses to*
*Plaintiff's First Request for Production of Documents*                                    *Page 9*
3319425.1
EXHIBIT F

other obligations of any of the Debtors.

**RESPONSE:** Defendant objects that responsive documents are in the possession, custody, and control of the Plaintiff. Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents, if any, after a reasonable search.

12. Documents evidencing any payments or Distributions (or the purposes of any such payments or Distributions) from any of the Debtors to Peggy Borgfeld, Ryan Downton, Jeffrey Madison, or Kevin Owens.

**RESPONSE:** Defendant objects that all documents regarding the purpose of any payments or the Distributions are in the possession, custody, and control of the Plaintiff. Defendant directs the Plaintiff to Debtors' bank statements, meeting minutes, transactional documents, and financial statements. Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents after a reasonable search.

13. Documents evidencing Peggy Borgfeld's, Ryan Downton's, Jeffrey Madison's, or Kevin Owens' use of any payments or Distributions from any of the Debtors for tax purposes or for any other purposes.

**RESPONSE:** Defendant objects that his personal tax obligations are neither relevant to any claims at issue in the Lawsuit, nor reasonably calculated to lead to admissible evidence. Subject to and without waiver of the foregoing and general objections, Defendant will produce responsive documents after a reasonable search.

14. Documents evidencing any tax refunds sought or received related to the Distributions.

**RESPONSE:** Defendant objects that his personal tax obligations are neither relevant to any claims at issue in the Lawsuit, nor reasonably calculated to lead to admissible evidence.

*Defendant Madison's Objections and Responses to*
*Plaintiff's First Request for Production of Documents*                    *Page 10*
3319425.1

EXHIBIT F

| Direction | Remote party | To | From | Text | Time stamp (Device time -06:00) |
|---|---|---|---|---|---|
| Incoming | Todd Cook <+15125169179> | Peggy Borgfeld <+19798205548> | Todd Cook <+15125169179> | FROM JASON DEMATTIA: Hey man. We need to talk about labs. We have been having big problems with timely reports, not getting all labs requested, not receiving all reports but when we call we get complete reports, also need to have each result sent separately so we can match. Any updates on electronic reporting?? My employees are going to revolt if I cannot fix. Thanks | 7/28/2015 12:54:35 PM |
| Incoming | Robert O'neil <+14097812747> | Peggy Borgfeld <+19798205548> | Robert O'neil <+14097812747> | Peggy hope you and baby are doing well. Miss messing with you. Need a time that we can talk as the numbers for labs are off 200 to 300 per month. At first I thought it is you are behind , but now it shows closed out months. | 10/19/2015 10:20:42 AM |
| Incoming | Robert O'neil <+14097812747> | Peggy Borgfeld <+19798205548> | Robert O'neil <+14097812747> | Peggy is there a time we could talk. I know you are busy. | 10/19/2015 3:15:37 PM |
| Outgoing | Robert O'neil <+14097812747> | Robert O'neil <+14097812747> | Peggy Borgfeld <+19798205548> | Hey Robert. I am at airport. Can I call you late tonight. Lots of problems with lab billing. | 10/19/2015 3:16:26 PM |
| Incoming | Jeff Madison <+15125692078>, Ryan Downton <+15126807947> | Group: +15125692078, +15126807947 | Jeff Madison <+15125692078> | See the txt from Robert below. What is he talking about?<br><br>Talking to Magnuson at One. We have to do different on EEG on Bc Bs as everyone else in 20,000s and they are 3000.<br>We lose five grand every time<br>No we don't lose. We pay them 75% of collections up to 8,000 grand<br>Are you sure about the payment. | 11/12/2015 08:18:14 AM |
| Incoming | Jeff Madison <+15125692078>, Ryan Downton <+15126807947> | Group: +15125692078, +15126807947 | Ryan Downton <+15126807947> | Is he saying the supplier is losing money on BCBS? That seems unlikely to me. | 11/12/2015 10:29:45 AM |
| Incoming | Jeff Madison <+15125692078>, Ryan Downton <+15126807947> | Group: +15125692078, +15126807947 | Jeff Madison <+15125692078> | Me too!!!! | 11/12/2015 10:30:20 AM |
| Incoming | Jeff Madison <+15125692078>, Ryan Downton <+15126807947> | Group: +15125692078, +15126807947 | Jeff Madison <+15125692078> | Peggy? | 11/12/2015 10:30:23 AM |
| Incoming | Todd Cook <+15125169179> | Peggy Borgfeld <+19798205548> | Todd Cook <+15125169179> | Before we all end up bankrupt , can you add my bonus into the next check ;)). Gobble Gobble | 11/24/2015 2:17:37 PM |
| Outgoing | Todd Cook <+15125169179> | Todd Cook <+15125169179> | Peggy Borgfeld <+19798205548> | Did u get the current mangum email? Jeff has halted sending labs. | 3/7/2016 12:49:23 PM |
| Incoming | Todd Cook <+15125169179> | Peggy Borgfeld <+19798205548> | Todd Cook <+15125169179> | Yep, Is there a story I am missing? | 3/7/2016 12:50:36 PM |
| Outgoing | Todd Cook <+15125169179> | Todd Cook <+15125169179> | Peggy Borgfeld <+19798205548> | My fault for opening my mouth. And Paul quit in rockdLe | 3/7/2016 12:51:05 PM |
| Incoming | Jeff Madison <+15125692078>, Ryan Downton <+15126807947>, Todd Cook <+15125169179> | Group: +15125692078, +15126807947, +15125169179 | Todd Cook <+15125169179> | FROM SCOTT JACOBS: Not sure if it's true, but I was just told Integrity Hospital is being audited by BCBS. Rep said he was told that all commissions will be on slow pay or no pay until audit is complete. Let's go take their accounts!!!! | 4/22/2016 9:20:04 AM |
| Incoming | Jeff Madison <+15125692078>, Ryan Downton <+15126807947>, Todd Cook <+15125169179> | Group: +15125692078, +15126807947, +15125169179 | Jeff Madison <+15125692078> | Perfect | 4/22/2016 10:04:33 AM |
| Incoming | Jeff Madison <+15125692078>, Ryan Downton <+15126807947>, Todd Cook <+15125169179> | Group: +15125692078, +15126807947, +15125169179 | Jeff Madison <+15125692078> | Hell yeah | 4/22/2016 10:04:38 AM |
| Outgoing | Jeff Madison <+15125692078>, Ryan Downton <+15126807947>, Todd Cook <+15125169179> | Group: +15125692078, +15126807947, +15125169179 | Peggy Borgfeld <+19798205548> | Yup. Chris is going to the bank. | 4/22/2016 10:05:23 AM |
| Outgoing | Todd Cook <+15125169179> | Todd Cook <+15125169179> | Peggy Borgfeld <+19798205548> | We can turn bcbs labs back on with marketers if you haven't done so already. | 8/30/2016 8:57:20 PM |
| Incoming | Todd Cook <+15125169179> | Peggy Borgfeld <+19798205548> | Todd Cook <+15125169179> | Cool, I will speak to Brandon | 8/31/2016 4:33:40 AM |
| Incoming | Todd Cook <+15125169179> | Peggy Borgfeld <+19798205548> | Todd Cook <+15125169179> | CPL & BCBS, let them CONTINUE btLL patients or go back to LRH | 8/31/2016 7:15:20 AM |

EXHIBIT G